**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

STONEX GROUP INC. and STONEX
FINANCIAL INC.,

                    Plaintiffs,         Case No. _____

      - against -

HOWARD SHIPMAN,

                   Defendant.

---

## COMPLAINT

Plaintiffs StoneX Group, Inc. and StoneX Financial, Inc. ("StoneX" or the "Company"), by their undersigned attorneys, for their Complaint against Howard Shipman ("Shipman"), alleges as follows:

### NATURE OF THE ACTION

1.    This is an action for theft of StoneX's trade secrets and other confidential and proprietary information.

2.    StoneX Group Inc. is a publicly traded financial services organization, which is listed on the NASDAQ stock exchange as SNEX.

3.    StoneX Financial Inc. is StoneX Group Inc.'s broker-dealer entity, registered with the Financial Industry Regulatory Authority ("FINRA").

4.    Shipman was the Co-Head of Quantitative Strategies within StoneX Financial Inc.'s Principal Equities Group (the "Quant Group") until his termination on December 9, 2022.

5.      Immediately after StoneX terminated Defendant's employment, effective immediately, Defendant extracted of 87 megabytes ("MBs") of data from StoneX's server, and he then tried to hide his tracks by clearing his conduct history in the server.

6.      In addition, in the period following Shipman's termination, StoneX's forensic analytics team discovered, among other things, that Shipman connected two external hard drives to his StoneX laptop after his termination to transfer StoneX documents onto the hard drives, and he deleted his virtual workspace from his StoneX laptop where he performed projects and coding work for StoneX.

7.      The immediate purpose of this lawsuit is to secure temporary and preliminary injunctive relief (i) to prevent further misappropriation and potential use of StoneX's trade secrets and confidential information; (ii) to secure StoneX's trade secrets and other potentially relevant evidence that Shipman could disseminate to third parties; and (iii) to evaluate the extent of harm suffered by StoneX thus far, and mitigate and prevent and future harm that Shipman poses through his continued possession of StoneX's confidential information.

## THE PARTIES

8.      StoneX Group, Inc. is an international publically traded financial services organization with its principal place of business at 230 Park Avenue, 10th Floor, New York, NY 10169.

9.      StoneX Financial, Inc. is a FINRA-registered broker-dealer firm with its principal place of business at 329 Park Avenue North, Suite 350, Winter Park, Florida 32789.

10.      Shipman is a Connecticut resident. From February 2021 until December 9, 2022, he was employed by StoneX as a Managing Director in the Principal Equities Development Group.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*. and under the Computer Fraud Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(c).

12.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the New York law claims in this action.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district. Further, Shipman's Employment Agreement (the "Agreement") with StoneX, dated February 26, 2021, provides the Borough of Manhattan, New York City, New York as the jurisdiction for actions or proceedings arising out the Agreement, including the actions present here.

## FACTS

### StoneX's Business and the Quant Group

14.     StoneX's Quant Group was established in 2021 when the Company hired Defendant and two other developers.

15.     Defendant was the Co-Head of Quantitative Strategies along with Evan Pfeuffer, a group that focuses on analytical research within the Quant Group until his termination on December 9, 2022.

16.     Since its inception, the Quant Group has made significant investments in technology, and data subscriptions, to develop new capabilities for the Company.

17.     These projects included:

   a.  Project "Pascal" – An internally developed National Market System ("NMS") electronic market-making software, designed to provide liquidity in NMS securities.

3

    i.   Pascal was developed during 2021 and became operational in 2022.

    ii.   As described in greater detail herein, ████████████ ████████████████████████████████████ ████████████████████████████ .

    iii.   StoneX invested in equipment, staff, leased co-location spaces, lines, and market data to support this endeavor. It invested millions of dollars to develop this trading system.

    iv.   Pascal became operational in 2022 and generated substantial revenue in 2022.

  b.   Project "Darwin" – A separately developed ██████████████ ████████████████████████████████████ ██████

    i.   Darwin was proposed and approved in early 2022. While Shipman was the lead developer for the program, its foundational operations relied ████████████████████████████████████ ████████████ .

    ii.   While still in the development stage, StoneX has already committed several million dollars towards the necessary hardware, data centers, and information necessary for Darwin's future operation.

**Howard Shipman Joins StoneX**

18.    Defendant Howard Shipman joined StoneX on February 8, 2021 as a Managing Director. He worked remotely from his home in Connecticut during the entirety of his employment.

19.     Shipman is a registered person with FINRA.

20.     The Company provided Shipman with a company-owned laptop to perform his work for StoneX.

21.     Shipman signed an Employment Agreement with StoneX on February 26, 2021.  A true and correct copy of Shipman's Employment Agreement is attached to the Johnson Declaration as Exhibit 1.

22.     Shipman's Employment Agreement included the following contractual agreements and obligations:

> Employee shall at all times perform Employee's duties faithfully and diligently and in compliance with all applicable laws, regulations, Employer written policies, and manuals provided to Employee, and any direction from Employer or from Employer's governing Board. . . . Employee also shall comply with all Employer and the Company's policies respecting ethics, trading in StoneX Group Inc. stock, and all applicable rules and regulations of the Securities and Exchange Commission. Employee shall become familiar with and shall abide by the terms of Employer's Policies, Procedures, and or Compliance Manual . . . .

(Johnson Decl. Exh. 1 at ¶ 4).

> In the event Employee's employment with the Company terminates for any reason, Employee agrees to deliver immediately to the Company all copies of materials of any nature containing any Confidential Information or otherwise regarding the Company or any customer of the Company, and Employee agrees not to take with him/her any such materials or reproductions thereof.

(Johnson Decl. Exh. 1 at ¶ 7.3(ii)).

> Employee acknowledges that the services to be rendered by Employee are unique and personal. Accordingly, Employee may not assign any of Employee's rights or delegate any of Employee's duties or obligations under this Agreement. The rights and obligations of Employer under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of Employer.

(Johnson Decl. Exh. 1 at ¶ 13).

23.    On February 8, 2021, his first day of employment with StoneX, Shipman acknowledged and agreed to comply with the StoneX U.S. Employee Handbook dated January 2020. (Johnson Decl., Exh. 2).

