# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STONEX GROUP, INC. and STONEX
FINANCIAL, INC.,

Case No. 23 civ 613 (JGK)

Plaintiffs,

- against -

HOWARD SHIPMAN,

Defendant.

### DECLARATION OF HOWARD SHIPMAN

I, Howard Shipman, am over the age of eighteen and understand the obligations of an

oath. I make this Declaration in response to the Declarations submitted by Plaintiffs in the above-

referenced case:

1.  I began my employment at StoneX on Feb 8, 2021 in the capacity of Managing Director,
    Principal Equities Development. Approximately one year later, I became Managing
    Director, Co-head of Quantitative Strategies.

2.  While employed at StoneX, I observed illegal activity, which I brought to the attention of
    StoneX management. *See, e.g.,* Ex. A (a true and correct copy of an email sent to StoneX
    management, outlining complaints.)

3.  In addition, to the illegal activity referenced in that email, I was aware that Evan Pfeuffer,
    had stolen confidential information and trade secrets from his prior employers, BTIG,
    Credit Suisse and UBS, ███████████████████████████

    ███████████████ He informed me of that, and described to me how he did it.

1

4. On December 9, 2022, I was shocked when informed by Jacob Rappaport, Global Head of Equities, that because of alleged "cultural differences," my employment was being terminated effective immediately, but that I would be given an offer to resign from the company, so long as I provided my decision by the following week. All indications, up to an including recent meetings, indicated that I was a highly valued employee.

5. I was concerned about accepting the invitation to resign, because I believed I was a whistleblower and that a resignation would undermine my ability to bring a retaliation case.

6. Therefore, I contacted counsel and negotiations ensued. Engaging in what I believe was a "best defensive is an offensive" approach, the company raised a variety of ever-changing false arguments about what I allegedly took or did after I departed, much of which were, on their very face, impossible. Given that these false allegations (much of which are not repeated in the plaintiff's Complaint) were transmogrifying, and given my concerns about Pfeuffer's role in dishonest behavior, I thought it best that my laptop computer (that I used for both personal and work purposes) not be returned to Evan Pfeuffer and his team directly, but instead be provided to a third party in escrow, to independently perform a forensic analysis.

7. At the initiative of my counsel in negotiations with opposing counsel, Nigel Telman, my counsel asked for a forensic analysis to be performed by a third party of my laptop, in order to avoid concerns about potential tampering by someone at StoneX. Mr. Telman agreed and indicated that Charles River Associates had been selected to take possession of the laptop.

8. After my termination, although I did not consult with anyone in advance about whether to remove personal information from my laptop before returning it, I did consult with StoneX policies. I was aware that to do so was in conformity with StoneX policies (as referenced below).

9. Then, pursuant to the agreement reached between counsel, I mailed by FedEx the laptop directly to Charles River Associates (CRA), as directed. The declaration from R. Cuyler Robinson, the forensic specialist who conducted the analysis of my laptop, has falsely attested that the laptop was mailed to CRA *by my counsel*. In fact, my counsel never had the laptop in her possession, and never touched or even laid eyes on the laptop. Thus, this false allegation raises concerns about the chain of custody of my laptop at CRA before it reached Mr. Robinson. It also raises questions about Mr. Robinson's effort to be accurate in his Declaration before making allegations, and attest only to facts of which he is personally and directly aware, as required with a sworn declaration. Below, I provide further responses to the incorrect assertions made by each of the Declarants:

A. **THE R. CUYLER ROBINSON DECLARATION**

**Paragraphs 9 and 20 of R. Cuyler Robinson's Declaration**

10. In paragraphs 9 and 20 of R. Cuyler Robinson's Declaration, he seems to imply misconduct for destroying data on December 9, after I learned I would be terminated. This is false.

11. As set forth below, the company's abrupt conduct of disconnecting me from the system is what caused the problem, and arose minutes *before* I was notified I was terminated, as described further below. I had previously explained to the company through counsel the problem caused by the company's abrupt disconnection of me from the system during a

3

sensitive server migration that I was requested to perform. Therefore, it is troubling that the company apparently did not inform the forensic specialist of what the company sloppily did during the sensitive December 9th migration of the server, and apparently failed to ask Mr. Robinson to evaluate whether that disconnection during a server migration could have caused the server issues he observed. Mr. Robinson's failure to address anywhere in his declaration the company's disruption of the server migration appears to indicate that the company did not ask him to evaluate whether their own conduct in disrupting the server migration could have caused the destruction he observed. This undermines his conclusions.

