N217StoC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

STONEX GROUP, INCORPORATED,

                    Plaintiff,

          v.                        23 Civ. 613 (JGK)
                                    Redacted

HOWARD SHIPMAN,

                    Defendant.
                                    Remote Conference
------------------------------x

                                    New York, N.Y.
                                    February 1, 2023
                                    2:05 p.m.

Before:

                    HON. JOHN G. KOELTL,
                                    District Judge

                         APPEARANCES

PROSKAUER, LLP
     Attorneys for Plaintiff
BY:  LLOYD B. CHINN
     NIGEL F. TELMAN
     DARYL LEON

PETERS HAMLIN LAW, LLC
     Attorney for Plaintiff
BY:  Kristan Peters-Hamlin

N217StoC

| | |
|---|---|
| 1 | (The Court and all parties appearing telephonically) |
| 2 | (Case called) |
| 3 | THE COURT:  Who is on the line for the plaintiff? |
| 4 | MR. CHINN:  Good afternoon, your Honor.  This is |
| 5 | Lloyd Chinn from Proskauer.  I'm joined by my colleague, |
| 6 | Daryl Leon, who is sitting in my office with me; a junior |
| 7 | associate working with us is just observing, she's not |
| 8 | participating or billing her time, but her name is Sydney Cone, |
| 9 | she's also on the line; and we're joined by an in-house counsel |
| 10 | from Stonex, Craig Hymowitz. |
| 11 | THE COURT:  Okay. |
| 12 | SPEAKER5:  And Nigel Telman is also on the line. |
| 13 | MR. CHINN:  My apologies.  I didn't realize my |
| 14 | colleague from Chicago is also on the line, Mr. Telman.  I |
| 15 | didn't realize. |
| 16 | THE COURT:  No problem.  Okay. |
| 17 | Who is on the line for the defendant? |
| 18 | MS. PETERS-HAMLIN:  Good afternoon, your Honor. |
| 19 | Kristan Peters-Hamlin on behalf of Howard Shipman. |
| 20 | THE COURT:  Okay.  Is your client on the line also or |
| 21 | not? |
| 22 | MS. PETERS-HAMLIN:  No, because this is a scheduling |
| 23 | matter. |
| 24 | THE COURT:  That's okay.  I didn't require his |
| 25 | presence. |

N217StoC

1          Okay.  Well, I've read the papers, and I have my own

2     observations.  But before I delve in, is there anything the

3     parties want to tell me?

4          MR. CHINN:  Yes, your Honor.  We would like, on behalf

5     of Stonex, to address at least briefly the theory that has been

6     proffered by the plaintiff -- I'm sorry, by the defendant for

7     why discovery in this matter needs to be so expansive.

8          I don't want to go too far into this, because I

9     suppose we can address some of this another time, but the basis

10    for the defendant's request for lengthier periods of discovery

11    than plaintiffs had proposed is based on a series of assertions

12    regarding the manner in which Stonex obtains some unidentified

13    source code from another company called BTIG.  We don't believe

14    that there's any basis here on this set of allegations for the

15    Court to expand the scope of discovery in the way suggested by

16    the defendant.

17         First, procedurally speaking, there's no reason for

18    BTIG to be a party of any sort in this case.  I think the word

19    impleader was used.  That makes absolutely no sense at all.

20    Mr. Shipman has no claim -- possible claim against BTIG.  And

21    Mr. Shipman as has no basis to stand in BTIG's shoes to assert

22    claims against Stonex, even if there were any.

23         Moreover, the factual theory put forward by the

24    defendant makes no sense on its face.  We have identified, that

25    is, Stonex has identified, two sets of computer code that

N217StoC

1   Shipman has taken.  And we've explained in our papers, one of

2   them is referred to as Pasqual, and one referred to as Darwin.

