N1QCstoC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   STONEX GROUP INC. and STONEX
     FINANCIAL INC.,
 4
                   Plaintiffs,
 5
               v.                      20 Civ. 613 (JGK)
 6                                     Telephone Conference
     HOWARD SHIPMAN,
 7
                   Defendant.
 8
     ------------------------------x
 9                                     New York, N.Y.
                                       January 26, 2023
10                                     10:00 a.m.

11   Before:

12                    HON. JOHN G. KOELTL,

13                                       District Judge

14                         APPEARANCES

15   PROSKAUER ROSE LLP
          Attorneys for Plaintiffs
16   BY:  LLOYD CHINN
          DARYL LEON
17        NIGEL TELMAN

18   KRISTAN PETERS-HAMLIN
          Attorney for Defendant
19

20

21

22

23

24

25
```

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          THE COURT:  Who's on the line for the plaintiff?

4          MR. CHINN:  Good morning, your Honor.  This is Lloyd

5     Chinn of Proskauer Rose.  I am joined in my office, not on a

6     separate call line, by Daryl Leon, a colleague of mine.  As

7     well, I'm joined by a colleague in Chicago, Nigel Telman.

8          THE COURT:  Any clients on the phone for you?

9          MR. CHINN:  Yes.  From StoneX, we have Craig

10    Chaimowitz, in-house counsel.

11         THE COURT:  Thank you.  And for the defendant.

12         MS. PETERS-HAMLIN:  Good morning, your Honor.  This is

13    Kristan Peters-Hamlin of the law firm Peters-Hamlin Law, LLC on

14    behalf of the defendant, Howard Shipman.  Mr. Shipman is

15    participating on the call, as well.

16         THE COURT:  Thank you very much.

17         There is an application for a temporary restraining

18    order and the necessity of scheduling.

19         I've read the papers, I've also read the proposed

20    voluntary stipulation by Mr. Shipman.

21         Ms. Peters-Hamlin, is it correct for me to refer to

22    you as Ms. Peters-Hamlin?

23         MS. PETERS-HAMLIN:  Yes, your Honor.

24         THE COURT:  Ms. Peters-Hamlin also says the defendant

25    will submit a detailed affidavit by tomorrow afternoon,

1    responding to the allegations in the complaint and the request

2    for a temporary restraining order.

3            So let me give you some observations before I listen

4    to the parties.  The proposed stipulation by Mr. Shipman

5    appears to go very far.  If I so ordered the stipulation, it

6    would appear to give much of what the plaintiff was seeking in

7    the TRO.  The plaintiff can point out to me what the gaps may

8    be.  If there is a contested TRO, I would give the defendant

9    the opportunity to respond and explain why I shouldn't enter

10   the temporary restraining order, unless there was some

11   irreparable harm that would occur while I was considering the

12   TRO.  That doesn't appear to be the case in this case because

13   there has been some considerable time to make the application

14   for a TRO in the first instance, and there's the voluntary

15   stipulation which would go into effect immediately.  The effect

16   of the voluntary stipulation also is not time banded.  So a TRO

17   can only exist for 14 days and then be extended for another 14

18   days.  The advantage of the voluntary stipulation is it's not

19   time bound.

20           Obviously, the next step after the TRO would be the

21   issue of the preliminary injunction.  The first round of the

22   preliminary injunction is included in the plaintiff's papers

23   that have been submitted, but there would have to be responsive

24   papers, particularly with the existence of a stipulation, which

25   appears to go very far, the parties would have the opportunity

N1QCstoC

1    for expedited discovery.  Based upon the email from

2    Ms. Peters-Hamlin, it appears that the facts may well be

3    contested.  So the parties could take expedited discovery.  The

4    plaintiffs say this is what Mr. Shipman did, Mr. Shipman says

5    no, I didn't do that.  So there could be expedited discovery

6    and then a decision on the preliminary injunction and, if

7    necessary, an evidentiary hearing on the preliminary

8    injunction.

9         So those were my observations.  Certainly, I would be

10   interested in knowing the parties' views on all of this,

11   including from the plaintiff, what the plaintiff thinks may be

12   the shortcomings in the voluntary stipulation compared to the

13   TRO.  But it's quite likely that the parties, to the extent

14   that there's a disagreement, could simply agree upon any

15   additional provisions of a voluntary stipulation that I could

16   add.  So those are my observations.

17        Mr. Chinn, your turn.

18        MR. CHINN:  Thank you, your Honor.  And I should say,

19   although you've seen from our papers that we believe this is a

20   case about an employee apparently plotting or at least

21   anticipating his departure, getting fired and taking his

22   employer's valuable tech with him, but having said that, we

23   acknowledge I think what the Court just observed.  I think the

24   stipulation we received shortly before the call this morning,

25   you know, addresses some of our short-term concerns, and we

1    appreciate it.  So we are interested in at least, in part,

2    following along that path.

3         In terms of where the stipulation falls a bit short,

4    we hadn't really thought through the sort of so-ordered

5    stipulation versus the TRO issue in the way you just described

6    it.  So I think that was a helpful observation that it's not

7    time limited.  So I'd like to just think that over for a

8    moment.