24.    The StoneX U.S. Employee Handbook includes a "Confidential Company Information" provision, which states:

> The Company's confidential and proprietary information is vital to its current operations and future success. Each employee should use all reasonable care to protect or otherwise prevent the unauthorized disclosure of such information.
>
> In no event should employees disclose or reveal confidential information within or outside the Company without proper authorization or purpose. Inappropriate disclosure of confidential information may result in disciplinary action up to and including termination.
> "Confidential Information" refers to a piece of information, or a compilation of information, in any form (on paper, in an electronic file, or otherwise), related to the Company's business that the Company has not made public or authorized to be made public, and that is not generally known to the public through proper means.
>
> By way of example, confidential or proprietary information includes, but is not limited to, nonpublic information regarding the Company's business methods and plans, databases, systems, technology, intellectual property, know-how, marketing plans, business development, products, services, research, development, inventions, financial statements, financial projections, financing methods, pricing strategies, customer sources, employee health/medical records, system designs, customer lists and methods of competing.
> . . .
>
> The Company's customers and suppliers entrust the Company with important information relating to their businesses. The nature of this relationship requires maintenance of confidentiality. In safeguarding the information received, the Company earns the respect and further trust of its customers and suppliers.

(Johnson Decl., Exh. 2 at pp. 28-29).

25.    During his employment, Shipman initially reported to Thomas Moore, the Managing Director and Head of Equity Trading. In or around October 2022 until his termination, Shipman reported to Christopher Amato in his position as Managing Director, Principal Equities Development.

6

### StoneX's Computer Network Architecture and Systems

26.    To build and maintain its programs for StoneX, the Quant Group utilizes a number of physical and cloud-based technology resources to perform its work for StoneX. Among these resources are computers, physical servers, and cloud based servers.

27.    The Company provided Defendant with a company-owned laptop to perform his work for StoneX.

28.    Shipman also used Microsoft Azure cloud servers to conduct his work on behalf of StoneX. A "cloud" based server, such as Azure, does not physically sit in StoneX's facilities. Rather, it is housed and maintained by a third-party provider, which, in the case of Azure, is Microsoft. In turn, Microsoft bills StoneX for its use of the Azure cloud servers.

29.    Authorized StoneX users are able to access the Azure servers from any location, provided they are logged in to StoneX's secure environment.

30.    The Quant Group utilized certain Azure servers that were dedicated to their projects (collectively the "Pascal Azure servers"). There were various servers, one of which was named Corvo-004.

31.    Shipman had "administrator" privileges on the Pascal Azure servers, including Corvo-004. This meant that he was the highest-ranking user of the server, and could create, delete, and change the access, controls and privileges of the server and the account. The only action he could not undertake was to grant "administrator" privileges to someone else on the Azure API subscription. These high-level privileges were (a) requested by Shipman, and (b) as represented by Shipman to StoneX, necessary for him to perform his work for StoneX.

32.    To access the Pascal Azure servers, Shipman used the local username "pianoman." Due to his administrator level of access, he also was able to access a permissions escalated user

account on said Azure servers, named "root". Once logged in as pianoman, Shipman could switch between the two accounts (pianoman and root) at his own discretion.

33.     In the time since Defendant's termination, Stonex has uncovered evidence that strongly suggests that Defendant used non-StoneX owned or approved computers, servers, and personal devices, such as his personal computer, a personally licensed Linode cloud server, and other non-StoneX devices to perform his computer-code development work for StoneX.

34.     Further, StoneX has also learned that Shipman accessed the Quant Group's Pascal Azure servers and issued commands via secure shell ("SSH") tunnels, which is a method of directly connecting to servers via an encrypted connection with a local account. In this way, Shipman maintained a connection to StoneX's systems for a small window of time (roughly one hour) after he was terminated by StoneX. He leveraged this brief access to issue commands in the Pascal Azure servers post termination. Shipman remained connected to StoneX's Pascal Azure server under the pianoman user account, which showed significant egress traffic post termination.

**StoneX Data Protection and Information Security Efforts**

35.     Because of the highly confidential and valuable nature of StoneX's business information, and in accordance with the compliance obligations imposed on StoneX by financial regulators in multiple jurisdictions across the globe, the Company utilizes many different layers and forms of information security.

36.     Upon starting any company-owned StoneX laptop, the laptop prompts the user with the following:

> *Attention – Please Read! This computer is for StoneX business use. In line with information security, policy, all system use, including e-mail, Internet, and intranet use may be monitored to guard against unauthorized or inappropriate use. Use of*

*this system constitutes, consent to monitoring, in accordance with local laws.*

*Unauthorized use may result in reprimand, financial penalties, and/or legal action.*

The user must then accept this statement by clicking "ok" before logging in.

37.     StoneX employees are required to follow StoneX's Acceptable Use Policy ("AUP") and Acceptable Use of IT Facilities Policy ("AUFP"). These policies are readily available to all StoneX employees on the corporate intranet. (*See* Wareman Decl., Exh.s 1 and 2).

38.     The AUP details StoneX's expectations regarding employee protection of StoneX's data, information, systems, networks and computers. It includes requirements to ensure information security, such as: (a) prohibiting unauthorized access to accounts (including stealing or misusing a password), programs and/or data, (b) requiring that StoneX's proprietary information stored on electronic and computing devices whether owned or leased by StoneX, the employee or a third party, remains the sole property of StoneX, (c) requiring that data owned, processed or held by the Company, must be protected in accordance with data protection standards, and (d) disclosing that the Company may log all forms of employee IT use and communications, and that the Company reserves the right to monitor computer equipment, systems and network traffic.

39.     Section 1.0 of the AUP provides that computer equipment, software, operating systems, storage media, network accounts providing electronic mail, internet browsing, and FTP remain the property of StoneX.

40.     Section 3.5 of the AUP maintains that accessing data, a server or an account for any purposes other than conducting StoneX business is prohibited.

41.     Section 3.8 of the AUFP provides StoneX's Exit Procedures, which states:

Upon leaving the Company it is expected that users:

- Promptly return all Company IT equipment in reasonable working condition.
- Do not delete any data which belongs to the Company.

- Transfer any data which may be needed by the Company to an appropriate server or colleague prior to departure.
- Ensure any of their own data that they wish to keep is removed from the Company's systems, as they will not be entitled to access this once they leave.
- Review and conform to any other procedures set out by the Company in relation to departure.

42.     In addition to Company policies, StoneX Group Inc. employs approximately 80 individuals globally to ensure the Company's cyber security. These employees operate via various teams, including Identity & Access Management, Cybersecurity/Security Operations, IT Governance, Risk & Compliance, Third Party Vendor Risk and Business Resiliency. All teams report to the Chief Information Officer.