12. As set forth below, on December 9, 2022, I was conducting my duties to retire and provision a new server requested by Evan Pfeuffer, when in the midst of migrating that server, the company cut off my access. This occurred *before* (not after, as he assumed based on the hearsay information he relied upon) I was notified I was terminated, apparently in anticipation of the company terminating me.

13. Approximately 90 minutes earlier, on December 9, 2022, during a training session for our two new Quantitative Researchers, Evan Pfeuffer requested of me a new server in Azure

14. After the training session ended, I began to review and plan for Pfeuffer's new Azure server, but there were two considerations/concerns: My manager, Christopher Amato had directed me on several occasions to keep costs in Azure under budget. Pfeuffer used a coding technique called "AVX-512." This technique could only be used on a specific type of server, and that type of server was in high demand. Moreover, Azure imposed a quota for that server type and we were near the limit.

4

15. Because of these concerns, I had to retire a server before I could provision a new server for Pfeuffer. I concluded that a server called "corvo-004" was the best candidate to retire.

16. It is considered Best Practice to sanitize or remove sensitive data from servers before retirement. This protects StoneX from theft or misuse of sensitive data.

17. Over the previous year, I retired approximately a dozen servers, and I followed this practice with all of them. Thus, this process was not unique to the situation occasioned by Pfeuffer's December 9 request. I had done this precise same process a dozen times before throughout the year.

18. These server operations were complex and initially required about 4 hours to perform. However, over time, I learned to use a series of scripts and background commands to automate portions of the task. None of these scripts or automated commands were designed for an interruption or unexpected disconnection.

19. After some planning, I began to retire "corvo-004" at approximately 3:55pm (ET), properly in performance of my duties.

20. After Market Close at approximately 4:05pm (ET), I began to execute my normal End of Day duties on the Trading System. These duties also include scripts or automated commands.

21. At 4:09pm, I noticed disconnections of my access to StoneX. The VPN was disconnected. I tried to login with my password, but that failed.

22. Since none of these scripts or commands were designed for an interruption or unexpected disconnection, I did not know the state, impact or result this would have. Possibilities include spinning in an infinite loop, spamming large amounts of data, consuming all available memory, data corruption or crashing.

5

23. Approximately 26 minutes after being disconnected by the company during that sensitive transfer of data, at about 4:35pm (ET), I was called by Jacob Rappaport, Global Head of Equities and Anne Johnson, Human Resources. Jacob Rappaport said, "Because of cultural differences," he wanted to give me an opportunity to preserve my "U4 and resign. I asked if I could have time to consider my decision. They gave me until Monday to respond.

24. Robinson seems to imply I was actively engaged with the StoneX environment after I was notified at about 4:35 pm on December 9 that I was terminated. This is not true. I was surprised by my termination by Jacob Rappaport, which occurred over the phone, while I was working from home. After the conversation, I left my desk in my home office and went to discuss the termination news with my wife for about an hour. This is understandable, given that this big news would have financial ramifications during the Christmas holidays on our large family.

25. During this time, I did not know the state of my scripts and automated commands for retiring and provisioning Pfeuffer's new server. I also did not know the state of my scripts and automated commands for my End-of-Day duties. It is likely they were still active, but due to the disruption, I did not know their behavior.

26. Prior to this moment at 4:35 pm on December 9, no StoneX employee or manager ever told me anything in any performance appraisal or conversation indicating that I was culturally different. It seemed the only cultural differences related to my expressions of concerns related to the illegal conduct that I complained about at StoneX.