3   And Mr. Shipman is not clear as to what he's even claiming was

4   stolen by Stonex from BTIG.  In paragraph 59 of his

5   declaration, he says 60 percent of something was stolen, but he

6   doesn't say 50 percent of what.  But that couldn't have been

7   Darwin because Shipman, as we explained in our papers, was the

8   primary author of Darwin during the last several months of his

9   employment.  That's what Stonex was paying him to develop.  And

10  whatever he is talking about, even according to his own claim,

11  40 percent of whatever that is was indisputably belonging to

12  Stonex.

13          As to the actual *bona fides* of the argument, that

14  Stonex obtains something at issue in this case from BTIG --

15  again, I don't go too far into this, because the Court may want

16  to address this in more detail another time.  But just to

17  address this from a scheduling perspective, we've addressed two

18  cases that deal with this argument.  And this argument, even if

19  it was true as to 100 percent of the computer-coded issue in

20  this case, which is not even the claim, this argument fails as

21  a matter of law.  And the two cases we've located that address

22  this very argument are *DTM Research, LLC. v. AT&T, Corp.*, 345

23  F.3d 327, and that's a 2001 4th Cir. case.  There, the Court

24  observed that these simple ownership is not -- or was not

25  relevant in the trade secretary context.

N217StoC

1      Another case, *Advance Fluid Systems, Inc. v. Huber*, 3d

2   Cir. 2020.  "A *per se* ownership requirement for

3   misappropriation claims is flawed."  It says, It takes account

4   neither of the substantial interests of lawful possessors of

5   the secrets how and the value of that secrecy, nor the

6   statutory language that creates the protection for trade

7   secrets while saying nothing of ownership as an element of a

8   claim for misappropriation.

9      And on the actual facts, there was a dispute——a very

10  minor one, if you will——between Stonex and BTIG that

11  Mr. Shipman references.  And that dispute was resolved

12  confidentially in March 2021 between Stonex and BTIG.  And at

13  issue in that case, all right, the conclusion of that -- it

14  wasn't a case.  I shouldn't have used that word.  At the

15  conclusion of that relatively minor dispute, it was understood

16  that no one at Stonex had stolen any proprietary code.  An

17  individual who formally worked for BTIG who joined Stonex, a

18  Mr. Badhuri, had used his phone to take pictures of certain

19  BTIG code from his computer, but that code, as it turned out,

20  was publicly available code.  Mr. Pfeuffer, while a BTIG

21  employee had downloaded a PDF from a public website, but

22  nothing was stolen or hidden from BTIG.  And a third-party

23  forensic examination was conducted that showed ha none of this

24  was proprietary.  So that matter was resolved.  It involved

25  merely some payment for incurred attorneys fees by BTIG.

1           I would note as well that Mr. Shipman never said a

2    word about this while employed, never asserted any concern that

3    the code he was working on was somehow not rightfully Stonex's.

4    But without this BTIG theory—which we think fails in all of

5    the various ways that I just reviewed—there is no reason for

6    this very expansive notion of discovery that's been threatened

7    by the defendant in various communications with us, and now

8    with the Court, to occur.  And we believe that a schedule, such

9    as the one we've proposed or far more like the one we've

10   proposed, is appropriate in this matter once you separate the

11   weak from the shaft with respect to this BTIG issue.

12           So thank you, your Honor.

13           THE COURT:  Let me make an observation before the

14   defense counsel gets an opportunity to speak.

15           The differences between the parties with respect to

16   the schedule is not that great.  The plaintiff wants the

17   discovery cutoff to be March 1.  The defendant wants it to be

18   no earlier than April 1.  So a one-month difference.  The

19   defendant also says counsel has a trial commitment that would

20   make it difficult to live with the March 1 deadline.  I'd

21   always respect a trial commitment in any event.  So the cutoff

22   for discovery of April 1 seems perfectly reasonable to me.

23           What should the scope of the discovery be with respect

24   to the preliminary injunction?  I couldn't possibly on this

25   phone call say that any proposed discovery is out of bounds at

N217StoC

1    this point.  Defense counsel fights some cases which are not in

2    the correspondence and acknowledges that I may well decide this

3    at a later date or the magistrate judge could decide it at a

4    later date, and that observation is right on.  You know,

5    Mr. Pfeuffer declaration is part of the plaintiff's submission,

6    so could the defendant take a deposition of Mr. Pfeuffer?  I

7    would think the answer to that is yes.

8           MR. CHINN:  We would agree.

9           THE COURT:  Should there be some exclusions from

10   out-of-bounds restrictions on that deposition, it would be

11   hard, if not impossible, for me to decide that now or in

12   advance.  For all I know, discovery into alleged prior bad acts

13   for the purposes of impeachment might be a relevant subject for

14   examination at a deposition.  Mr. Pfeuffer appears to be a

15   fairly important witness, so it's hard to decide those

16   questions now.  I mean, the parties' differences, at least

17   before me——and I wanted to let the parties talk before I

18   did——are relatively small.  You know, there's a schedule, the

19   difference of which is only a month.  So and then there's the

20   issue of CRA, which is a separate issue.