9         We had requested in our proposed TRO, in addition to I

10   think what the Court is suggesting, a party discovery, we had

11   also sought expedited third-party discovery because we believe

12   there can be important information in the possession of, for

13   example, Linode, and also Mr. Shipman's internet service

14   provider.  So that would be an issue that we would ask to be

15   addressed here and whether it's a TRO or so-ordered

16   stipulation --

17        THE COURT:  Stop.  I'd authorize expedited discovery.

18   My suggestion essentially was, okay, there seems to be a fairly

19   comprehensive proposed stipulation.  I could so order the

20   stipulation.  I would certainly order expedited discovery

21   because what that does is it let's the parties talk about what

22   the appropriate schedule is for the briefing and hearing on the

23   preliminary injunction.  Parties can take discovery, we can

24   take discovery from each other, discovery from third parties,

25   work out how long that will take, whether the plaintiff wants

1    to submit additional papers in support of the preliminary

2    injunction, responsive papers and then, if necessary, an

3    evidentiary hearing.  I mean, if the plaintiff says the

4    defendant did this and the defendant says no, I didn't, that

5    seems to be something that could only be resolved at an

6    evidentiary hearing on the preliminary injunction.

7             MS. PETERS-HAMLIN:  Your Honor, before you make a

8    decision on expedited discovery, you will allow me to briefly

9    address that in this call; correct?

10            THE COURT:  Of course.  I'll allow you to say anything

11   you wish.

12            MS. PETERS-HAMLIN:  Well, not anything.

13            THE COURT:  Well, anything you choose to say after I

14   finish with Mr. Chinn.

15            MS. PETERS-HAMLIN:  Thank you.

16            MR. CHINN:  Your Honor, all of that, you know, is

17   perfectly acceptable to StoneX in terms of mapping out a

18   schedule, and I think it sounds like you may be suggesting that

19   we confer with Mr. Shipman's counsel and arrive at a proposed

20   schedule and refer to you.  I'm not sure you're saying that,

21   but it sounds like you may be suggesting that, and that's fine

22   with us to proceed in that fashion procedurally.

23            I guess the big question -- so in terms of the

24   stipulation -- so I raised the sort of one issue, that being

25   discovery, including third-party discovery.  We had also sought

1     a broader prohibition on employment, which I'm prepared to talk

2     about.  But I guess the question we're unclear about on our

3     side is based on the email and the attached proposed

4     stipulation, we don't know if Mr. Shipman is taking the

5     position that he has any of our confidential or trade secret

6     information in his possession, whether he had such information

7     and deleted it.  We don't know whether he's saying yes or no to

8     that.  That matters for paragraph 5 because in paragraph 5, he

9     says I agree to refrain from working or consulting to any

10    person or business to whom I have disclosed or discussed any of

11    the materials copied from StoneX's computer system.  I guess

12    the question is, reading paragraph 5 with the cover email that

13    enclosed this, we can't tell if Mr. Shipman is acknowledging

14    that he has our information in his possession or that he has

15    had it in his possession since leaving StoneX, we just don't

16    know.  The point of raising this question is because paragraph

17    5 is limited in that way:  Is that a hollow promise?  Is he

18    taking the position that I haven't done any such thing so I am

19    not restrained from working anywhere?  Or is he conceding that

20    he has?  So that's a little unclear to us between the email and

21    the proposed stipulation.

22           The sort of fundamental position here is we understand

23    he denies wrongdoing.  He says that was stated in the cover

24    email.  But does that just mean we don't have a statutory cause

25    of action, but he does have our information and has some

N1QCstoC

1   explanation for it?  Or is he saying he doesn't have our

2   information, he never had it, didn't delete it, and we just

3   don't know?  So on that point, we would request a broader

4   prohibition on employment until we get a better answer to that

5   question.  So that's the other issue in terms of substance,

6   your Honor.  That's the other issue, if you will, we had with

7   the proposed stipulation.

8           THE COURT:  Okay.  Just an observation, the defendant

9   also says that the defendant would submit a detailed response

10  by tomorrow by 3:30.  Certainly we can wait for a response to

11  that.

12          Second, what is the defendant's position as to whether

13  he took, destroyed confidential information.  I took it from

14  the gist of defense counsel's email that the defendant, in

15  fact, denies wrongdoing.  I took that to mean the defendant

16  would say that he didn't, in fact, do the things he's accused

17  of doing.

18          But, in any event, with expedited discovery, the

19  defendant, under oath, would explain why it is that he denies

20  what the plaintiff is saying.  And with respect to employment,

21  this is, at best, shadowboxing because of where the defendant

22  is employed or looking for employment will swiftly be

23  determined whether Ms. Peters-Hamlin wants to tell me about

24  that now or in the submission tomorrow or in the expedited

25  discovery, it's going to come out very quickly.

1          So I'm going to listen to Ms. Peters-Hamlin in a

2    moment, but with respect to the issue as to whether a TRO has

3    to include a broader prohibition on employment, I certainly am

4    not so sure about that and would certainly wait for the

5    defendant's response tomorrow afternoon.

6          This is also to both sides, which Mr. Chinn intuited,

7    the way that this should be resolved is for the parties to

8    discuss between themselves how to go forward, briefing

9    discovery, hearing on a preliminary injunction.  You know all

10    of that better than I do, and my entry of the order, so

11    ordering the voluntary stipulation, which would then give you

12    both breathing room for your discussion about how this all

13    should proceed.  And, of course, if you all couldn't agree on

14    that, simply enter an order.