43.     StoneX also employs a stand-alone internal audit team, which exists outside of StoneX's cyber security group and reports directly to StoneX's executive committee. Among other things, this team conducts independent audits of StoneX's cyber security systems.

44.     Further, StoneX performs regular third-party penetration testing to ensure the security of its network.

45.     StoneX ensures employee desktops, laptops, mobile devices, servers, and databases are initially configured to meet the Company's cyber security requirements.

46.     To log on to StoneX's network, employees can utilize a virtual private network ("VPN"), which is an online portal used to access StoneX's network, or connect directly from one of StoneX's physical offices using an authorized device. VPN login requires a username, password, multi-factor verification and an authorized StoneX device. Access to StoneX's network from within a StoneX office requires the use of a username, password and authorized StoneX device.

47.     StoneX also uses best-in-class endpoint detection and response ("EDR") tools to detect and investigate threats to its network. It also utilizes malware and virus detection/prevention

tools, and works with third-party providers, such as Microsoft and Crowdstrike, to further monitor and protect its network.

48.     Across its entire network, StoneX utilizes the 'least privilege' principle, which means that StoneX employees only have access to the data or information that they need to perform their job.

49.     StoneX's confidential information is heavily guarded. In addition to all of the other security measures in place throughout StoneX's network, the Company utilizes additional monitoring, vulnerability management and remediation programs to ensure the protection of this information.

50.     Upon information and belief, Shipman was fully aware of StoneX's cyber security policies and procedures.

51.     Between September 2021 and March 2022 StoneX's Cyber Security Architect Frank McGovern and Michael Glatz, Manager of Security Engineering, spent hours speaking directly with Shipman about the various rules and regulations of cyber security compliance that were applicable to him and his team, including sharing copies of policies applicable to the environment.

52.     In addition, Vito Demonte, Associate Director of IT Governance Risk and Compliance, also shared ten separate StoneX's policies about network management, password management, change management, privileged access management, audit, control, access control and encryption with Shipman.

**Development of Pascal**

53.     Project "Pascal" is StoneX's new NMS electronic market making project, and the computer code for Pascal is a highly valuable piece of proprietary software. It is classified by StoneX as confidential information.

54.     The Pascal code comprises three main code libraries, named: "Alabama," "Texas," and "Tampa." At a high level:



55.     These components that make up Pascal are stored in a code "repository," which is an archive of computer source code, stored on servers (cloud or physical).

56.     The source code itself is not used to operationally run Pascal, instead a "compiled" executable version of the source code is created and used in daily operations. For example, when an individual buys a copy of Microsoft Word and installs it on their system, they have an operational copy of the program, but they do not have the underlying source code for Microsoft Word. Microsoft retains the source code so that it retains exclusive control over the program. If Microsoft provided individual users with the source code, anyone with a copy could replicate and distribute it without Microsoft's control.

57.     Shipman was the developer of Texas.

58.     Pascal's computer code was written on StoneX's Pascal Azure servers, ███

████████████████████████████████████████████████████████████

███████████████████████████████

### **Development of Darwin**

59.     Following completion of the operational code for Pascal, StoneX began development of Darwin in early 2022.

60.     Darwin was designed to ████████████████████████████████

███████████████████████████████. All of the computer code for Darwin was intended to be – and was in fact – developed by StoneX employees.

61.     ████████████████████████████████████████████

████████████████████████████

62.     Darwin was to be developed (*i.e.,* the code should have been written and stored) on the StoneX Pascal Azure servers in accordance with StoneX's policies.

63.     On or about January 27, 2022 Shipman presented project Darwin for approval in a meeting with Thomas Moore and Jake Rappaport, which Pfeuffer attended.

64.     Subsequent to this presentation, Shipman's supervisor, Thomas Moore, approved project Darwin.

65.     The first experimental trades using Darwin occurred on or about February 2022.

66.     ████████████████████████████████████████████

██████████████████████████████████

67.     Darwin █████████████ is the analytical "brains" of the code that utilized

███████████████████

13

68.     The development of "Darwin" had advanced significantly enough that on December 9, 2022, Shipman's termination date, he provided a virtual presentation of Darwin to the current Quant Team. In that presentation, Shipman:

    a.  Demonstrated Darwin's operation in a test environment,

    b.  Presented portions of Darwin's source code,

    c.  Edited, compiled and re-ran portions of the source code to demonstrate its use and specific features including the design, editing and running of a new calculator, and

    d.  Stated that he would be sharing the source code with the rest of the team later that day or Monday, December 12, 2022.

69.     Subsequent to Shipman's termination and after investigation and discussions with other members of the Quant Team, StoneX has been unable to locate a copy of the Darwin source code as presented on December 9th on any of the Azure servers or any of StoneX's systems or repositories.

70.     Upon information and belief, Shipman did not share a copy of the Darwin source code with anyone at StoneX. He promised Pfeuffer on multiple occasions that he would share the Darwin code with him, but as of his termination he did not.

**StoneX Terminated Shipman on December 9, 2022**

71.     StoneX terminated Shipman's employment on December 9, 2022.

72.     StoneX management directed IT to begin terminating Shipman's authorized StoneX's account at approximately 3:09pm CST on December 9, 2022.

73.     StoneX's Front Office Management Team and Anne Johnson (Global HR Business Partner) contacted Shipman twenty minutes later to advise that he was being terminated effective

immediately via a telephone call at approximately 3:30pm CST on December 9, 2022. The call lasted approximately 10 minutes.

74.     StoneX's security team coordinated to terminate Shipman's access to its systems and network – before Shipman was notified of his termination. However, unbeknownst to StoneX, Shipman's pre-existing connection to the Pascal Azure servers from his Linode server allowed him to remain on the network until logging off.

75.     Specifically, on December 9, 2022, Shipman logged into the Pascal Azure servers from his Linode server, rather than his StoneX issued laptop, at roughly 8:58am CST. The IP address for this non-StoneX Linode cloud server – which upon information and belief, is Shipman's personal cloud server – is ▮▮▮▮▮▮ ("Shipman's IP Address").