27. In fact, just a few days earlier I was receiving endorsements from management:

a)    At 11:41 AM, Friday, December 2, 2022, I delivered a new Quantitative Strategies Plan for 2023 to Charles Lyon, Executive Vice President of StoneX, and Jacob Rappaport, Global Head of Equities, and Thomas Moore, Head of Equity Trading. At 5:52pm, Friday, December 2, 2022, Charles Lyon responded with "Good to see clear communication, especially on projects of this scale."

b)    At or around 5:00pm, Monday, December 5, 2022, at a Global Presentation of "Institutional Units: Strategy and Vision", Jacob Rappaport presented a Global Equity Plan which included elements of the plan I gave him earlier.

28. Based on these endorsements by management, I was looking forward to a profitable 2023. I was completely surprised by the termination, especially when just four days prior, management was offering a ringing endorsement of my performance.

29. When I returned to my desk after my conversation with my wife, I closed all the open applications on the StoneX laptop.

**Paragraphs 17 and 18 of Mr. Robinson's Declaration**

30. With respect to paragraphs 17 and 18 of Mr. Robinson's Declaration, those paragraphs misunderstand what happened because ostensibly, Mr. Robinson was not informed about the company's ham-handed disruption of the sensitive server migration when it –without forewarning—disconnected me.   The "bash_history" files for users and "root" are considered sensitive. Hence, their removal was properly included in my scripts and background commands for server retirement.  Removal of the "bash_history" files was also included in the approximately dozen server retirements I was required to perform over the previous year.

31. I believe Cuyler misunderstands his "other" artifacts in paragraphs 17 and 18.  I properly used a series of scripts and automated commands to sanitize data for retired servers.  This was completely consistent with the proper performance of my duties, and would have created absolutely no problems for the company—just like on the dozen of other server

7

retirements I performed during the last year—but for the company's inept disconnection of me during a sensitive operation that the Company management had asked me to perform.

**Paragraphs 21, 22 and 23 of Mr. Robinson's Declaration**

32. With respect to paragraphs 21, 22 and 23 of Mr. Robinson's Declaration, he has opined about intent without knowing company policy. Per the policy of StoneX's "Acceptable Use of IT Facilities for Exit Procedures," I moved files of my own data to a USB drive. (By mistake, there was an over-inclusion instruction, which lead to moving files that were not my own data. I corrected that mistake and deleted those files. I have agreed in my Stipulation filed on  January 26, 2023 to allow the inspection of the USB drive to verify the files were deleted. I also agreed to allow the inspection of my personal computer to verify that I am not in possession of those files.)

33. The StoneX Acceptable Use of IT Facilities 3.8 Exit Procedures reads that: "Upon leaving the Company, it is expected that users … ensure any of their own data that they wish to keep is removed from the Company's systems, as they will not be entitled to access this once they leave."

34. Moreover, I was concerned about leaving my personal data in the hands of the Cybersecurity Team for the following reasons:   On or about October 25, 2022, I compiled a list from Azure of sixty-five users globally who had identical permissions, privileges and access as Pfeuffer and I to our sensitive Azure servers.  I gave that list to three members of management:  Christopher Amato, my direct manager; Thomas Moore, Head of Equity Trading;  and Jacob Rappaport, Global Head of Equities. Several other users of Azure were missing emails.  Many were in foreign countries such as Poland.

8

Most names were not recognized by us. Our managers and team members expressed concerns for the lack of security and poor policies and practices at StoneX.

35. Upon seeing the above-referenced list of sixty-five users, Pfeuffer said he was 100% certain that the team's source code had already been copied in another country.

36. On or about October 2022, I heard that **StoneX's Global Head of Cybersecurity,** Khai Waterman, was terminated for misappropriation of funds and sexual misconduct!

37. Because of concerns such as the above about lax cybersecurity controls, I did not maintain source code on the laptop. While there is a folder

I recall they contained preliminary design documents. I am not in possession of either folder.

### Paragraphs 24, 25 and 26 of Mr. Robinson's Declaration

38. With respect to paragraphs 24, 25 and 26 of Robinson's declaration, he makes incorrect conclusions. VirtualBox is a software program that creates and runs virtual versions of computers. From time to time, we ran VirtualBox to evaluate different versions of Linux. For example, I ran a test to evaluate different versions of a C++ code compiler. This was a free and fast way to quickly test new features and stay up to date with recent innovations.