21          Okay.  Ms. Peters-Hines, what do you want to tell me?

22          MS. PETERS-HAMLIN:  Peters-Hamlin, your Honor.

23          THE COURT:  I'm sorry.  Did I --

24          MS. PETERS-HAMLIN:  It's English rather than German.

25          THE COURT:  Thank you.  Sorry.  I can't read my own

N217StoC

 1   notes.

 2            MS. PETERS-HAMLIN:   No problem.

 3            I think that it's worthwhile to address a couple of

 4   the mischaracterizations of the history with BTIG and also what

 5   my arguments are.

 6            As the Court is aware, that is only one part of my

 7   argument.  The discovery -- it sounds like you're willing to go

 8   with April 1 anyway, but the discovery is not expansive because

 9   BTIG -- that's a small part of what the discovery would be

10   because, clearly, I should have an opportunity to take the

11   deposition of the declarant.

12            And your Honor is spot on that impeachment is

13   absolutely one of the bases that I would want to explore with

14   BTIG.  Because I've come to learn, I've looked at

15   communications that were made by text message from Mr. Pfeuffer

16   to my client in which he clearly indicates that he stole code

17   from BTIG and was bringing it to their "new venture."  And he

18   says that the way he was able to get it out without their

19   detection was a technique where he E-crypt source code to the

20   end of the PDF file's law internal instructions.  And it turns

21   out that he then -- something that Mr. Badhuri did, who used to

22   sit right next to Mr. Pfeuffer  at BTIG, he also took something

23   more than just that one photograph.  And we have information

24   about that.  BTIG will undoubtedly be looking into that now and

25   finding those encrypted PDFs.  But it turns out that

N217StoC

1   Mr. Pfeuffer provided a declaration swearing under oath that he

2   hadn't taken anything.  And that declaration is absolutely

3   contradicted by the text messages that I've reviewed where he

4   tells my client that he did take that information and brought

5   it with him.  So the declaration that he provided to BTIG is

6   precarious.

7          So your Honor is absolutely right, that kind of

8   information that this individual is ready, willing, and able to

9   lie about under oath is something that's going to be very

10  powerful, I think, in your Honor's assessment of whether -- you

11  know, because some of this is going to be a he-said-she-said,

12  right?  It's very powerful evidence for your Honor to consider,

13  and it also goes to the issue of whether the portion of the

14  Darwin code that ███████████████████████████████████████

15  ████████████████████████████████████████████████████████████

16  ███████████████████████████████  and they worked on it

17  together, and they shared a password to that code, which was

18  insisted upon by Mr. Pfeuffer.  He insisted that they share a

19  password whenever they worked on the Darwin code.  So they both

20  had access to what each other was doing.  So the portion of the

21  code that was worked on by Mr. Pfeuffer ██████████████████

22  ████████  60 percent of that was stolen from BTIG.  And those

23  encrypted PDFs are going to be coming to light, I believe,

24  shortly.  And BTIG probably is an indispensable party here.

25  Because it turns out that this code that Stonex is suing over

N217StoC

1  is the springboard for that code.  The platform for that code

2  was developed at BTIG.  And if that were true, then obviously

3  Mr. Pfeuffer would have had no reason to steal it.

4       But moreover, there's another aspect of the code,

5  which I believe is called ██.  And ████████████████ that

6  Mr. Badhuri, who sat right next to Mr. Pfeuffer at BTIG, stole

7  from BTIG as well.  So Mr. Badhuri had his responsibilities on

8  the code, Mr. Shipman had his, and Mr. Pfeuffer had his own.

9  And they all contributed to the code and it was accessible at

10 all times to Mr. Pfeuffer, who shared a password to the Darwin

11 code.  So the arguments that he can't get in, and he can't find

12 it, he was locked out are not true and, in fact, perjurious.

13 And in fact that's something we shouldn't be hamstrung in

14 proving.

15      With respect to Pasqual, your Honor, which he's

16 identified is a different source code, what is important to

17 know——and I think you saw that in the declaration——is there are

18 65 individuals who share access to Pasqual, and it's all under

19 the same password.  So it's kind of impossible to say who did

20 what since everybody gets in under the same password.  And they

21 found, actually, that -- they believed, as my client's

22 declaration said, that there was somebody overseas who was

23 accessing it.