15          So, your turn, Ms. Peters-Hamlin.  You've been very

16    patient.

17          MS. PETERS-HAMLIN:  Thank you, your Honor.

18          This matter was filed with the Court on January 19th,

19    and the order to seal it was on January 23rd.  My client just

20    got the pleadings yesterday and I have been corresponding since

21    early December with opposing counsel.  So they knew my email

22    address, we've been talking in a very cordial, courteous way

23    for more than a month.  They could have forwarded to me or my

24    client on January 19th or January 23rd these pleadings so we

25    could, by today's conference call, provided the Court with a

1    very detailed factual basis that would cause the Court to

2    understand that everything that we've already provided and the

3    voluntary stipulation is appropriate.  We will be answering all

4    of the questions that opposing counsel has raised, that he

5    believes expedited discovery are necessary for in our

6    declaration tomorrow.

7            Moreover, we have already agreed to allow a computer

8    frisk and a frisk of the -- a computer frisk of his personal

9    computers and for CRA to come to his home and look for things.

10   Obviously, we have no concerns whatsoever about discovery

11   beginning with Linode.  My client has no control over Linode

12   whatsoever.  So we would consent to a third-party discovery of

13   Linode, as well.

14           Now, with respect to what is before the Court and what

15   is not.  A little background is valuable, I believe.

16           So the parties have an agreement that all merits of

17   any employment dispute, including these kinds of disputes that

18   are -- your Honor I think believes are presently before the

19   Southern District of New York must be arbitrated before FINRA.

20           THE COURT:  Could I stop you for a moment.

21           MS. PETERS-HAMLIN:  Yes, your Honor.

22           THE COURT:  While that wasn't addressed in the papers,

23   I suspected that the ultimate merits of the dispute would have

24   to be arbitrated before FINRA.  I appreciated that the limited

25   nature of the matter before me would be a preliminary

N1QCstoC

1    injunction in aid of arbitration.  I get all of that.

2          MS. PETERS-HAMLIN:  Yes.  So what I am saying is that

3    we're giving him -- your Honor correctly mentions that we're

4    not only giving him what he needs from a TRO perspective, but

5    we're also giving him more than that, we're giving more than

6    the application.  We're agreeing to a permanent injunction, not

7    just a preliminary injunction, but a permanent injunction

8    because he voluntarily agree to everything that they've

9    requested.

10          Now, they did ask the Court to make a variety of

11    findings of fact, and I think that is inappropriate for them to

12    ask this Court to do because they have filed a FINRA action.

13    And I want to give the Court a little bit of history so that it

14    understands what's going on.

15          On January 9th, my client made a presentation of this

16    thing that they called a Darwin sandbox.  That Darwin sandbox,

17    once it was supposed to be up and running, was supposed to

18    result -- it was supposed to increase the profits of the

19    company.  The oral agreement with my client and with Evan

20    Pfeuffer was that each would get approximately $11 million

21    apiece.  Once he showed them a presentation that day without

22    any notice --

23          THE COURT:  I'm sorry.  I think you said January 9th.

24    I think you meant December 9.

25          MS. PETERS-HAMLIN:  Correct, your Honor.  I'm sorry.

N1QCstoC

December 9.

On December 9, he made this presentation on that same day.  To his shock, he was told that there are cultural differences and that is why he is being terminated.

Now my client had brought to the company's attention SEC violations because they had been doing -- engaging in a couple of illegal activities, one of which is using encrypted messaging by an encrypted encryption methodology — and he took photos of this — called Signal.  Now, those kinds of violations have resulted time and again with SEC settlement agreements with major banks for $175 million, $150 million, $75 million, and he's got photos of that.

Moreover, he also complained about another illegal activity, which the SEC finds violative, called managing the spread.  There are also a variety of employment discrimination complaints, and he was also aware that Mr. Pfeuffer had about 60 percent of what was in their code really didn't even belong to StoneX because Mr. Pfeuffer had brought that from BTIG, and he -- you know, and we've got documentary evidence of this, it's -- 60 percent of it is a theft of trade secret perpetuated by Evan Pfeuffer.

So these are things that were brought to the attention of the company.  They then told him at a meeting where Mr. Pfeuffer said, who was senior to my client, he said to him, I need you to give me a new server.  And pursuant to -- it's

1    expensive to run a bunch of different servers.  So pursuant to

2    Pascal, he was required to retire the 004 server so that he

3    could give a new server to Evan, and that was something he was

4    instructed to do on December 9th by Evan.

5         And then, all of a sudden in the middle of that

6    process of moving the 004 server, retiring it and transferring

7    it, all of a sudden he was cut off of use of his computer and

8    the server, and he didn't know what happened.  And then he got

9    a call from Mr. Amato for -- saying there is cultural

10   differences and for that reason, you're being terminated.