76.     This is evidenced through authentication logs utilizing a private key that only Shipman possessed.

```
{
    "▮▮▮▮▮▮▮▮",
    "status": "success",
    "continent": "North America",
    "continentCode": "NA",
    "country": "United States",
    "countryCode": "US",
    "region": "NJ",
    "regionName": "New Jersey",
    "city": "Cedar Knolls",
    "district": "",
    "zip": "07927",
    "lat": 40.8229,
    "lon": -74.4592,
    "timezone": "America/New_York",
    "offset": -18000,
    "currency": "USD",
    "isp": "Linode, LLC",
    "org": "Linode",
    "as": "AS63949 Akamai Technologies, Inc.",
    "asname": "AKAMAI-AP",
    "mobile": false,
    "proxy": false,
    "hosting": true
}
```

```
 1  corvo-004/var/log/auth.log.1:Dec   9 09:58:25 corvo-004 sshd[27230]: pam_unix(sshd:session): session opened for user pianoman by (uid=0)
 2  corvo-004/var/log/auth.log.1:Dec   9 09:58:25 corvo-004 systemd-logind[1404]: New session 33761 of user pianoman.
 3  corvo-004/var/log/auth.log.1:Dec   9 09:59:30 corvo-004 sshd[26440]: Accepted publickey for pianoman from 69.144.213.40 port 41620 ssh2: RSA SHA256:XIno828dFWtaxKSz3/dc3NV1D10oF1sW72TLjC23fWQ
 4  corvo-004/var/log/auth.log.1:Dec   9 09:59:30 corvo-004 sshd[26440]: pam_unix(sshd:session): session closed for user pianoman.
 5  corvo-004/var/log/auth.log.1:Dec   9 09:59:30 corvo-004 systemd-logind[1404]: New session 33762 of user pianoman.
 6  corvo-004/var/log/auth.log.1:Dec   9 10:01:36 corvo-004 sshd[31060]: Accepted publickey for pianoman from 69.144.213.40 port 41622 ssh2: RSA SHA256:XIno828dFWtaxKSz3/dc3NV1D10oF1sW72TLjC23fWQ
 7  corvo-004/var/log/auth.log.1:Dec   9 10:01:36 corvo-004 sshd[26069]: pam_unix(sshd:session): session closed for user pianoman.
 8  corvo-004/var/log/auth.log.1:Dec   9 10:01:36 corvo-004 systemd-logind[1404]: New session 33765 of user pianoman.
 9  corvo-004/var/log/auth.log.1:Dec   9 10:07:59 corvo-004 sshd[31950]: Disconnected from user pianoman 69.144.213.40 port 41622
10  corvo-004/var/log/auth.log.1:Dec   9 10:08:01 corvo-004 sshd[31060]: pam_unix(sshd:session): session closed for user pianoman
11  corvo-004/var/log/auth.log.1:Dec   9 10:08:01 corvo-004 sshd[40946]: Accepted publickey for pianoman from 69.144.213.40 port 41624 ssh2: RSA SHA256:XIno828dFWtaxKSz3/dc3NV1D10oF1sW72TLjC23fWQ
12  corvo-004/var/log/auth.log.1:Dec   9 10:08:01 corvo-004 sshd[40946]: pam_unix(sshd:session): session opened for user pianoman.
13  corvo-004/var/log/auth.log.1:Dec   9 10:08:01 corvo-004 systemd-logind[1404]: New session 33768 of user pianoman.
14  corvo-004/var/log/auth.log.1:Dec   9 15:31:43 corvo-004 sshd[41076]: Disconnected from user pianoman 69.144.213.40 port 41624
15  corvo-004/var/log/auth.log.1:Dec   9 15:31:43 corvo-004 sshd[40946]: pam_unix(sshd:session): session closed for user pianoman
16  corvo-004/var/log/auth.log.1:Dec   9 15:37:47 corvo-004 sshd[38007]: Accepted publickey for pianoman from 69.144.213.40 port 41628 ssh2: RSA SHA256:XIno828dFWtaxKSz3/dc3NV1D10oF1sW72TLjC23fWQ
17  corvo-004/var/log/auth.log.1:Dec   9 15:37:47 corvo-004 sshd[38007]: pam_unix(sshd:session): session opened for user pianoman by (uid=0)
18  corvo-004/var/log/auth.log.1:Dec   9 15:37:47 corvo-004 systemd-logind[1404]: New session 33091 of user pianoman.
19  corvo-004/var/log/auth.log.1:Dec   9 15:42:34 corvo-004 sshd[38010]: Disconnected from user pianoman 69.144.213.40 port 41628
20  corvo-004/var/log/auth.log.1:Dec   9 15:42:34 corvo-004 sshd[38007]: pam_unix(sshd:session): session closed for user pianoman
21  corvo-004/var/log/auth.log.1:Dec   9 15:49:01 corvo-004 sshd[40349]: Accepted publickey for pianoman from 69.144.213.40 port 41630 ssh2: RSA SHA256:XIno828dFWtaxKSz3/dc3NV1D10oF1sW72TLjC23fWQ
22  corvo-004/var/log/auth.log.1:Dec   9 15:49:01 corvo-004 sshd[40349]: pam_unix(sshd:session): session opened for user pianoman by (uid=0)
23  corvo-004/var/log/auth.log.1:Dec   9 15:49:01 corvo-004 systemd-logind[1404]: New session 33096 of user pianoman.
24  corvo-004/var/log/auth.log.1:Dec   9 16:47:39 corvo-004 sudo: pianoman : TTY=pts/5 ; PWD=/mnt/data1/projects ; USER=root ; COMMAND=/usr/bin/su -l
25  corvo-004/var/log/auth.log.1:Dec   9 16:47:39 corvo-004 sudo: pam_unix(sudo:session): session opened for user root by pianoman(uid=0)
26  corvo-004/var/log/auth.log.1:Dec   9 16:47:39 corvo-004 su: (to root) pianoman on pts/5
27  corvo-004/var/log/auth.log.1:Dec   9 16:47:39 corvo-004 su: pam_unix(su-l:session): session opened for user root by pianoman(uid=0)
28  corvo-004/var/log/auth.log.1:Dec   9 16:48:18 corvo-004 sshd[20721]: Disconnected from user pianoman 69.144.213.40 port 41620
29  corvo-004/var/log/auth.log.1:Dec   9 16:48:18 corvo-004 sshd[26440]: pam_unix(sshd:session): session closed for user pianoman
30  corvo-004/var/log/auth.log.1:Dec   9 16:48:30 corvo-004 sshd[40344]: Disconnected from user pianoman 69.144.213.40 port 41630
31  corvo-004/var/log/auth.log.1:Dec   9 16:48:30 corvo-004 sshd[40349]: pam_unix(sshd:session): session closed for user pianoman
```

77.  As discussed further below, Shipman remained logged into the Pascal Azure servers until 4:45pm CST that evening, a period that included nearly 75 minutes after he was terminated at 3:30pm CST.