39. I did not copy VirtualBox files from the StoneX laptop.

40. Prior to my termination, and over the course of my duties at StoneX, I tested many new features with different VirtualBoxes. Old tests were deleted and new tests were created.

41. I do not recall deleting a VirtualBox after my termination.

42. I do not recall connecting and disconnecting a USB drive for 5 seconds

9

43. I do not recall removing Google Chrome web history. Nor do I recall ever using the Google Chrome browser.

**Paragraphs 29 and 30 of Mr. Robinson's Declaration**

44. With respect to paragraphs 29 and 30 of Robinson's declaration, I have a copy of "QuantStrat Plan 2023.docx" which I authored. I have agreed to remove it. I also agree to allow an inspection of my computer to verify it is removed.

45. I do not recall the file mm_shares.xlsx, nor can I recall the contents. I am not in possession of that file. I agree to allow an inspection of my computer to show that I am not in possession of that file.

**Paragraphs 31 and 34 of Mr. Robinson's Declaration**

46. With respect to paragraphs 31 thru 34, Mr. Robinson fails to understand certain protocols at StoneX. An alternative connection was approved to be maintained to monitor Trading Systems when the VPN failed, for important reasons.

47. On August 1, 2012, Knight Capital caused a major stock market disruption and lost approximately $440 million in about 45 minutes. Many analysts agreed that lack of human monitoring was a key factor.

48. At StoneX, we were occasionally locked out of the trading environment for a failed password. StoneX used a "ticket" support system which was very slow. Sometimes, support took 15 to 20 minutes to reinstate our access. This can feel like an eternity on a sophisticated, multi-million dollar trading system.

49. We asked the IT Department for a "breakglass" system. This is a process for quickly logging in with a "breakglass" password if we were locked out. This was never delivered.

50. We also suffered frequent disconnects by the VPN almost daily. This spurred several conversations about the "Knight scenario" between me, my manager, Christopher Amato and Evan Pfeuffer. We discussed methods of alternative access to monitor the trading systems to protect the firm during VPN outages.

51. It was agreed that I would use encrypted access through a server in Linode for emergencies. Since the connection was encrypted between the StoneX laptop and StoneX server, no sensitive data was compromised. My manager, Christopher Amato referred to this as a "backdoor" and he approved it.

52. Subsequently, on frequent VPN interruptions and service outages, this was our only means to monitor trading and protect the firm.

53. With respect to paragraph 34, Robinson is incorrect. A Linode data volume was never mounted to the corvo-004 server by me. I do not know if that's possible, and I certainly do not have the technical knowledge to do so. The files listed by Robinson under the directory use the common naming convention I used on all Azure servers, *e.g.* /mnt/data1.

## B. PFEUFFER DECLARATION

54. I was the primary developer of Texas. Pfeuffer was the primary developer of Tampa. However,  although Pfeuffer was the primary developer of Tampa, most of Tampa was not developed by Pfeuffer at StoneX, but at his prior employers.

55. Pfeuffer described to me how he stole code from BTIG. He added a "hidden encrypted payload appended to a pdf." The pdf reader would ignore data after the document's original end. When someone viewed it, it would appear normal. He then emailed the pdf through corporate email servers. He explained that he used this technique on pdfs of

books, such as a textbook on Linux. He ran multiple tests to refine this technique. He told me to "Keep it secret. Keep it safe. Like the ring."

56. Pfeuffer was at a U24 management level; I am U5.

57. When he imported BTIGs source code to StoneX, he referred to the process saying, "The eagle is on the runway, looking to land." And later, when completed, he celebrated with "The Eagle has landed. Code extracted." Since broker dealers are required to save emails for several years, his activities in this regard can be verified with a search of his emails with pdf attachments at StoneX or with previous employers.

58. Evan Pfeuffer also described using the same process to steal code from Credit Suisse for use at BTIG.

59. Our manager, Christopher Amato was aware of the theft and condoned it. It was decided they would refer to the code as written from "memory." Hence, the code that StoneX is claiming belongs to it does not. I would estimate that about 60% of the code is owned by BTIG, stolen by Pfeuffer, with the knowledge and approval of Amato.