24      But I believe that further belaboring this is probably

25 ill-advised because your Honor seems to indicate that April 1

N217StoC

1   is a date that you're inclined to give it.  So I would hope

2   that for the first two weeks of February we won't have any

3   depositions set.  I note that there's a third-party subpoena

4   returnable on February 13 for Linode.  We have no opposition to

5   that.

6           I should say that I've asked my client what Linode is

7   about and apparently it's something that was maintained both by

8   my client——he opened an account, it cost him I think $120 a

9   month——and also by Mr. Pfeuffer.  And I think the reason is

10  that they had a very unstable connection and they were both

11  working from home and I -- he said that the VPN dropped

12  frequently.  So in order to access and do the work while they

13  were at Stonex, they used that Linode process and he dropped

14  the Linode account because it was only to provide that stable

15  connection.  He dropped it after he left Stonex because it was

16  a -- you know, he was unemployed, he has like four or five

17  kids, and it was $120 a month.  So as of December 14, he

18  dropped that.  However, you know, Linode can still be -- they

19  obviously still have the system and they can assess everything,

20  I believe, that Mr. Shipman did or had.  And that will be

21  forthcoming promptly.

22          THE COURT:  Can I say something at this point?  Are

23  you finished with your initial observation?

24          MS. PETERS-HAMLIN:  Well, the ones that address the

25  April 1 date and also the responses to some of the statements

N217StoC

1    that he was making about BTIG and Darwin and that sort of

2    thing, I have finished with that portion, your Honor.

3           THE COURT:  Okay.  The parties should, both sides,

4    understand that I will keep my eye on the ball, so to speak.

5    And while the scope of discovery is broad, and certainly

6    limited to the claims that are before me, and proportional to

7    the needs for discovery with respect to those claims, I also

8    appreciate that there are heightened emotions, if you will, on

9    both sides.  But I will keep my eye on the ball.

10          As I understand it, the issues are whether the

11   defendant took trade secrets from the plaintiff and is

12   potentially using them or not.  There are certainly some broad

13   denials in the plaintiff's declarations and some gaps about

14   failures of recollection and, as I read it, inability to know

15   what was actually going on in the hour after the notice of

16   termination.

17          MR. CHINN:  Your Honor, I believe you just misspoke

18   slightly.  You referred to the plaintiff's declaration but,

19   based on what you're saying, I believe you're referring to the

20   defendant's.

21          THE COURT:  Yes, yes.

22          Ms. Peters-Hamlin was kind enough to correct me

23   several times in the last conference; you're kind enough to

24   correct me now.

25          Yes, I was talking about the defendant's declaration.

N217StoC

1            So all of the information with respect to BTIG may or

2     may not ultimately be relevant to those issues.  I certainly

3     don't see why BTIG has to be a party to this case.  The

4     plaintiff has no claim against BTIG.  The defendant has no

5     claim against BTIG the only references to BTIG come from the

6     defendant's subtle suggestions that pursuing the case may get

7     the plaintiff in trouble with BTIG and, shouldn't we bring BTIG

8     into the mix so that it can assert all of its claims against

9     the plaintiff?

10            MS. PETERS-HAMLIN:  I wouldn't say that's exactly my

11     argument.  It's a little bit different than that, your Honor.

12     My argument is in fact --

13            THE COURT:  Okay.  But please, don't interrupt me.

14     After I'm done, you're certainly welcome to say what you would

15     like.

16            MS. PETERS-HAMLIN:  My apologies.

17            THE COURT:  That's okay.  It's never necessary to

18     apologize.

19            So as I said, I will keep my eye on the ball, but

20     we're talking about now a reasonable schedule.  The plaintiff

21     had wanted a discovery cutoff of March 1.  The defendant wanted

22     a discovery cutoff a couple months later, but certainly no less

23     than April 1.  So the discovery cutoff is April 1.  Plaintiff's

24     moving brief on the motion for preliminary injunction,

25     April 14.  Defendant's response, April 28.  Plaintiff's reply,

N217StoC

May 1.  Hearings, May 24 at 9 a.m.  I authorize expedited

discovery.  If there are disputes with respect to the expedited

discovery or the scope of discovery, you could bring them to my

attention.  If I can decide them, I'll attempt to decide them.