11        So the problem with cutting somebody off in the middle

12   of them providing an instruction to retire one server in order

13   to -- pursuant to their supervisor's instruction to open

14   another is -- what that does is it then can make the server

15   retirement kind of do an endless loop and create all kinds of

16   problems, which my client then discussed with Evan was going to

17   create problems on Monday morning, which, you know, the word

18   "s-h-i-t show" was used in the affidavit to explain that, but

19   that was not because my client did something wrong, it's

20   because he was doing exactly what he was told to do.  And then,

21   instead of finding out before they shut down his use of his

22   computer, whether he was in the middle of transferring the

23   server or not, they just unilaterally terminated him and that

24   is what created the problem.

25        Now, on Monday morning, he did call in to find out

1    whether everything was up and running, and with five minutes of

2    7:00 a.m., they said everything is running smoothly.  So there

3    is much ado about nothing here, and I think that will get

4    explained to the Court tomorrow.

5           He was given until -- Mr. Amato told him on

6    December 9th they had until the following week to resign.

7    Obviously, if he's resigning, then he has a difficult time

8    bringing a Sarbanes Oxley or Dodd Frank claim saying he was

9    terminated because he's resigning.

10          So he called me and I got on the phone with Craig

11   Chaimowitz, and I let him know that there was going to be an

12   SEC filing, as well as a Department of Labor filing.

13   Obviously, you have to exhaust administrative remedies before

14   the DOL before going to the Southern District of New York, and

15   I informed him that that's what we were going to do.

16   Unfortunately, I had a two-week trip to Egypt in the interim,

17   so that delayed things a little bit, but I did inform him

18   that's exactly what we're going to do.

19          My client also put in writing to the chief of

20   compliance, which we're going to provide to the Court tomorrow,

21   and Mr. Chaimowitz and a variety of others, senior people, once

22   again, the SEC violations that he had complained about and

23   other misconduct.

24          So, since that time -- so, keep in mind that, first

25   he's told there is cultural differences.  And then I start

1    talking for the ensuing weeks with opposing counsel, and here,

2    a variety of iterations of things that allegedly my client did,

3    none of which ended up appearing in the U4.  And the reason

4    that even though they're, you know, pretty much directly

5    elicited on a U4, to say has there been any misconduct in terms

6    of theft of trade secrets, because on the U4, you can sue

7    somebody for defamation, you know, in a pleading, you can't

8    because it's insulated.  There is a qualified immunity for what

9    you put in the pleading.  So notably, they didn't put any of

10   this in the U4 that was filed on January 8th.

11        So we're going to explain every factual allegation

12   that is raised in the declarations.  And although opposing

13   counsel is saying to you that there were findings of fact that

14   he wanted from you that were included in his proposed TRO, we

15   believe those are properly before, A, FINRA, which they have

16   filed a FINRA complaint as of yesterday, it's properly before

17   FINRA, and I've already had a communication from FINRA counsel.

18   It's properly before the DOL.  And it's properly before the SEC

19   because this is a little bit more complex than what has met the

20   eye.

21        Obviously, the Court doesn't have, you know, our point

22   of view because they delayed six days in providing me what they

23   had filed on January 19th, despite the fact that we had been

24   corresponding so that I've got my pants down around my ankles

25   right now talking to the Court in trying to explain what's

1   going on.  So we really do think it would be fair for the Court

2   to wait to hear his explanations before tomorrow.

3           With respect to expedited discovery, there's no reason

4   for expedited discovery.  And the reason there's no -- other

5   than what he's agreed to.  And the reason there's no need for

6   expedited discovery is because FINRA moved expeditiously, so

7   does the DOL.

8           And with respect to the only things that are properly

9   before the Court since the parties have an agreement to bring

10  all merits before FINRA, the only things that are properly

11  before the Court are the TRO issue, the injunctive relief,

12  which he's 100 percent agreed to.  So there's really no reason

13  for expedited discovery in this Court, which would be

14  duplicative of what goes on at FINRA.

15          Obviously, he's an individual who -- he has four or

16  five kids, two of them are in college.  To have him undergo

17  expedited discovery here, discovery in FINRA, discovery at the

18  DOL is really corporate bullying of an individual.  He's given

19  them what they wanted and there's nothing more that is needed.

20          We will also address with the Court tomorrow in our

21  answer that he has no intention of working for any company that

22  is a competitor.  The companies that he's looking at are

23  expressly listed in their agreement as not being competitors.

24  I mean by definition, it's not a competitor.  Unlike a lot of

25  trade secret cases where a company has not only an allegation

1    that the employee has taken something, but they have some

2    evidence that he's using it at a new place of employment which

3    is a competitor, there is no such allegation here.  There is no

4    allegation of damages because there's no allegation that he has

5    provided this information to another company and is using it.

6    In fact, as you'll find out tomorrow in his declaration, he's

7    not looking at a company that would be a competitor, he's

8    agreed not to use this or share any of this information that

9    they claim that he took with any corporation.  So other than

10   allowing CRA, Charles River Associates to come to his home and

11   do a frisk of all of his computers, which, you know, is all

12   that is needed, I believe that once the Court sees his

13   declaration tomorrow, that the Court will be satisfied that the

14   small aspect of this case that is pending before the Southern

15   District of New York, which is the injunctive relief, is

16   satisfied fully by the declaration -- or the stipulation that

17   he has provided to Court and that the rest of this case should

18   instead proceed before FINRA and the DOL and the SEC.