78.  Shipman – via his "pianoman" username – was the only individual logged into the Pascal Azure servers between 3:00pm and 4:45pm CST.

**Shipman Steals StoneX Code and Tries to Cover His Tracks**

79.  After his termination, Shipman maintained his connection via Shipman's IP Address. Even though he was by this point an ex-StoneX employee with no authorized access to StoneX data, he continued not only to access that data, he manipulated and egressed StoneX's intellectual property.

80.  Between 3:30pm and 4:45pm CST, post-termination, Shipman used his access to StoneX's systems to execute an unknown number of commands, deletions, and/or other actions, culminating in his extraction of 87 megabytes ("MBs") of data from StoneX's server. 87MBs is slightly larger than the Pascal repository (roughly 70MBs) that was archived on the Pascal Azure servers at the time of the data egress.

81.     Also between 3:30pm and 4:45pm CST, Shipman deleted the server "bash history" from November 7, 2022 onwards. The "bash history" is a log of all prior coding commands utilized on a server that would reveal all of his actions.

82.     Without the bash histories, StoneX is unable to determine (a) exactly what was included in the 87MBs that Shipman egressed, and (b) where it was sent. However, StoneX is working with a forensics firm to investigate this and other questions.

83.     Immutable independent logs obtained from Microsoft, which Shipman was unable to delete, confirm that 87 MBs of data was egressed from the Pascal Azure servers during this period.



84.     Following the egress of data, Shipman (logged in as "pianoman") deleted his account's server bash history from the Pascal Azure server named Corvo-004 at approximately 4:05pm CST.

17

85.     Shortly after deleting his "pianoman" history, Shipman switched from his "pianoman" account to the Administrator level "root" account. Only Shipman, with his Administrator access, could have switched their account username from "pianoman" to "root."

86.     Thereafter, Shipman deleted the bash command history associated with the administrator level "root" account at 4:13pm CST eliminating the record of commands associated with this account as well as his personal pianoman account.

87.     The StoneX information security team was alerted to this activity as two security alerts were raised after Shipman's termination for history files being cleared by the account "pianoman" and "root" at 4:05pm CST and 4:13pm CST.





88.     After Shipman's termination, StoneX located a folder in the Pascal Azure servers named "Darwin," but it was empty. StoneX has been unable to find a copy of the Darwin source code anywhere else.

89.     Additionally, after Shipman's termination at 3:30pm CST and final logoff of his login from his Linode server at approximately 4:45pm CST on December 9, 2022, Shipman made additional unsuccessful attempts to access StoneX's network that evening and throughout the weekend.

**Forensic Work on Shipman's Laptop**

90.     StoneX's outside counsel, Proskauer Rose LLP, hired Charles River Associates ("CRA") to perform forensic examinations of StoneX's computer systems, and Shipman's StoneX laptop.

91.     CRA was retained on or about December 27, 2022.

92.     Due to the delay by Shipman in returning his StoneX laptop, CRA only received the laptop during the day on January 3, 2022.

93.     To date, StoneX has spent more than $5,000.00 in order to (a) respond to Shipman's conduct and (b) pay CRA to conduct its damage assessment of the data taken from Shipman's computer.

94.     CRA's forensic investigation of StoneX computers and systems is ongoing, but to date, CRA has done the following:

    a.   On January 2, 2023, CRA collected from StoneX computer system logs and records associated with Shipman that are more specifically described below.

    b.   On January 3, 2023, CRA received Shipman's StoneX laptop. CRA was informed that the laptop was owned by StoneX, assigned to Shipman, and was shipped to CRA by counsel representing Shipman. The laptop was a Dell Precision 7540 with serial number FCL0833 ("Shipman's Laptop").

    c.   On January 4, 2023, CRA received a copy of a StoneX virtual computer (server) named Corvo-004. The virtual computer was hosted within a Microsoft Azure cloud environment operated by StoneX.

    d.   CRA used forensic software to examine the collected forensic evidence. Forensic software is used to search for and recover files and folders, identify and interpret artifacts that show computer and user activity, and other computer investigative tasks.

95.     As a result of CRA's investigation to date, CRA determined the following events occurred after Shipman was notified that his employment was terminated.

96.     On December 9, 2022 at 3:03pm CST, StoneX disabled Shipman's Microsoft Windows user account due to Shipman's termination. Shipman was still able to access StoneX's Microsoft Azure environment despite his account being disabled because Shipman configured this

environment to be accessible through network connections and local accounts that were under Shipman's control. Furthermore, disabling Shipman's Microsoft Windows user account did not prevent Shipman from accessing Shipman's Laptop, likely because Shipman's Laptop was not connected to StoneX's network. Because of this, Shipman was able to access StoneX's Microsoft Azure environment and his laptop after his termination.

97.     On December 9, 2022 at 4:05pm CST, a Microsoft Azure Defender security alert reported that the "bash_history" for the "pianoman" account on the Corvo-004 server was deleted. Additionally, based on a VIM text editor program log file, user folders under the pianoman account, including Desktop, Downloads, and Documents, were deleted on December 9, 2022 around 4:14pm CST.

98.     Clearing the bash_history and deleting the Desktop, Downloads, Documents and other folders destroyed data on the Corvo-004 server. More specifically, clearing bash_history obfuscated any commands Shipman may have issued on Corvo-004 using the pianoman or root accounts. If Shipman issued commands to access other cloud computers or StoneX source code, these commands were destroyed.

99.     On December 10, 2022 at 10:55:15am CST, a SanDisk drive was connected to Shipman's Laptop.  Shipman's Laptop assigned the SanDisk drive a device name of "SanDisk Cruzer Glide USB Device" and an internal serial number of "20042605701683737105". The storage volume on the SanDisk drive was named "UBUNTU-SERV".