**Paragraph 9 of Mr. Pfeuffer's Declaration**

60. With respect to paragraph 9 of Pfeuffer's declaration, Pfeuffer is only partially correct.

61. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

and they were included in a global presentation by the Head of Equity

Jacob Rappaport on December 5, 2022. █████████████████████████████████████

████████████████████

62. ███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████

**Paragraph 10 of Mr. Pfeuffer's Declaration**

63. Paragraph 10 of Pfeuffer's declaration is misleading. ████████████████████

████████████████████████████████████████████████████████████████████████

████████████

**Paragraph 14,15, and 16 of Mr. Pfeuffer's Declaration**

64. With respect to paragraphs 14, 15 and 16 of Pfeuffer's declaration, Pfeuffer incorrectly

implies that the December 9, 2022 presentation ████████████████████████████

████████████████████████████████████████████████████████████████████████

65. About six months prior to the training session, on or about June 2022, I provided Pfeuffer

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████ This was part of our duties as Co-Heads of Quantitative Strategies.

████████████████████████████████████████████████████████████████████████

████████████████████████████

66. Moreover, Pfeuffer asked that we both use the same password, so that he could have full

access to everything I worked on or accessed. He explained this was in case I went on

vacation.

67. On December 9, 2022, I ran a training session for two new quantitative researchers who joined the team. Pfeuffer also attended. In that presentation, we: a--Demonstrated Darwin's operation in a test environment; b--Presented portions of Darwin's source code; c--Edited, compiled and re-ran portions of the source code to demonstrate its use and specific features including the design, editing and running of a new calculator; and d—I stated that I would share the source code with our two new hires, and work with both of them personally to train them further.

**Paragraph 17 and 18 of Mr. Pfeuffer's Declaration**

68. With respect to paragraphs 17 and 18 of Pfeuffer's declaration, Pfeuffer's account of our conversation is not accurate and was reported differently in December by Stonex's in-house counsel to my counsel, making it clear to me that Pfeuffer is either fabricating or misrecalling, as his story keeps changing.

69. The day after my termination, on Saturday, December 10, 2022, Pfeuffer and I spoke. As his friend, I was concerned that Pfeuffer was now alone on the team to manage both my duties and his. He expressed that was his concern as well, and he thought Monday would be a "shit show." I told him my systems were reliable and should be fine on Monday morning, but if he had an issue, to please call. I did indicate I was concerned because I was disconnected abruptly from the system in the middle of performing my duties.

**Paragraph 19 of Mr. Pfeuffer's Declaration**

70. Pfeuffer has falsely claimed that I structured my systems to fail in my absence. I did not. He is projecting, because that is in fact what he did in the event he was terminated. Indeed, I have confirmation that they operated correctly at StoneX on Monday morning, December 12, the first business day after I was terminated.

14

71. On Monday morning, December 12, 2022, I was informed that a test trade was successfully executed 5 minutes after the system came up at its regularly scheduled time of 7:00am.

72. Ironically, five months earlier, on or about June 2, 2022, Pfeuffer described to me a new change ██ ██ ███████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████. I advised him this is a breach of his duty to customer orders and could harm the firm. Approximately three months later, Pfeuffer informed me he had removed the "Dead Man's switch.

73. The evidence that Pfeuffer created a Dead Man's switch should be available for review in the source repository's history. If StoneXwere truly interested in this issue (other than for reasons other than to undermine my credibility in a SEC and DOL investigation), they would assign Charles River Associates to investigate the fact that it is Pfeuffer who created a Dead Man's Switch.

74. On December 13, 2022, Pfeuffer contacted me and wrote, "Truthfully I have nothing negative to say about your work here, I appreciate all the help you gave me and I look forward to catching up when you have settled your concerns."

## C. **DECLARATION OF AMATO**

### **Paragraph 17, 18 and 19 of Mr. Amato's Declaration**

75. The assertions in these three paragraphs are also addressed in my response to Robinson's paragraphs 29 and 30.

76. I have a copy of "QuantStrat Plan 2023.docx" which I authored. I have agreed to remove it I also agree to allow an inspection of my computer to verify it is removed. I do not recall the file mm_shares.xlsx, nor can I recall the contents. I am not in possession of that file. I agree to allow an inspection of my computer to show that I am not in possession of that file.