If I think I should refer all of the discovery disputes to the

magistrate judge, I will.  I think that disposes of almost

everything, except for the issue with respect to Charles River.

        MS. PETERS-HAMLIN:  May I address that, your Honor?

        THE COURT:  Sure.

        Is there anything else the parties want to tell me

with respect to the schedule that I've just set out or to

respond to anything that I've said?

        MS. PETERS-HAMLIN:  I would say that with respect to

the characterization that our reason for believing that BTIG is

relevant is because it might create trouble for the plaintiff,

that is not at all what our interest is.  What our interest

actually is is that part of the burden of proof of the

plaintiff is to show that it had ownership of proprietary

information——"proprietary" obviously implies that they own

it——and that their proprietary information was stolen by my

client and used to some effect that has created damage for

them.  And they cannot show that they owned this information

because they utilized the trade secrets developed at -- over

many, many years of BTIG.  And in fact, they don't own -- this

isn't their proprietary information because it's stolen.  And

N217StoC

1    that's one aspect of their *prima facie* case.  And that's why --

2    since we have to defend against the *prima facie* case, that is

3    why BTIG is relevant and, I believe, an indispensable party so

4    that they can participate in this sealed case and help

5    elucidate for this Court what part of this code is actually

6    theirs.  So that was our actual argument.

7         And then I would like to know, since your Honor

8    suggested a magistrate -- I'm not familiar who the magistrate

9    is in this case, so if that can be addressed at some point just

10   to let me know, that would be helpful.

11        And then lastly, with respect to the CRA issue, since

12   that's my concern, when the Court is ready, I believe it makes

13   the most sense for me to be the person who addresses that first

14   for the Court as to why I'm asking the Court to amend its

15   as-ordered order to say that, with respect to just his laptop

16   computer, his personal computer that has attorney-client

17   privileged communications with me, settlement discussions with

18   me, also personal correspondence with family members, friends

19   very sensitive other personal information, I believe that CRA

20   should not look at that.  I did not know until this week that

21   it was the same computer that he was using for his

22   correspondence with me that has been alleged to have some

23   Stonex information on it.

24        But the reason that we're concerned about having

25   Mr. Robinson is because, based on his affidavit, that gives me

N217StoC

|    |    |
|----|----|
| 1  | some concerns because he's used some language that causes me to |
| 2  | believe that he's not independent and objective.  For instance, |
| 3  | in paragraph 6 and 7, he makes a statement using hearsay that |
| 4  | he received from the -- two statements of hearsay that he |
| 5  | received from Stonex personnel that can't possibly -- the |
| 6  | information regarding the termination of the plaintiff couldn't |
| 7  | possibly be within his own knowledge.  And he relies on it when |
| 8  | a declaration should be based on personal knowledge.  He uses |
| 9  | very heavy language such as how he destroyed Stonex data |
| 10 | without having any information sufficient about the migration |
| 11 | that occurred.  And also, then admitting in paragraph 35 that |
| 12 | he can't really know what was done and whether this information |
| 13 | was destroyed. |
| 14 | THE COURT:  Are you still there?  There seemed to be a |
| 15 | break.  Hello? |
| 16 | MR. CHINN:  Your Honor, this is plaintiff's counsel. |
| 17 | We're still on.  We can hear you, but we don't hear anything |
| 18 | from defense counsel. |
| 19 | THE COURT:  Right. |
| 20 | Ms. Peters-Hamlin? |
| 21 | Ms. Simon, can you check, please. |
| 22 | THE DEPUTY CLERK:  It looks like she may have dropped |
| 23 | off, but I will communicate with her. |
| 24 | THE COURT:  Okay.  Thank you.  Should I stay on? |
| 25 | THE DEPUTY CLERK:  For one moment, yes. |

N217StoC

1          (Pause)

2          THE COURT:  Ms. Peters-Hamlin, are you on?

3          MS. PETERS-HAMLIN:  Hello?  This is

4   Kristan Peters-Hamlin.

5          THE COURT:  Yes.  Hi.  This is Judge Koeltl.

6          Mr. Chinn, are you still on?

7          MR. CHINN:  Yes, we're on.

8          THE COURT:  Okay.  Ms. Peters-Hamlin, you dropped off

9   at the point where you were explaining to me why the

10   declaration submitted by CRA indicates that they should not be

11   expert employed to inspect the defendant's personal device.