19            THE COURT:  Thank you for that explanation.

20            A couple of observations before I turn to Mr. Chinn.

21            The application before me is actually for a

22   preliminary injunction with a temporary restraining order

23   before I decide the preliminary injunction.  Is there a

24   possibility of a preliminary injunction?  Well, a preliminary

25   injunction in aid of arbitration is something that's permitted

N1QCstoC

1      under the cases.  And as to findings of fact, I couldn't enter

2      a preliminary injunction without findings of fact, conclusions

3      of law.

4             You explained that there's a larger issue between the

5      parties as to what the reasons were for the defendant's

6      termination.  You say he was terminated for a variety of

7      impermissible reasons, including retaliation, and you correctly

8      say those issues are not before me, but for FINRA.  So the

9      focus here would be in connection with the preliminary

10     injunction, whether there's a sufficient showing of likelihood

11     of success and irreparable injury, even though the ultimate

12     dispute with respect to whether trade secrets were taken, used,

13     computer abuse may be the subject of arbitration.

14             MS. PETERS-HAMLIN:  Your Honor, may I interrupt

15     briefly just to bring one thing that I think is very helpful to

16     the Court, to your attention?

17             THE COURT:  Sure.

18             MS. PETERS-HAMLIN:  Your Honor is correct that you

19     have to make findings of fact for a preliminary injunction in

20     aid of issuing that preliminary injunction.

21             THE COURT:  Right.

22             MS. PETERS-HAMLIN:  As your Honor also knows that if

23     the parties were to settle and to withdraw all of this or if

24     the parties were to come to a stipulation or a settlement and

25     then ask the court to enter a judgment consistent with that

1   without any findings of fact, that is a different scenario.

2          THE COURT:  Oh, sure.  Be my guest.

3          MS. PETERS-HAMLIN:  What my client has done is he has

4   entered into a voluntary stipulation, which is, in essence,

5   he's settling all of the TRO and preliminary injunction issues

6   without your Honor having to go through the elaborate process

7   because it is a stipulation.  I would respectfully suggest that

8   it is entirely possible that your Honor doesn't have to make

9   any findings of fact because he's already stipulating to the

10  relief, and therefore you don't have to support, for appellate

11  purposes or any other purposes, why there's an injunctive

12  relief because he's agreed to it voluntarily and stipulated to

13  it.

14          THE COURT:  First of all, I never act for purposes of

15  appellate review, I act because I think I'm required by the law

16  to do what I do.  Rule 65, injunctive relief, would require

17  findings of fact, conclusions of law.  But don't take me wrong,

18  if the parties agreed to settle this case, to dismiss the case,

19  that would be perfectly fine with me.

20          Now, I think you're right to focus on the issue of the

21  defendant's search for employment and use of or alleged use of

22  confidential information, which is at the heart of the request

23  for a TRO and the request for a preliminary injunction.

24          The reasons for the termination are not, as I

25  understand it, before me or part of the preliminary injunction,

1     and perhaps the parties could reach an agreement with a little

2     or more than a little conversation precisely about whether

3     there was any taking of trade secrets and whether the plaintiff

4     is seeking to use any trade secrets that were taken and what

5     the limits are -- I'm sorry.  The defendant.  I keep saying the

6     plaintiff.  But if defendant took any trade secrets and what

7     the limits of the defendant's search for employment are.  The

8     plaintiff has pointed to an uncertainty as to whether the fifth

9     provision of the voluntary stipulation is sufficient because it

10    says:  "I agree to refrain from working or consulting with any

11    person or business to whom I have disclosed or discussed any of

12    the materials copied from StoneX computer systems."

13          What that leaves open is, did the defendant copy

14    materials from StoneX's computer systems; and second, is the

15    defendant applying for employment in any firm that he would

16    otherwise be prevented from working for.

17          MS. PETERS-HAMLIN:  Yeah.  So, your Honor, he can

18    address all of that tomorrow, but for the time being --

19          THE COURT:  Hold on.  Just let me finish my thoughts.

20          MS. PETERS-HAMLIN:  I apologize.

21          THE COURT:  That's okay.  It's one of the difficulties

22    of a telephone conference.  You would see me trying to say

23    something if you were in court, hard to do that over the phone,

24    and you're very polite and I appreciate it.

25          So, as to whom he is seeking employment, one would

N1QCstoC

| | |
|---|---|
| 1 | think that what you've told me so far is he's not seeking |
| 2 | employment with any competitor, and he knows he can't and he's |
| 3 | not going to do that. |
| 4 | MS. PETERS-HAMLIN:  Correct. |
| 5 | THE COURT:  That's not what paragraph 5 says. |
| 6 | As to the other issue as to whether he took any |
| 7 | materials copied from StoneX's computer systems, that's |
| 8 | something that's not been responded to. |
| 9 | MS. PETERS-HAMLIN:  Your Honor, I think I'm going to |
| 10 | suggest to both opposing counsel and your Honor that we |
| 11 | potentially proceed as follows.  If you look at the CRA |
| 12 | declaration in paragraph 35, he says that he cannot tell, |
| 13 | really, what has been taken and what there is, and he would |
| 14 | need to do a forensic analysis.  We've consented to that and |
| 15 | said fine, do that on an expedited basis, do a forensic |
| 16 | analysis.  And that is in the stipulation. |
| 17 | So what I would respectfully suggest is for today's |
| 18 | purposes, the stipulation is more than enough.  Tomorrow, the |
| 19 | Court will have, at 3:00 or 3:30, a declaration that will |
| 20 | address all of the things that the Court has identified, where |
| 21 | he's looking, his not having shared any improper information, |
| 22 | not going to a competitor, everything that he's done, he'll |
| 23 | address every single paragraph that he does not -- that he |
| 24 | contests in the declarations by Mr. Pfeuffer and the CRA |
| 25 | forensic specialists, which are the ones that -- are the two |

1    declarations that have the most substantive allegations.  The

2    ones that he does not contest, he will indicate that, as well.