100.     On December 13, 2022 at 11:47:47pm CST, the SanDisk drive was connected to Shipman's Laptop.  At 11:49:54pm CST, a "D:\StoneX Docs" folder was created on the SanDisk drive. Between 11:50:34pm and 11:51:31pm CST, the following folders were created on the SanDisk drive within the StoneX Docs folder:

| Timestamp CT | Event | Path |
|---|---|---|
| 12/13/22 11:50:34 PM | Created | D:\StoneX Docs\SIP |
| 12/13/22 11:50:35 PM | Created | D:\StoneX Docs\Travel |
| 12/13/22 11:50:35 PM | Created | D:\StoneX Docs\Texas |
| 12/13/22 11:50:45 PM | Created | D:\StoneX Docs\Baml |
| 12/13/22 11:50:46 PM | Created | D:\StoneX Docs\Budget |
| 12/13/22 11:50:47 PM | Created | D:\StoneX Docs\Darwin |
| 12/13/22 11:50:47 PM | Created | D:\StoneX Docs\Custom Office Templates |
| 12/13/22 11:50:47 PM | Created | D:\StoneX Docs\Candidates |
| 12/13/22 11:51:01 PM | Created | D:\StoneX Docs\HPC |
| 12/13/22 11:51:01 PM | Created | D:\StoneX Docs\Data |
| 12/13/22 11:51:02 PM | Created | D:\StoneX Docs\OnixS |
| 12/13/22 11:51:02 PM | Created | D:\StoneX Docs\OneNote Notebooks |
| 12/13/22 11:51:30 PM | Created | D:\StoneX Docs\Research |
| 12/13/22 11:51:30 PM | Created | D:\StoneX Docs\Personal |
| 12/13/22 11:51:30 PM | Created | D:\StoneX Docs\Outlook Files |
| 12/13/22 11:51:31 PM | Created | D:\StoneX Docs\Security Standards |

101.    On    December    14,    2022    at    12:00:35am    CST,    a
"C:\Users\howard.shipman\.VirtualBox" folder and any files it contained was deleted from
Shipman's Laptop.



102.    VirtualBox is a software program that creates and runs virtual versions of
computers. Any virtual computers and information about those virtual computers are typically
stored within the VirtualBox folder that was deleted.

103.    On December 14, 2022 at 12:01:48am CST, the SanDisk drive was disconnected
from Shipman's Laptop. The SanDisk drive was connected at the time that the VirtualBox folder
was deleted and then disconnected one minute and thirteen seconds later.

104.    On December 14, 2022 at 9:08:27pm CST, the SanDisk drive was again connected
to Shipman's Laptop and was disconnected about 5 seconds after it was connected.

105.    On December 23, 2022 at 2:39pm CST, all Google Chrome web history was cleared
from Shipman's Laptop. Clearing the web history removes the history of web sites that were

visited, saved passwords, and other web browser data and settings. CRA was unable to recover any Google Chrome external web browsing history data from Shipman's Laptop because it was cleared.

106. On December 26, 2022 at 3:45:53pm CST, a Sony drive was connected to Shipman's Laptop. The Sony drive had previously been connected to Shipman's Laptop on December 5, 2022 at 1:26:24pm CST. Shipman's Laptop assigned the Sony drive a device name of "Sony Storage Media USB Device" and an internal serial number of "7&388e6bd2."

107. Sixty-three seconds after the Sony drive was connected to Shipman's Laptop, two files were accessed. The files "C:\Users\howard.shipman\Documents\Darwin\QuantStrat Plan 2023.docx" and "C:\Users\howard.shipman\Documents\mm_shares.xlsx" were accessed at exactly the same time on December 26, 2022 at 3:46:56pm CST. No other files were accessed during this timeframe. These artifacts are likely consistent with the two files being copied to the Sony drive. The Sony drive was then removed from Shipman's Laptop on December 26, 2022 at 4:06:15 pm CT.

108. These documents are highly sensitive and confidential to StoneX.

109. The "QuantStrat Plan 2023" document is marked "Strictly Confidential and Private, Property of StoneX," and includes detailed information about StoneX's strategy, monetization strategy and market predictions, for the Quant Group.

110. The "mm_shares" document is a Miscrosft Excel file that includes sensitive and confidential financial projects for StoneX's market-making activities. This information is unique to StoneX and its target goals.

111. CRA also conducted research about Shipman's Linode account. Linode is a cloud computer company that provides Linux virtual machines to its customers. A customer can sign up

for a Linode account at Linode.com and then create and configure computers that will be hosted by Linode.

112.    Between August 16, 2022 and December 9, 2022, over two-hundred secure shell protocol ("SSH") connections were made to the Corvo-004 server with the username pianoman from IP address ███████████ SSH is a protocol used to connect computers over a network. According to its American Registry for Internet Numbers (ARIN) record, the computer with the ███████████ IP address was registered to Akamai Technologies, Inc. and is associated with Linode (the "Linode Cloud Computer").

113.    Multiple Linux artifacts and log files from the Corvo-004 server that collectively indicate StoneX data existed on the Linode Cloud Computer.

114.    Specifically, the Corvo-004 server and the Linode Cloud Computer were connected through SSH and a data volume on the Linode Cloud Computer was mounted to the Corvo-004 server. Other artifacts showed that within this mounted data volume were multiple files and based on file name these files appear to be StoneX source code files:

| .viminfo Files |
| --- |
| /mnt/data1/projects/test/share/research/darwin/src/fitzroy/loaders/FitzRoyLoader.hpp |
| /mnt/data1/projects/test/share/research/darwin/makefile |
| /mnt/data1/projects/test/share/research/darwin/src/makefile |
| /mnt/data1/projects/test/share/research/darwin/src/forge/ForgeMode.cpp |
| /mnt/data1/projects/darwin/bin/RunSim.sh |
| /mnt/data1/projects/darwin/etc/syms.256.list |
| /mnt/data1/projects/darwin/bin/RunTest.sh |
| /mnt/data1/projects/darwin/bin/RunFit.sh |
| /mnt/data1/projects/darwin/bin/RunSample.sh |
| /mnt/data1/projects/darwin/DelMe.cpp |
| /mnt/data1/projects/durango/scripts/install_node/InstallNodePackages.sh |
| /mnt/data1/projects/darwin/etc/samples.list |

115.    Based on the information uncovered by StoneX and CRA, it is evident that Shipman has taken valuable computer code and other materials relating to Pascal and Darwin.  StoneX has uncovered no information, however, which indicates that Shipman has taken information relating to its customers or counterparties.