## D. DECLARATION OF WAREMAN

### Paragraph 16 of Wareman's Declaration

77. With respect to paragraph 16 of Wareman's declaration, Wareman is incorrect. StoneX does not use the 'least privilege' principle, in spite of our team's many requests to use a "need to know" policy.

78. This allegation is also addressed in my response to Robinson's paragraphs 21, 22, 23.

79. On or about October 25, 2022, I compiled a list from Azure of sixty-five (65) users globally who had identical permissions, privileges and access as Pfeuffer and I to our sensitive Azure servers. I gave that list to Christopher Amato, my direct manager, and Thomas Moore, Head of Equity Trading, and Jacob Rappaport, Global Head of Equities. Several of the users were missing emails. Many were in foreign countries such as Poland. Most names were not recognized by us. Our managers and team members expressed concerns for the lack of security and poor policies at StoneX.

80. ███████████████████████████████████████████

███████████████████████████████████

### Paragraph 22 of Wareman's Declaration

81. With respect to paragraph 22 of the Wareman declaration, this is also addressed in my response to Robinson's paragraphs 31 and 34, above.

82. An alternative connection was maintained to monitor Trading Systems when the VPN failed.

83. On August 1, 2012, Knight Capital caused a major stock market disruption and lost approximately $440 million in about 45 minutes. Many analysts agreed that lack of human monitoring was a key factor.

84. At StoneX, we were occasionally locked out of the trading environment for a failed password. StoneX used a "ticket" support system which was very slow. Sometimes, support took 15 to 20 minutes to reinstate our access. This can seem like an eternity on a sophisticated, multi-million dollar trading system.

85. We asked the IT Department for a "breakglass" system. This is a process for quickly logging in with a "breakglass" password if we were locked out. This was never delivered.

86. We also suffered frequent disconnects by the VPN almost daily.

87. This spurred several conversations about the "Knight scenario" between me, my manager Christopher Amato and Evan Pfeuffer. We discussed methods of alternative access to monitor the trading systems to protect the firm during VPN outages.

88. It was agreed that I would use encrypted access through a server in Linode for emergencies. Since the connection was encrypted between the StoneX laptop and StoneX server, no sensitive data was compromised. My manager, Christopher Amato referred to this as a "backdoor" and he approved.

89. Subsequently, on frequent VPN interruptions and service outages, this was our only means to monitor trading and protect the firm.

**Paragraph 24, 25, and 26 of Wareman's Declaration**

90. With respect to paragraphs 24, 25, 26) This is also addressed in my response to Robinson's paragraph 16.

91. Both Robinson and Wareman seem to imply I was actively engaged with the StoneX environment after I was terminated. This is not true.

92. I was completely surprised by the termination, especially when, just four days prior, management was offering ringing endorsements of my performance.

93. Given my shock, our large family, and the imminence of Christmas and the financial ramifications of being suddenly unemployed, after the conversation ended, I naturally left my desk to discuss my termination with my wife for approximately an hour.

94. During this time, I did not know the state of my scripts and automated commands for retiring and provisioning Pfeuffer's new server since I was disconnected. I also did not know the state of my scripts and automated commands for my End-of-Day duties. It is likely they were still active, but due to the disruption, I did not know their behavior.

95. When I returned to my desk, I closed all the open applications on the StoneX laptop.

**Paragraph 27, 29, 30 and 31 of Wareman's Declaration**

96. With respect to paragraphs 27, 29, 30 and 31, This is also addressed in my response to Robinson's Declaration paragraphs 17 and 18.

97. The "bash_history" files for users and "root" are considered sensitive. Hence, their removal was included in my scripts and background commands for server retirement, which I was asked to perform for Pfeuffer on December 9, and which I was in the middle

18

of properly performing, pursuant to my duties, when StoneX created the server problem by disconnecting me in the midst of the migration.

98. This same removal of the "bash_history" files was also included in the migration of approximately a dozen servers I retired over the previous year. It was proper to do so, and would have created zero problems, if StoneX had not improperly disconnected me in the middle of the proper performance of my duties.

### **Paragraph 28 of Wareman's Declaration**

99. Regarding paragraph 28, after my termination on December 9, 2022, and while away from my desk discussing with my wife the termination, I was not aware of any egress of data.