12          MS. PETERS-HAMLIN:  Correct.

13          So I just want to make clear that we don't have any

14   problem with them inspecting Linode, or doing that, or the USB,

15   we're just concerned with this particular laptop computer

16   because it has attorney-client privileged communications on it

17   as well as very personal and confidential information about his

18   private life.  So we were suggesting Blum Shapiro or Kroll to

19   do that.  And there are things in his declaration that caused

20   me to believe that he spent some time talking with people

21   inside Stonex and receiving information from them and is not as

22   objective and independent as somebody that should have access

23   to attorney-client privilege and trusted with attorney-client

24   privilege communications and settlement discussions.

25          For instance, he says in paragraph 9 that he's going

1   to describe——and he's using heavy language——how Mr. Shipman

2   "destroyed Stonex data."  And then in paragraph 35 he says that

3   he cannot ascertain what is -- has been done until he actually

4   examines the computer and the USB, etc.  So he seemed like he

5   exhibited an alacrity to make this very strong statement that

6   it was destroyed because he considers himself an agent of

7   Stonex.

8         He also says in paragraphs 6 and 7 information that is

9   clearly hearsay.  It does meet the standards of direct and

10  personal knowledge concerning matters involving Mr. Shipman's

11  employment and when he was terminated, etc.

12        The other thing is in paragraph 12, for instance, he

13  makes a false statement that I shipped the laptop to CRA.  In

14  fact, my client shipped it himself.  He paid $100.  We were

15  told by Mr. Telman that they would reimburse him.  They never

16  have.  And he says there that I did it.  Now, I don't know if

17  there was some reason to try to make my client look like he was

18  not cooperative and not willing to send the laptop in, but, in

19  fact, he did it of his own accord.  So maybe that was just a

20  sloppy paragraph, but it was actually untrue.

21        I just -- I have concerns that my attorney-client

22  privileged communications with my client, which include

23  settlement discussions as well as -- the vast majority of stuff

24  on his computer has to do with private and personal family

25  things etc.  It just doesn't seem, in light of what

N217StoC

| | |
|---|---|
| 1 | Mr. Robinson has said, that he's the appropriate person to look |
| 2 | at that.  We suggested two outstanding companies, Blum Shapiro |
| 3 | and Kroll, just for that one computer to ensure that |
| 4 | attorney-client privileged communications aren't in the hands |
| 5 | of somebody who appears not to be as independent and unbiased |
| 6 | as he should be.  And we would request that the Court just |
| 7 | modify the so-order to say that the parties will agree to a |
| 8 | third party to do the -- to forensically examine the laptop. |
| 9 | And we're ready, willing, and able to have that accomplished |
| 10 | this week, your Honor. |
| 11 | THE COURT:  Okay.  Mr. Chinn. |
| 12 | MR. CHINN:  Well, your Honor, I guess I should -- I'm |
| 13 | sorry.  Go ahead, please. |
| 14 | THE COURT:  No.  I was saying I don't think you had an |
| 15 | opportunity to respond to Ms. Peters-Hamlin. |
| 16 | MR. CHINN:  Thank you very much. |
| 17 | Look, I'm not going to go back and rehash the BTIG |
| 18 | issues.  I'm going to focus on this forensic imaging project, |
| 19 | unless there's something in particular the Court wants me to go |
| 20 | back and address.  I mean, I think we've made our position |
| 21 | clear with respect to those other issues. |
| 22 | On the question of the forensic examination of |
| 23 | Mr. Shipman's devices, as the Court will recall, the voluntary |
| 24 | stipulation that was submitted to the Court, that was drafted |
| 25 | entirely by defense counsel and her client.  So we did not -- |

N217StoC

1   Stonex did not participate in the drafting of that.  And in

2   that affidavit -- I'm sorry.  In that stipulation that was

3   proposed and so ordered by the Court on January 26, defense

4   counsel and defendant are referring specifically to back to the

5   papers that we had already filed that they had reviewed.  So

6   all the things that have just been said about the Charles River

7   Associates affidavit, all of those things were known at the

8   time the stipulation was submitted to the Court and so ordered.

9           In the days thereafter, following the entry of this

10  order, we engaged with Charles River Associates to prepare to

11  do this collection.  We had hoped that it would have been on

12  Monday or Tuesday this week, but in reliance upon what had been

13  written by defense counsel and ordered by the Court, that's how

14  we proceeded.