3    I believe the Court will be fully satisfied and so will

4    opposing counsel that they have answers to those questions

5    tomorrow.  And then we can have another call in the following

6    week or the Court can just send us an email saying, based on my

7    review of this declaration, I don't have -- I have these

8    questions still, but I want to ask Mr. Shipman about directly

9    next week or I have no questions and I believe that this is

10   what we need to do.

11            I think that, given that January 19th, this was filed;

12   January 23rd, it was under seal.  Six days they sat on their

13   hands before they sent me anything.  I don't think we need to

14   do anything more than the stipulation that the Court presently

15   has to enter that.  By tomorrow afternoon -- he's not starting

16   work anywhere, he's not working anywhere right now.  By

17   tomorrow afternoon, he's not going to be working anywhere.  By

18   tomorrow afternoon, you'll have more of an answer and then we

19   can have a further hearing or a conference call next week if

20   the Court believes that's necessitated, or after the Court

21   evaluates everything, has more facts from both sides, which I

22   think is only fair, before there's any further orders than what

23   he's stipulated to, I think the Court will have a better idea

24   of what, if anything, else is necessary in addition to the

25   stipulation that's already filed.  But it would be unfair to my

N1QCstoC

1    client to do more than what he has stipulated to, given that

2    he's willing to really hustle and get the Court a very detailed

3    declaration tomorrow.

4              THE COURT:  Okay.  I'll listen to Mr. Chinn in a

5    moment.  As I thought I conveyed, of course, subject to

6    listening to Mr. Chinn, I'll sign the stipulation, I'll so

7    order it.  It's not really a stipulation, it's an agreement by

8    Mr. Shipman.  But it's an order, I'll sign it.  I certainly

9    don't see that I would have to or intend to sign a TRO today

10   without getting the detailed response tomorrow.  So I'll

11   consider that.  After I consider that, I'll probably set it

12   down for another conference next week.

13             But there's one part of what I've said that apparently

14   didn't come through sufficiently clearly.  I welcome, I welcome

15   the parties reaching some agreement in this case, which would

16   effectively resolve the purposes for coming to federal court,

17   which is to get an injunction against conduct allegedly in

18   violation of the federal statutes, which you correctly say is

19   properly before other tribunals.  I don't know the answer to

20   that, frankly, because I don't know whether all of these issues

21   can be raised in FINRA or not, but if they're subject to

22   arbitration, certainly the underlying case would be stayed

23   under Second Circuit law these days, stayed but not dismissed

24   if, in fact, I had to make those decisions.  But the parties

25   can relieve me of all of that by entering into their own

1    agreement or voluntarily dismissing this case with whatever

2    agreements they have between the parties.

3              MS. PETERS-HAMLIN:  Your Honor, I did hear your Honor

4    saying that and I will say that I believe that opposing counsel

5    will benefit from seeing the declaration tomorrow and then we

6    can have those conversations.

7              THE COURT:  Sure.

8              MS. PETERS-HAMLIN:  And I must say, in support of

9    my -- I haven't had the pleasure of getting to know Mr. Chinn

10   or talking to him, but I have had some conversations with Nigel

11   Telman, and I think we've had very professional and courteous

12   conversations, he's truly a gentlemen.  I've never had anything

13   but positive interactions with Proskauer in decades.  So I feel

14   that after they've had the benefit of my -- that my client's

15   declaration tomorrow, I am ready, willing, and able to talk to

16   Mr. Chinn, which sounds -- if I infer correctly, Mr. Chinn may

17   be willing to talk with me, as well.  Obviously, anything that

18   the parties can do to relieve the Court of the burden of

19   dealing with a case that can clearly be resolved amicably

20   between counsel is something that I'm committed to do.

21             THE COURT:  Mr. Chinn.

22             MR. CHINN:  Your Honor, a lot has been said here, and

23   I'm not going to go into detail addressing a lot of it because

24   I think, as everybody on this call knows, a lot of what has

25   been said here, these various assertions, they're not before

N1QCstoC

1   the Court.  I mean, just to be clear, as to all of this, these

2   claims about why Mr. Shipman was terminated, we deny all of

3   that.  We're not going to get into that with any detail.

4         With respect to the procedural status here, yes, we're

5   happy to look at whatever is submitted tomorrow and engage in

6   further conversations, but I don't want to get away from the

7   very detailed information that we've already provided to the

8   Court.  We know that a number of things occurred here that are

9   not in any way explained away by the comments that have been

10  made by defense counsel on this call.  We know that data was

11  transferred on December 9th, we know there were three sets of

12  deletions on December 9th, we know that after the termination,

13  we know that storage drives were inserted into our computer,

14  StoneX's computer, and we know that files were transferred with

15  curious names that correspond directly to the technology that

16  we believe has been stolen, like StoneX DOCs, texts and so

17  forth, and we know a virtual box was deleted from his computer.