**Further Evidence of Shipman's Malicious Intent and Deception**

116.     Following Shipman's termination, on December 10, 2022, Pfeuffer contacted Shipman to say 'goodbye'.

117.     During that phone call, Shipman stated that StoneX should expect a "shit show" on Monday morning. When Pfeuffer asked Shipman what he meant, or if Shipman would help or StoneX avoid the impending "shit show," Shipman stated that he would do nothing to assist StoneX or Pfeuffer.

118.     StoneX shortly thereafter discovered that Shipman had sabotaged Pascal so that it would not run correctly in his absence. Fortunately, StoneX was able to resolve the issue without any disruption to the running of Pascal.

## COUNT I

## VIOLATION OF THE DEFEND TRADE SECRETS ACT

119.     StoneX repeats, re-alleges, and incorporates by reference paragraphs 1 through 118 above as set forth fully herein.

120.     As set forth above, StoneX owns various trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), which are critical to the success of its business, including, without limitation, the information described in paragraphs 1-17; 35-70 above.

121.     StoneX's trade secrets relate to StoneX's services used in interstate and foreign commerce.

122.     StoneX's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. StoneX's trade secrets give it a competitive advantage over other law companies who do not have access to that trade secret information. StoneX's trade secrets are valuable and crucial to its business functions and

competitive position as a company. The trade secrets Shipman has misappropriated are of enormous potential value to a competing company.

123.    Shipman's actions as described herein constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

124.    Shipman misappropriated StoneX's trade secrets by acquiring them while knowing he had acquired them by improper means, including theft, misrepresentation, and breaches and inducement of breaches of duties to maintain the secrecy of StoneX's trade secret information.

125.    StoneX is entitled to damages for actual losses caused by Shipman's misappropriation of its trade secrets, and damages for any unjust enrichment caused by Shipman's misappropriation that is not addressed in computing its actual losses. In the alternative, StoneX is entitled to a reasonable royalty for Shipman's misappropriation of its trade secrets.

126.    Shipman's misappropriation of StoneX's trade secrets was willful and malicious, entitling StoneX to attorney's fees and exemplary damages.

127.    Temporary, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of StoneX's trade secrets.

## COUNT II

## **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**

128.    StoneX repeats, re-alleges, and incorporates by reference paragraphs 1 through 127 above as set forth fully herein.

129.    As set forth above, Shipman has violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing at least one StoneX computer used in or affecting interstate commerce or communications, without authorization or by exceeding

authorized access to such computer(s), and by obtaining information from the Company's protected computer(s).

130.    The computer files Shipman accessed without authorization were maintained on StoneX's computers and computer system, which are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2), in that they were used by StoneX to engage in interstate and foreign commerce and communications and to otherwise conduct StoneX's business across state lines, via the Internet.

131.    Upon the termination of his employment, Shipman was not authorized to access the computer files described above, and his accessing and transmission of those files was without authorization and contrary to the interests and policies of StoneX.

132.    Shipman has not returned any files or documents to StoneX.

133.    By engaging in the conduct described above:

    a.  Shipman intentionally accessed at least one computer without authorization or exceeded his authorized access, and thereby obtained information from a protected computer, in violation of the CFAA, 18 U.S.C. § 1030(a)(2)(C);

    b.  Shipman knowingly and with the intent to defraud, and in violation of his fiduciary duty to StoneX, accessed at least one StoneX protected computer without authorization. By means of such conduct, he furthered his intended fraud, including without limitation accessing, obtaining, transmitting, and removing, without authorization, electronic files and information belonging to StoneX, including but not limited, files containing its valuable business information, including confidential, proprietary, and trade secret information, by dishonest methods in violation of the CFAA, 18 U.S.C. § 1030(a)(4);

c.   Shipman knowingly caused and commanded the transmission of computer files and information and as a result of such conduct, intentionally and without authorization caused damage in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(A); and

d.   Shipman intentionally accessed a protected computer without authorization, and as a result of such conduct, recklessly and/or intentionally cause damage and loss, in violation of the CFAA, 18 U.S.C. § 1030(a)(5)(B) and (C).

134.   As a result of Shipman's misconduct and violations of the CFAA, StoneX suffered "damage" and/or "loss" as those terms are interpreted under the CFAA, in an amount exceeding $5,000, and is entitled to an award of damages under 18 U.S.C. § 1030(g) for Shipman's multiple breaches of the CFAA. The damage and loss suffered by StoneX includes the cost of reasonably investigation and otherwise responding to Shipman's violations (including the hiring of a forensic computer analyst to conduct such investigation and analysis) as well as impairment of the integrity of StoneX's computers and system, and of the data stored in that system.

135.   Wherefore, StoneX respectfully requests temporary, preliminary and permanent injunctive relief, and such other relief as this Court may deem just and proper.

## COUNT III

## MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW

136.   StoneX repeats, re-alleges, and incorporates by reference paragraphs 1 through 135 above as if set forth fully herein.

137.   As set forth above, StoneX owns various trade secrets critical to the success of its business, including, without limitation, the information described in paragraphs 1-17, 35-70 above, which constitute "trade secrets" under New York law.

138.    StoneX's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. StoneX's trade secrets give it a competitive advantage over other companies who do not have access to that trade secret information. StoneX's trade secrets are valuable and crucial to its business functions and competitive position as a company. The trade secrets Shipman has misappropriated are of enormous potential value to a competing company.

139.    Shipman's actions have caused and will continue to cause damage to StoneX and, unless restrained, will further damage StoneX, the nature and extent of which may not be able to be proven with certainty, irreparably injuring StoneX, leaving it without an adequate remedy at law. StoneX is therefore entitled to temporary, preliminary and permanent injunctive relief to prevent such irreparable harm.

140.    StoneX is entitled to damages as a result of Shipman's misappropriation to the extent its actual losses are calculable.

**COUNT IV**

**<u>BREACH OF FIDUCIARY DUTY</u>**

141.    StoneX repeats, re-alleges, and incorporates by reference paragraphs 1 through 140 above as if set forth fully herein.

142.    As a StoneX employee, Shipman owed StoneX an undivided duty of loyalty and was obligated to act with the utmost good faith and candor and in the best interests of StoneX.

143.    StoneX relied on Shipman's duties of loyalty, integrity, and faithful performance of his duties and responsibilities.

144.     Shipman knowingly and willingly breached those fiduciary duties by misappropriating StoneX's trade secrets for his own personal gain through improper means.