100.    Through no fault of my own, I did not know the state of my End-of-Day procedures because StoneX, in a ham-handed fashion, had disconnected me, so I could not monitor or supervise what was going on. I did not know the state of the retirement of the server "corvo-004". I did not know whether the processes fell into an infinite loop and spammed large amounts of data. I did not and could not know if the interrupted procedures consumed all available memory and crashed with a large core file. I was not in the position to know whether the disrupted procedures resulted in corruption of files.

101.    These activities were complex operations on a multi-million dollar trading system. I would compare the disruption similar to firing the pilot of a 747 just before it's about to land at LaGuardia airport, locking the pilot out of his controls as he approaches the runway. If the pilot cannot control anything, the unsafe landing is not his fault, but the fault of whoever thought it a clever idea to lock out a pilot in the middle of a sensitive operation—a landing.

### Paragraph 33 of Wareman's Declaration

102. Wareman's assertions in paragraph 33 are incorrect. I did not make any additional attempts to access StoneX's network that evening and throughout the weekend. Whatever was happening to the commands that began before I was disconnected --and perhaps were continuing in a loop or spamming because of the abrupt disconnection in the middle of procedures -- were occurring without my having any ability to monitor them, because I had been disconnected from the system.

## E. DECLARATION OF KOLB

### Paragraph 7 of Kolb's Declaration

103. Paragraph 7 of Kolb's declaration is incorrect. I did not issue commands via SSH after my termination.  However, my automated scripts and background commands relied on the distributed execution of commands via "ssh," including my End-of-Day procedures, and including the migration, retirement and provisioning of servers. The state or impact of those commands is not something I can know, nor is it something that any of the declarants can know.  It is patently absurd for a company to disconnect an employee in the midst of sensitive company procedures that he was asked to do.  The unthoughtful and ill-considered disruption of sensitive procedures may have caused consequences that Kolb incorrectly assigns to intentional behavior on my part.

### Paragraph 8 of Kolb's Declaration

104. Kolb's assertions in paragraph 8 are  addressed above in response to Wareman's paragraph 28 above.

105. After my termination and while away from my desk talking about family finances in light of my termination, I was not aware of an egress of data.

106. I did not know the state of my End-of-Day procedures.

107. I did not know the state of the retirement of the server "corvo-004". I did and do not know whether the company's ill-considered disruption of those sensitive processes caused the processes fall into an infinite loop and spam large amounts of data, or whether they consumed all available memory and crashed with a large core file or were corrupted. I could not, because I was disconnected in the midst of those processes.

108. These activities were complex operations on a multi-million dollar trading system. I would compare the disruption similar to firing the pilot of a 747 just before it's about to land at LaGuardia airport, locking the pilot out of his controls as he approaches the runway.

### **Paragraph 10 of Kolb's Declaration**

109. I am unaware of the state of Azure servers after my termination. This is addressed above in response to Robinson's Declaration's paragraphs 16. I, j and k.

110. After the my conversation with Jacob Rappaport when I was terminated on December 9, I left my desk and discussed my termination with my wife for approximately an hour.

111. During this time, I did not know the state of my scripts and automated commands for retiring and provisioning Pfeuffer's new server. I also did not know the state of my scripts and automated commands for my End-of-Day duties. It is likely they were still active, but due to the disruption, I did not know their behavior.

112. When I returned to my desk, I closed all the open applications on the StoneX laptop.

## F. **DECLARATION OF JOHNSON**

113. With respect to paragraph 3 of Johnson's Declaration, it is important to clarify that all members of the Pascal team were 100% remote. One recent exception was a new Quantitative Researcher who commuted to the NY office.

114. Regarding the times indicated in Johnson's Declaration, it is important to note that she is referencing central time instead of east coast time, which is why the timing appears to be one hour earlier. She correctly notes however, that the company began the disruption of the sensitive procedures I was undertaking before I knew what was going on or that I had been terminated.

I declare under the penalty of perjury under 28 U.S.C. §1746 that the foregoing is true and correct, to the best of my knowledge and belief.

Howard Shipman

January 27, 2023