15          On Monday, we were advised of this new issue, this

16  retraction of what has been stated in the so-called voluntary

17  stipulations to the Court, and we made it clear that we had no

18  interest in -- and the issue that was raised with us on Monday

19  was the issue of privilege.  And we made it clear there that we

20  had no issue with segregating out privileged information and

21  that it would be easily accomplished since defense counsel made

22  it clear that all the privileged communications at issue were

23  with her at her e-mail address.  And we understand that she was

24  retained by Mr. Shipman as counsel we believe at some point in

25  December of 2022, so we don't believe there's even a lengthy

N217StoC

1  time period at issue.  And so we stated during the call and we

2  made it clear in a letter to the Court that we were perfectly

3  prepared to agree to a protocol to protect that privileged

4  information and, indeed, even have the Court so order it so

5  that it would have the force of a court order and requiring

6  that those materials be segregated.

7          And the reason for this is just efficiency.  We're

8  trying to move this along.  This is what was, in fact, proposed

9  by the defendant, and we had been moving along that path.  And

10 we'd like to continue to move along that path and not have to

11 halt the process to hire yet another vendor to come into the

12 process for this unique purpose.  And we are perfectly willing,

13 as we said on paper, as we said to defense counsel, as I'm

14 saying now, to enter into any sort of appropriate stipulation

15 to be executed by a court order by the Court, if the Court's

16 willing to do so, to protect those interests.

17         And to the extent that there are other interests that

18 have now been identified that there are some sort of personal

19 documents—not privileged, but personal—you know, we have

20 every reason to believe that a protocol to be arrived at to

21 address those.

22         As far as the statements about Charles River

23 Associates—which is a very well-known, nationwide service

24 here—about the declaration at issue, I mean, these are really

25 sort of picking on the matters.  I mean, paragraphs 6 and 7,

N217StoC

1    they begin with "Upon information and belief."  Yes, certain

2    information was provided to Charles River Associates by Stonex.

3    I mean, there's no question about that.  That's obvious on the

4    face of the declaration.  But that doesn't suggest that they

5    would act contrary to an agreed-upon protocol so ordered by the

6    Court.

7         I mean, in paragraph 9, he previews what his

8    conclusions are, and they're defended in paragraph after

9    paragraph throughout the declaration.  So at one point, he

10   describes how the device came to be in Stonex's possession,

11   that is the personal laptop.  That's in paragraph 12.  He says,

12   "On January 3, 2023, CRA received a laptop that was shipped to

13   CRA by FedEx."  No dispute there.  "CRA" -- I think there's

14   just a letter there missing there.  It says "RA," but I believe

15   it should say CRA.  "CRA was informed by Proskauer that the

16   laptop was owned by Stonex, assigned to Shipman, and was

17   shipped to CRA by counsel representing Shipman."

18        Look, I don't know exactly -- there may be a mistake

19   there in terms of who actually shipped it, but to attribute

20   that to Charles River and say, because of that mistake they

21   cannot be trusted to follow an agreed-upon, so-ordered forensic

22   protocol, I just don't think is well-founded.

23        And then the attack on paragraph 35 -- I mean,

24   paragraph 34 is nothing more than sort of a summation of, look,

25   we've presented all of this evidence through the first 34

N217StoC

1    paragraphs, but there are certain things that we don't know

2    because we don't have access yet to the devices themselves or

3    to the Linode cloud computer.

4           I don't think anything -- there's anything about any

5    of these paragraphs that have been pointed to that is in any

6    way troubling or suggests some ill motive or improper practice

7    on the part of Charles River Associates that would make them

8    unqualified to do what they were proposed to do by defendant

9    and his counsel on January 26, 2023.

10          And lastly, the current concern for us, as I've

11   already alluded to, is bringing a new vendor into this is going

12   to inherently slow things down.  The contracting

13   process——though, I'm sure there's going to be some fight over

14   who's going to pay——what the precise scope is.  We were

15   provided with a declaration just moments prior to the

16   commencement of this call.  Apparently, there are two

17   computers.  We don't know which of these is the one that's

18   being claimed to be the one that shouldn't be looked at by

19   Charles River.

20          So in short, we believe that this is going to lead to

21   substantial delay and there's no basis or need to do it.  And

22   so that -- our position is that we should simply go forward on

23   the basis of the order signed on January 26, 2023.  And we have

24   agreed on this call to a stipulation to be ordered by the Court

25   a protocol that protects Mr. Shipman's interests and privileged

1   information and, as he's now disclosed, personal information.