18        So, from all of this, we believe that, at a bare

19  minimum, Mr. Shipman has done three things:  That he's taken a

20  copy of StoneX's Proskauer code; that he's taken, in its

21  entirety, the December 9, 2022 version of StoneX's new

22  proprietary trading system, Darwin; and he's taken other

23  confidential information relating to the running of StoneX's

24  business, which was saved to the second storage device that he

25  used.  Now that evidence, we have that evidence.

1          So, look, we're happy to see what's presented to us

2    tomorrow, but before we are willing to enter into any sort of

3    thought or discussion that this is somehow amenable to just a

4    conversation between counsel to relieve the Court of this case,

5    I don't want to forget the pretty significant amount of

6    information that's been collected and presented here.

7          And I also want to point out, defense counsel keeps

8    suggesting that we delayed bringing this issue to her

9    attention.  Mr. Telman had a number of conversations with her

10   in which he raised this question and was given very summary

11   sorts of statements about he didn't take anything, he didn't do

12   anything, you're barking up the wrong tree, and we just -- our

13   own investigation, including, you know, a very prestigious

14   forensic firm's conclusions tells us -- would tell us

15   otherwise.  And we are aware of a lot of deletion history.

16         So yes, we sought the sealing order starting last

17   Thursday, we received the sealing order I believe on the end of

18   the day Monday or on Tuesday.  We advised, by email on Tuesday,

19   Ms. Peters-Hamlin that we were going into court, we were filing

20   our complaint because that's, in fact, when we were doing it.

21   The prior action was just for the purpose of sealing.

22         As for the Court's powers here, if we don't reach a

23   resolution, the FINRA rules expressly address -- I believe it's

24   FINRA Rule 13804 expressly addresses the situation that we're

25   in.  While we didn't refer, I guess, expressly to filing a

1    separate arbitration, I think the word the Court used to

2    describe something I was doing earlier -- I think the Court,

3    easily intuitive from our papers, given the scope of the relief

4    requested, that another form was involved here, that we

5    disclosed in our papers that he's FINRA registered.  We've

6    asked for a TRO and a preliminary injunction, and that is

7    precisely what is allowed by FINRA Rule 13804.  And as the

8    Court mentioned, cases decided on this subject.  And if there

9    is not a resolution, a voluntary resolution between the

10   parties, we very much want to proceed not only with the CRA

11   examination, but with expedited discovery as was discussed at

12   the very outset of this call, leading ultimately to a hearing

13   on our request for preliminary injunction where we will be

14   seeking findings of fact and conclusions of law as the Court

15   has already observed it's required to make if we go that route.

16          So, this idea that the single page that we received

17   this morning somehow disposes of this entire case, we do not

18   agree with that.  Just to be very clear, that is not -- we

19   appreciate it and we think it's a step in the right direction

20   potentially, we do not agree that resolves the matter.

21          MS. PETERS-HAMLIN:  I never said that --

22          MR. CHINN:  Excuse me.  I'm talking --

23          THE COURT:  Stop.  Stop.  Stop.  All stop.  You've all

24   been very polite so far.  Mr. Chinn has the floor at the

25   moment.

1          MR. CHINN:  So, your Honor, we are perfectly --

2          THE COURT:  Or the phone, I should say.

3          MR. CHINN:  Fair enough.  We are perfectly prepared to

4     wait and see what we receive tomorrow and go from there, but we

5     do want to proceed with expedited discovery, including

6     third-party, which I guess I heard incorrectly from

7     Ms. Peters-Hamlin.  I thought at the outset she said we have no

8     issue with third-party discovery directed to Linode, and later

9     in the discussions she said there should be no third-party

10    discovery or just discovery at all.

11          So I'm not sure what the position is there, but we

12    would like to proceed.  We would ask that the Court modify the

13    order it's going to issue to permit the parties to proceed on a

14    schedule to be agreed upon, and if it can't be an agreed upon

15    order with the Court with discovery matters including

16    third-party discovery, we're willing to revisit with the Court

17    all next week, as I think the Court has suggested.

18          I'm not sure that there's anything else that --

19          THE COURT:  That you have to say?

20          MS. PETERS-HAMLIN:  That I have to say at this moment

21    to address any number of things that we view as inaccurate or a

22    misstatement of our obligations with respect to the -- not the

23    U4s, it's actually the form U5, and the questions therein and

24    the duties that we had with respect to our reason of

25    termination at the time of termination versus what was

1   discovered thereafter.  I don't think the Court's probably too

2   interested into getting into that minutia since those issues

3   are not before the court.

4           With that, I'll stop here.

5           THE COURT:  Okay.  So let me make my observations.

6           First, while I suggested to the parties that it would

7   be good if they could resolve the case, I decide every case

8   that's before me on the facts and the law.  If it's not this

9   case, it's another case.  Don't feel in any way, either party,

10  that you have any obligation to "relieve the court of the

11  case."  So long as the case is proceeding, I will decide it.