145.     As a direct and proximate result of Shipman's disloyalty and breach of his fiduciary duties, StoneX has been and is being harmed. Shipman is still in possession of StoneX's most valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of StoneX's competitors. On information and belief, Shipman has shared, or is planning to share, this confidential information with others who may use, or are using, the information to StoneX's detriment.

146.     Shipman's actions have caused and will continue to cause damage to StoneX and, unless restrained, will further damage StoneX, the nature and extent of which may not be able to be proven with certainty, irreparably injuring StoneX, leaving it without an adequate remedy at law.

147.     Temporary, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of StoneX's most valuable confidential business information and trade secrets.

## COUNT V

## <u>CONVERSION</u>

148.     StoneX repeats, re-alleges, and incorporates by reference paragraphs 1 through 147 above as if set forth fully herein.

149.     StoneX had legal ownership and a superior right of possession to each of the files on the Pascal Azure servers.

150.     Shipman exercised unauthorized dominion over those files that rightfully belonged to StoneX.

151.     Shipman's unlawful possession of StoneX's most valuable confidential business information and trade secrets was to the exclusion of StoneX's rights and inconsistent with StoneX's private possession.

152.     As a direct and proximate result of Shipman's unauthorized actions, StoneX has been and is being harmed. Shipman is still in possession of StoneX's most valuable confidential business information and trade secrets and is able to access and use this information for his own personal gain and for the benefit of StoneX's competitors. On information and belief, Shipman has shared, or plans to share, this confidential information with others who may use, or are using, the information to StoneX's detriment.

153.     StoneX is entitled to damages as a result of Shipman's misappropriation to the extent its actual losses are calculable.

## PRAYER FOR RELIEF

StoneX reserves the right to pursue any and all available remedies against Shipman, including damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including an order of seizure, a temporary restraining order, a preliminary injunction, a permanent injunction, and other available remedies necessary to prevent propagation or dissemination of StoneX's trade secrets.

**WHEREFORE**, StoneX respectfully requests that the Court:

I.     Grant a temporary restraining order (i) ordering Shipman, and anyone acting in concert or participation with Shipman, to refrain from engaging in further acts of misappropriation of any of StoneX's proprietary, confidential and/or trade secret information obtained from StoneX's computer systems and servers; (ii) temporarily restraining Shipman, and anyone acting in concert or participation with Shipman, to refrain from using, copying, reviewing or disclosing

any of StoneX's proprietary, confidential and/or trade secret information obtained from StoneX's computer systems and servers, by no later than _____, 2023 ____ at ___ am/pm, any and all of StoneX's proprietary, confidential and/or trade secret information (including copies thereof) that Shipman and/or subordinates at his direction copied, printed or otherwise obtained from StoneX's computer systems, including all copies of StoneX's electronic files and all paper copies in his possession; (iii) temporarily restraining Shipman, and anyone acting in concert or participation with Shipman, to account for any and all of StoneX's proprietary, confidential and/or trade secret information currently in his custody or control, or in the alternative, produce for immediate inspection and imaging all computers, servers, and/or other electronic devices belonging to, under the control of, accessible to, or operated by him, including his home computer(s), cloud or physical servers, and/or other electronic devices capable of transmitting and/or storing information (including any non-StoneX device or location (physical or cloud) that Shipman owns, controls, has access to, or transferred/held during the past nine (9) months); (iv) requiring Shipman, and anyone acting in concert or participation with Shipman, to permit the permanent removal, deletion, and destruction of all copies of StoneX's electronic files or information transmitted to Shipman's computers or personal email accounts or otherwise in his possession, subject to the supervision of StoneX, so as to preserve evidence of all such files or information, and (v) grant permission to StoneX to conduct expedited third-party discovery related to information about and concerning Shipman's non-StoneX Linode cloud server and internet service provider records.

II.     Grant a preliminary injunction (i) ordering Shipman, and anyone acting in concert or participation with Shipman, to refrain from engaging in further acts of misappropriation of any of StoneX's proprietary, confidential and/or trade secret information obtained from StoneX's

computer systems and servers; (ii) ordering Shipman, and anyone acting in concert or participation with Shipman, to refrain from using, copying, reviewing or disclosing any of StoneX's proprietary, confidential and/or trade secret information obtained from StoneX's computer systems and servers, any and all of StoneX's proprietary, confidential and/or trade secret information (including copies thereof) that Shipman and/or subordinates at his direction copied, printed or otherwise obtained from StoneX's computer systems, including all copies of StoneX's electronic files and all paper copies in his possession; (iii) ordering Shipman, and anyone acting in concert or participation with Shipman, to account for any and all of StoneX's proprietary, confidential and/or trade secret information currently in his custody or control, or in the alternative, produce for immediate inspection and imaging all computers, servers, and/or other electronic devices belonging to, under the control of, accessible to, or operated by him, including his home computer(s), cloud or physical servers, and/or other electronic devices capable of transmitting and/or storing information (including any non-StoneX device or location (physical or cloud) that Shipman owns, controls, has access to, or transferred/held during the past nine (9) months); (iv) ordering that Shipman, and anyone acting in concert or participation with Shipman, is temporarily restrained from working or consulting for any person or business (a) to whom he has disclosed or discussed any of the materials he copied from StoneX's computer systems, or (b) with whom, on or after September 10, 2022 through the date of this order, he discussed any employment or consulting arrangement.

III.   Enter a judgment that Shipman has:

   a.   Violated the DTSA;

   b.   Violated the CFAA;

   c.   Misappropriated StoneX's trade secrets;

    d.  Breached his fiduciary duties, including his duty of loyalty to StoneX; and

    e.  Exercised unauthorized dominion over property that rightfully belonged to StoneX.

IV.    Enter a judgment that Shipman's violations and breaches were willful and malicious; and

V.    Find that Shipman can have no benefit as a result of his misappropriation and wrongful acts.

Dated:  New York, New York
        January 19, 2023

PROSKAUER ROSE LLP

/s/
Lloyd B. Chinn
Daryl Leon
Eleven Times Square
New York, New York 10036-8299
212.969.3000
lchinn@proskauer.com
dleon@proskauer.com

Nigel F. Telman (*pro hac vice* forthcoming)
Steven J. Pearlman (*pro hac vice*
forthcoming)
Three First National Plaza
Chicago, Illinois 60602-4342
312.962.3548
ntelman@proskauer.com
spearlman@proskauer.com

*Attorneys for Plaintiffs StoneX Group, Inc.
and StoneX Financial, Inc.*