2   We're happy to take whatever steps necessary to protect those

3   matters.

4           THE COURT:  All right.  I won't change the stipulation

5   that Charles River should be the organization that inspects the

6   personal computer in addition to the other devices.  To bring

7   in another firm at this point just to inspect the personal

8   computer would unnecessarily add to the time and expense for

9   reviewing that computer.  It would also be inconsistent with

10  the original stipulation, which was so ordered, and add a level

11  of complexity to the case, which is utterly unnecessary.

12  Charles River has already opined with respect to various

13  aspects of the search for information, and so it would be more

14  efficient to have it complete that process.  The parties can

15  work out an acceptable protocol to protect any attorney-client

16  privilege or other agreed-upon redactions from the computer.

17          MS. PETERS-HAMLIN:  And then, your Honor, will

18  so-order --

19          THE COURT:  If you --

20          MS. PETERS-HAMLIN:  -- inner spousal privilege?

21  There's attorney-client privilege.  I don't know if there's

22  priest penitent -- I don't know.  But we have to come

23  together --

24          THE COURT:  I would --

25          MS. PETERS-HAMLIN:  -- as parties.

N217StoC

1          THE COURT:  Yes, I would certainly authorize redaction

2  of spousal privilege, priest penitent privilege, as well as

3  doctor-patient, attorney-client.

4          MS. PETERS-HAMLIN:  So I will look for something from

5  opposing counsel hopefully today or tomorrow.  I'll try to get

6  my client.  We'll revise it, if necessary, sign it, and then

7  we'll present it to the Court to be so ordered.

8          Your Honor, does that sound good to you?

9          THE COURT:  Yes, that's good.  I'm usually always

10  here.

11          By the way, the magistrate judge on the case is

12  Magistrate Judge Figueredo.

13          MS. PETERS-HAMLIN:  Okay.

14          THE COURT:  All right.  I think that completes

15  everything.

16          Is there anything else for me now?

17          MS. PETERS-HAMLIN:  No.  Thank you so much, your

18  Honor.  I appreciate it.

19          MR. CHINN:  For the plaintiff, your Honor, no.  I

20  mean, we did just receive this declaration a few moments before

21  the call and we don't believe it to be complete, but we have

22  not met and conferred on that matter with defense counsel.  So

23  I think it would be premature to present that as a dispute to

24  the Court at the moment.

25          So with that, nothing further for plaintiffs.

N217StoC

1        THE COURT:  Okay.  Great.  Bye now.

2        (Adjourned)

3        (Recalled; appearances remain the same)

4        THE COURT:  Okay.  The reason for the follow-up call

5   is I should have mentioned in the earlier call that there was

6   the outstanding application for a temporary restraining order.

7   I don't know if that's been effectively withdrawn or if you

8   want me to rule on it.

9        Mr. Lloyd Chinn.

10        MR. CHINN:  Your Honor, I believe this may have come

11   up in our initial call last Thursday, at least in some

12   preliminary fashion, I believe that Stonex is prepared to

13   proceed on the basis of the so-ordered stipulations and is

14   prepared to proceed from there to this application for a

15   preliminary injunction, assuming that there's no resolution or

16   something along the way.

17        THE COURT:  Fine.

18        MR. CHINN:  If that's acceptable --

19        THE COURT:  Yes, absolutely, absolutely.

20        MR. CHINN:  Okay.

21        THE COURT:  Sure.  No problem.

22        And I -- so the application for a temporary

23   restraining order is withdrawn in light of the so-ordered

24   stipulation, right?

25        MR. CHINN:  Yes, your Honor.

N217StoC

1          I think that was -- I think that makes a lot of sense

2     just from an efficiency point of view.  So yes, that's our

3     position.

4          THE COURT:  Great.  And do you agree with that, too,

5     Ms. Peters-Hamlin?

6          MS. PETERS-HAMLIN:  You bet.

7          THE COURT:  Okay.  Great.  That was the reason for the

8     call.  So I'll put that in the order that summarizes today's

9     conference calls.  Thanks very much.  Sorry for bringing you

10    back on.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25