12  If you all have the ability to save the time and expense of

13  proceeding with this case in addition to the other cases that

14  you're proceeding with in other forums, you are perfectly able

15  and capable of doing that, but you do me no favors by simply

16  removing another case from my docket.  So don't think that

17  there's any obligation on either parties' part to relieve the

18  Court of the case.  So long as the case is pending before me, I

19  will decide it on the facts and the law.

20          Second, I appreciate that the parties have set out

21  their various positions before he.  I also appreciate that, as

22  I said before, some of the things that have been said are not

23  properly before me, for example, was there retaliatory

24  termination — I don't think that's an issue in the complaint

25  before me.  Yes, I have an obligation to decide any request for

N1QCstoC

1    a TRO and a preliminary injunction.  There are some issues with

2    respect to whether any of the allegations in the complaint are

3    not arbitrable.  I don't know because it has not been briefed

4    in the papers, but certainly there can be an injunction in aid

5    of arbitration.  And how that fits in with the actual issues in

6    the arbitration or arbitrations is something that's just not

7    addressed in the papers.  But when I saw the issue of FINRA in

8    the papers, certainly it triggered my understanding of

9    preliminary injunctions in aid of arbitration.  I think I've

10   probably written on that.

11          So, with respect to where we are, I've already said

12   I'll sign the stipulation, enter it as an order.  I expect the

13   defendants to follow through with a submission tomorrow by

14   3:30.  I urge the parties to talk about where they are at that

15   point.

16          There still is the application for a preliminary

17   injunction.  So long as that's outstanding, it is something

18   that I would have to decide, irrespective of the still

19   outstanding request for a TRO, which may be mooted by the

20   parties' discussions and by any agreement with respect to where

21   you are and whether there is the need for a TRO in addition to

22   the so-ordered stipulation.  The stipulation on its face allows

23   certain discovery by CRA of the defendant's computers.  And

24   defense counsel agreed to third-party discovery from Linode.

25   So you all can talk about that.  As I always tell parties, you

1    can agree; if you don't agree, I'll decide.  So that's where we

2    are.

3            MS. PETERS-HAMLIN:  Your Honor, what would you like

4    from me in terms of my answer?  I'm not going to be able to get

5    my answer, as counsel, filed tomorrow.  The first thing we're

6    going to do is get the declarations submitted to the Court and

7    opposing counsel regarding all of the allegations.  And then

8    your Honor mentioned that you still have to address an

9    application for a PI.  So I assume you're going to want an

10   answer, a written answer from me if opposing counsel and I are

11   not able to come to some sort of solution.

12           Is there any way I could have a reasonable schedule or

13   date to submit that or is it not something that your Honor

14   thinks needs to be scheduled at this point in time?  I do have

15   a trial coming up in February and I am the sole practitioner.

16           THE COURT:  I would have hoped that the parties could

17   make a suggestion to me with respect to an appropriate

18   scheduling order, if you can't reach any other agreement, what

19   the scheduling order would be on the preliminary injunction.

20   So there would have to be a response and a reply, and there's a

21   question whether there should be any expedited discovery before

22   a response and a reply.

23           If you submit a declaration tomorrow that reflects a

24   dispute of fact as to whether the defendant did certain things

25   that the plaintiff alleges, perhaps there should be expedited

N1QCstoC

1    discovery to find out what the facts are before the hearing on

2    the preliminary injunction.  But do I listen to the parties on

3    those things?  Of course.  If you can't work that out, perhaps

4    the best thing for me to do would be to have another conference

5    with you next week, but I would welcome the parties'

6    submissions to me.  As I said, if you all can't agree, I'll

7    decide.  That's what I do.

8            MS. PETERS-HAMLIN:  Okay.  Understood.

9            MR. CHINN:  Okay.

10           THE COURT:  You don't have to submit an answer

11   tomorrow.  You've undertaken to submit a declaration, fine.  If

12   the parties don't agree on a schedule for the preliminary

13   injunction and whether anything else is necessary on the TRO,

14   you can just tell me, send me another letter tomorrow about

15   where you are on your discussions, and if there's no agreement,

16   I may well either decide it on the correspondence or have

17   another conference with you next week.  Clear enough?

18           MS. PETERS-HAMLIN:  Okay.  Thank you, your Honor.

19           MR. CHINN:  Thank you, your Honor.  I think we'll want

20   to have that discussion tomorrow after we see the declaration.

21   It might make sense to --

22           THE COURT:  Send me a letter on Monday or Tuesday?

23           MR. CHINN:  Send a letter on Monday morning.  I was

24   thinking we're going to need some time to look at whatever it

25   is we get at 3:30 to evaluate what the next steps are.

N1QCstoC

1              MS. PETERS-HAMLIN:  I'll wait for Mr. Chinn to write

2      me and he'll probably want to schedule a call on Monday and

3      we'll try to hammer out some sort of agreement on Monday before

4      addressing the Court.

5              THE COURT:  Send me a letter Tuesday morning about

6      where you all are.

7              MR. CHINN:  Okay.  Thank you, your Honor.

8              MS. PETERS-HAMLIN:  Thank you, your Honor.  Have a

9      wonderful weekend.

10              THE COURT:  Good to talk to you all.  Bye.

                              * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25