N2D1STOC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  STONEX GROUP, INC.,

4                 Plaintiff,

5         v.                             23 Civ. 613 (JGK)

6  HOWARD SHIPMAN,

7                 Defendant.             Conference (Remote)
   ------------------------------x

8                                        February 13, 2023
                                         12:01 p.m.
9

   Before:
10
                      HON. JOHN G. KOELTL,
11
                                         District Judge
12
                          APPEARANCES
13
   PROSKAUER ROSE LLP
14      Attorneys for Plaintiff
   BY:  LLOYD B. CHIN, ESQ.
15       DARYL LEON, ESQ.

16 PETERS HAMLIN LAW LLC
        Attorneys for Defendant
17 BY:  KRISTAN PETERS-HAMLIN, ESQ.

18
   ALSO PRESENT:  CRAIG HYMOWITZ, General Counsel, StoneX Group
19                HOWARD SHIPMAN, Defendant

20

21

22

23

24

25

N2D1STOC

1        (Case called)

2        THE COURT:  Who's on the line for the plaintiff?

3        MR. CHIN:  Good morning, your Honor.  Well, good

4    afternoon, I guess, now.  Lloyd Chin and Daryl Leon from

5    Proskauer for the plaintiffs.  We're also joined by Craig

6    Hymowitz, in-house counsel, with plaintiff.

7        THE COURT:  And who's on the line for the defendant?

8        MS. PETERS-HAMLIN:  Kristan Peters-Hamlin on behalf of

9    Mr. Shipman, and Mr. Shipman is also on the line, your Honor.

10   Good morning.  Or good afternoon.

11       THE COURT:  Good afternoon.

12       All right.  I just received a declaration by the

13   defendant, Mr. Shipman, in connection with the plaintiff's

14   motion to compel.  I also received an *ex parte* submission by

15   the defendant asking me to file the *ex parte* submission under

16   seal.

17       My practice is, first of all, if I get an *ex parte*

18   submission, I indicate on the record that there is an *ex parte*

19   submission.

20       Second, there are limits to what can be filed under

21   seal.  Portions of the submission plainly don't warrant filing

22   under seal; portions do.  The portions that don't require

23   filing under seal, I can explain now, and the portions that do

24   warrant filing under seal, I won't detail what they are, but

25   having disclosed what can be disclosed, I'll simply file the

N2D1STOC

1    *ex parte* submission under seal.

2            What does not warrant filing under seal?  The fact

3    that the defendant no longer wishes to be represented by his

4    counsel and the counsel will be filing an application to

5    withdraw, with the consent of the defendant, after this

6    conference.  And the defendant will then be pro se.  The

7    reasons for that are traditionally subject to filing under seal

8    and so I'll respect that at this point, and having disclosed

9    what can reasonably be disclosed, I'll place the *ex parte*

10   submission under seal.

11           Because the defendant will be pro se, I will also

12   enter an order which explains to the defendant that he can

13   consult the New York Legal Assistance Group, which provides

14   assistance to pro se litigants in the court, and I'll provide

15   to the defendant the details of the New York Legal Assistance

16   Group.  Whether they can assist the defendant in this case, I

17   don't know, but that's up to the defendant.  He can consult

18   with the New York Legal Assistance Group.

19           The submission was that the defendant wishes

20   henceforth to proceed pro se.  And of course a defendant has

21   the right to proceed pro se.  Is it your intention, desire to

22   proceed pro se from here on, Mr. Shipman, rather than to get

23   another lawyer?

24           MS. PETERS-HAMLIN:  Your Honor, before you move on, I

25   don't think anywhere in his declaration does he say that he

N2D1STOC

1    wishes to no longer be represented by me.  He did not say that.

2    He said that he exhausted his funds and so he consents to my

3    withdrawal.  So if there were an order saying he indicated he

4    wishes that I'm no longer his counsel, that would be

5    inconsistent with what his declaration actually says.  As he

6    made very clear, he was very happy with my representation.

7            THE COURT:  Oh, yes, that's right.  I mean, do you

8    want me to put the whole declaration in the record not under

9    seal?

10           MS. PETERS-HAMLIN:  I have no objection to it being

11   put as is on the entire record.  Mr. Shipman is on the phone.

12   If he has an objection to the declaration being put not under

13   seal, he can speak now.  But I don't have an objection to the

14   entirety of the declaration being on the record without being

15   under seal.

16           THE COURT:  Mr. Shipman?

17           MR. SHIPMAN:  I have no objection, your Honor.

18           THE COURT:  Okay.  All right.  That's fine.  That's

19   fine.  The lack of funds is a traditional reason for putting

20   something under seal.  But so be it.

21           Mr. Shipman, is it your desire to proceed pro se

22   rather than to look for another counsel?

23           MR. SHIPMAN:  Your Honor, I will look for another

24   counsel, but in lieu of *[sic]* lack of funds, I don't know if

25   it's reasonable to expect that I'll find one to work within my

N2D1STOC

1    means.  I know no other way to proceed than pro se.

2                THE COURT:  Okay.  You're welcome to look for other

3    counsel; you're welcome to consult with the Legal Assistance

4    Group.  They also have contacts with other private lawyers.

5    Whether this is a case that would, you know, indicate that

6    there is other representation out there is something which I

7    don't know.

8                There is always an issue as to whether there should be

9    any stay while a party attempts to find other counsel.  In this

10   case, there's a need for some expedition because there is an

11   ongoing expedited discovery in connection with a motion for a

12   preliminary injunction.  And so there is a need for some

13   expedition.  And the defendant doesn't foresee getting another

14   lawyer.  If things change, an application could be made to me

15   with respect to any stay, but at this point it doesn't look

16   like there should be a stay.  But I'm always open to any

17   applications that are made before me.

18               So the indication is that the application to withdraw

19   as counsel would be made after this hearing.  So, fine.  So I

20   got the plaintiff's submission and I got the defendant's

21   response today.

22               I also issued an order on February 10, in response to

23   the plaintiff's application.  Having read what the defendant

24   has now submitted, it's not clear to me that there is a dispute

25   about anything at the moment.  The initial application appeared

N2D1STOC

to say that the production of computers, devices, accounts in

the defendant's possession or control was being limited by the

defendant to those computers, devices, or accounts that the

defendant recalls contained information from the plaintiff.

The defendant, in the defendant's submission, says no, no, that

provision in paragraph 4 of the original order is not being

disputed, Charles River can come to the defendant's house and

inspect any such devices, if you will.  There was some dispute

with respect to accounts, such as a Brooks Brothers account,

but not with respect to any of the physical devices.  The

parties were going to work out a protocol, which I have no idea

where that stands.  And it was contemplated that the defendants

could be required to produce an inventory of computers,

devices, and accounts, although that wasn't specifically

included in the original order.  But this is discovery, and I

would have expected that the parties would work out the details

of the discovery without the kind of apparent acrimony that

developed.  "Accounts" was plainly not intended to cover a

Brooks Brothers account.

          And the last paragraph of my February 10 order said

that the defendant should take any necessary steps to ensure

that evidence is not destroyed by third parties.  And I said

the defendant should promptly reactivate his Linode server and

any other accounts that he's canceled to ensure preservation of

evidence.  That was plainly meant to avoid the situation where

N2D1STOC

| | |
|---|---|
| 1 | there is an automatic destruction of accounts after a certain |
| 2 | period of time; so that if there is a Linode server out there |
| 3 | which automatically deletes matter after some period of time |
| 4 | after the account with Linode is stopped, that Linode doesn't |
| 5 | do that with respect to any information that is relevant to |
| 6 | this case.  Now again, I would have expected that these are the |
| 7 | kinds of issues that get resolved between the parties. |
| 8 | Correspondence back and forth suggests that may not be the |
| 9 | case, and so my next step may well be to assign the case to a |
| 10 | magistrate judge for general pretrial to minutely manage the |
| 11 | discovery, which should be fairly straightforward. |
| 12 | So now I'll listen to the parties.  This was |
| 13 | originally an application by the plaintiff, and having read the |
| 14 | application, I waited for some period of time to see if there |
| 15 | was a response from the defendant.  When I didn't get that, I |
| 16 | issued the order that I issued and then I got the defendant's |
| 17 | response today. |
| 18 | So what would the plaintiff like to tell me? |
| 19 | MR. CHIN:  Well, your Honor, I think the February 10 |
| 20 | order largely resolved our concerns.  I do — at least with |
| 21 | respect to this particular issue — that is, you know, our |
| 22 | concern that the position being taken by the defendant was that |
| 23 | he was going to self-select which devices would be made |
| 24 | available for discussion, which was contrary to paragraph 4 of |
| 25 | the January 26, 2023, order, and I think the Court has agreed |

N2D1STOC

1   with us on that point.

2             Now we received this filing a few minutes before the

3   conference today in which there's an assertion that, well,

4   there was no need to make that request, that this was all fine

5   and good and there was no problem here; and if that's true,

6   then fine.  But I would only suggest that if the Court's

7   concerned that we, the plaintiffs here, filed an application

8   without any need for doing so, I would suggest to the Court

9   that Exhibit B to the declaration that was filed at about 11:30

10   today — Exhibit B is a string of emails, which you don't need

11   to read in their entirety, but if you just start on page 1,

12   there's a statement:  Your interpretation of that order is

13   simply overbroad and wrong.  So, I mean, I don't think there's

14   a resolution there.  And if you go further into the — I don't

15   know the number, but page 6 of the pdf — and if you read the

16   first three paragraphs at the top of page 6 of that pdf, it's

17   clear that the position being taken by the defendant was that,

18   we're not going to give you every device, we're going to give

19   you those devices that either now or at one time had StoneX

20   matter on them, and I think there's no question that that was

21   the position being taken.  Now it's true that —

22             THE COURT:  Could — go ahead.

23             MR. CHIN:  Sorry.  Please go ahead, your Honor.

24             THE COURT:  What page of the attachment are you

25   referring to?

N2D1STOC

1          MR. CHIN:  This is Exhibit B, page 6.

2          THE COURT:  My pages aren't numbered, so just tell

3     me ——

4          MR. CHIN:  Oh, it's a Word document.  My apologies.

5     They're not numbered, but if you just page through to a page

6     that starts at the top, "You claimed in the call."

7          THE COURT:  Okay.  Hold on.

8          "You claimed in the call."

9          MR. CHIN:  All right.  So "You claimed in the call,"

10    and this is following up on a --

11         MS. PETERS-HAMLIN:  I'm going to have to interrupt

12    too.  So I'm looking at Exhibit B and it looks like it's only

13    four pages long.  So you said page 6?

14         MR. CHIN:  That's the way it printed out for us.  It's

15    the paragraph beginning "You claimed in the call."

16         MS. PETERS-HAMLIN:  Okay.  So if you go on it

17    electronically, because I sent it to you electronically, it's

18    four pages, and I don't see any page that begins with "You

19    claimed."  So how you printed it is hard for us to follow.  If

20    you could just indicate where it is electronically.

21         THE COURT:  I have it.  It is the final email and it's

22    in the paragraph that begins bolded, **Devices**.  Then we turn to

23    the subject of devices.

24         MS. PETERS-HAMLIN:  Thank you, your Honor.  I see it

25    now.

N2D1STOC

1          THE COURT:  And so I'm being pointed to the paragraph

2     that says "You claimed."

3          MS. PETERS-HAMLIN:  I see it now, your Honor.  Thank

4     you.

5          THE COURT:  Sure.

6          MR. CHIN:  And so now I understand there is some

7     back-and-forth here in terms of talking — we're asking to be

8     advised in advance of the inspection what the devices are so

9     that our consultant will know what equipment to bring.  But

10    bound up in that discussion is also what is going to be made —

11    what devices, systems, and accounts are going to be made

12    available for inspection.  And the statement that's being made

13    by defense counsel here, "You claimed in the call he needs to

14    identify an account for every device in his home.  I made clear

15    to you that paragraph 3 does not require that, nor should it."

16    So again, defense counsel was conflating the obligation to

17    ultimately rid Mr. Shipman of any copies of our material,

18    conflating that obligation in paragraph 3 of the January 26,

19    '23, order with paragraph 4 that's not limited in that fashion.

20    I mean, it's not limited to those devices that have those

21    things.  It's all devices in his possession, custody, or

22    control.

23         So we go on here.  She says, "'Devices' is a broad

24    term and it includes a blender."  We're not seeking blenders

25    that don't have — that don't store data.  I mean —

1          THE COURT:  Could I stop you.  Okay.  Okay.  Okay.

2          MS. PETERS-HAMLIN:  Can I respond to that, your Honor?

3          THE COURT:  No.  Not at the moment.

4          MR. CHIN:  If I could just —— In conclusion, your

5    Honor, we could not get a straight answer here, and if you —— I

6    mean, the paragraph that begins, "I told you that CRA could

7    feel free to verify that when they are in his home performing

8    the examination by examining his iPad.  You asked whether he

9    has any phones in the house; I informed you he does but that

10   none of them have StoneX's proprietary, confidential, and trade

11   secret information on them and that's why they were not listed

12   in the paragraph 3 accounting that he provided with this

13   declaration, and they are therefore not relevant to the

14   examination described in paragraph 4."  So your Honor, that's

15   precisely the concern that we had is that they —— it was made

16   clear to us by defense counsel that there were other devices

17   out there that they were, based on their own self-selection,

18   determining would not be made available for our inspection, and

19   that's what prompted our application to the Court, and the

20   Court has now addressed that in his February 10th order, and

21   now we have an affidavit saying, well, I'm fine making all of

22   my —— all the devices in my possession, custody, or control,

23   presuming —— presumably that would be in his household or

24   anywhere else he has possession, custody, or control, that he's

25   going to make them available.  You know, whether they are ——

N2D1STOC

1    belong to his wife, his children, but they're in his

2    possession, custody, or control, I think we should have those.

3            There's a separate issue relating to the Linode

4    server, which we can come back to, but that's the essence of

5    our application.  And that's why we made it, your Honor, is

6    that we felt like they were — based on the language that you

7    see here and other statements that were made to us orally, we

8    felt that there was some self-editing, self-selection going on

9    here when we were entitled to have everything in his control

10   inspected — every device, every system.  We're not looking for

11   a Brooks Brothers account.  We're talking about, you know,

12   accounts like an email account, an account that would store

13   information or data, that belongs — potentially belong to us.

14           THE COURT:  Okay.  So I was going to stop you a little

15   earlier, but I'm perfectly prepared to say that the parties on

16   both sides in good faith had a misunderstanding about what was

17   being agreed to, and in part, it arose from a lack of

18   cooperation, if you will, and the unavoidable ambiguity from

19   time to time of obligations, so there is the mixing of the

20   obligations of paragraph 3 with respect to accounts with the

21   obligations of paragraph 4 that relates to the requirement for

22   the defendant to permit CRA access to any computer, device, or

23   account in the defendant's possession or control.  In the

24   course of interpreting obligations, any ambiguities are usually

25   worked out in constructive meet-and-confers.  And so the

plaintiff says the defendant wasn't agreeing, the defendant

says, no, no, read all of the correspondence, all of the

emails, and we were agreeing to the provisions of paragraph 4.

Well, what are devices?  So the defendant says, if you read

devices as broadly as the plaintiff would say, it would include

blenders.  Not really.  Food processors, old cameras, or movie

projectors.  Not really.  Does it include accounts?  Well, it

says accounts.  Well, how is that to be interpreted?  So the

parties would normally discuss that.  But those are things that

usually get worked out.  And so they weren't worked out.  And

so I got the application by the defendant and I issued an order

which said essentially that, yes, the defendant had the

obligation to comply with the January 26th order.  Did I say

that devices included blenders and cameras?  No.  Did I say

that it included all accounts?  Well, there are provisions that

specifically applied to accounts, but the parties really have

to work that out.  And this usually gets done without the Court

having to intervene.

          So at this point the plaintiff says, Judge, there were

statements in that email correspondence that we took one way

and so we came to you; we're perfectly satisfied with the most

recent order that you issued.  And the defendant seemed to be

satisfied.  In the defendant's current submission, the

defendant says, the plaintiffs really came to you without

justification because we were not attempting in any way to

1    circumvent the January 26th order.

2            And so now, Ms. Peters-Hamlin, you can tell me

3    anything that you want.

4            MS. PETERS-HAMLIN:   Thank you, your Honor.

5            First, as your Honor noted a week or so ago when you

6    were addressing the issue of timing of discovery, I had brought

7    to opposing counsel's attention that I have a trial on

8    February 23rd, and your Honor mentioned that usually

9    professional courtesy would require that people be a little bit

10   flexible on discovery and not require somebody who's imminently

11   going to trial to jump through hoops and finish discovery by

12   March 1st.  And I thank you for that consideration.  And we

13   then set the date for April 1st.  Unfortunately, opposing

14   counsel has not taken your Honor's insights about professional

15   courtesy and giving someone who's about to go to trial a little

16   bit of time, and instead required accountings that would be

17   more consistent with deposition or other kind of discovery to

18   be turned around within 24 hours and then was rather terse when

19   my client and I took a little bit more time or didn't agree

20   with what we thought was their overbroad requirement of an

21   accounting that went beyond paragraph 3 and conflated both

22   paragraphs.  I agree with your Honor that devices, which is

23   something —— devices and accounts, which is something that the

24   defense left —— sorry —— the plaintiff left —— StoneX left

25   completely undefined and then asked my client to swear that he

N2D1STOC

1   had revealed every single device and account that he has ——

2   that's what they provided to him to swear to.  And that would

3   have been very difficult for him to go through and think of

4   every device and account without some definition.  And your

5   Honor is right.  I mean, it can include devices, can include

6   blenders, etc.  So that's why it was incumbent upon the

7   plaintiff StoneX to state what kind of device that they were

8   looking for, because they wanted him to swear to something that

9   he couldn't swear to, because he couldn't go through every

10  device and account.

11          So we did have a meet-and-confer after I brought to

12  your attention that there are terms that were not defined and

13  they were asking for him to mention and swear to something he

14  couldn't swear to realistically, and in that meet-and-confer

15  they said, well, we don't want him to, you know —— what are the

16  computers he's used?  And I said there's only been two

17  computers.  You're not happy with that answer, but there have

18  only been two computers he's used in the last two years.  And I

19  said, we don't believe that you're only supposed to look at the

20  computers that he tells you and represents to you that he's

21  used that don't have confidential information on it.  We're

22  giving you the only computers that he's used in the last two

23  years and you can look at it.  And they said, okay, what about

24  USB drives?  And I said, we've identified those for you and you

25  can look at those.  Then they said, what about an iPad?  Does

1  he have an iPad?  And I said, yes, he does, and the iPad, I've

2  asked him about that, it only has movies and games on it, but

3  you're welcome to look at it if you want.  If you want to

4  inspect it, you're welcome to look at it.  And that of course

5  is in the correspondence that they pointedly failed to produce

6  to the Court, which I think lacks candor because we did say,

7  you can look at the iPad.  It doesn't have anything on it, he

8  never used it for StoneX work, but if you want to see the

9  movies that he's downloaded, that's fine.  You can look at it.

10 And then they asked about accounts.  And I said the only —— you

11 know, does he have an email account?  And I said yes, he

12 absolutely does.  In fact, we brought this up to the Court's

13 attention.  He has a Yahoo account, and that's why we told the

14 Court that we're going to need some privileged information and

15 confidential information not to be looked at, and the Court

16 said provide us with those protocols, and we provided our

17 version of those protocols to opposing counsel, and identified

18 the various confidential communications —— medical; priest; you

19 know, communications with his wife, which are covered by the,

20 you know, spousal privilege; communications with me; and with

21 other counsel.  And also said there's really no reason for you

22 to look at anything that preceded when he started with StoneX.

23 So we've given that to them and we disclosed the account.  We

24 also disclosed that he had a Linode account, and we told them

25 that he decommissioned the server and there's really no way to

N2D1STOC

```
 1   reverse that, and he did it before he knew that there was any
 2   lawsuit.  The only reason he ever used Linode and incurred that
 3   $120 a month was to create a stable connection for his work at
 4   StoneX.  There was no reason for him to keep it after that.  He
 5   had no reason to believe that they were bringing any claims
 6   that he had done anything wrong.  They had terminated him
 7   because of cultural differences and said that he was going to
 8   be allowed to resign.  So now he has four or five kids, two of
 9   whom are in college, and one who's had serious medical
10   procedures in the recent past that are very confidential, and
11   those are very expensive things that have gone on in his life.
12   So when he was looking to —— that he was terminated and was
13   basically getting cheated out of his bonus, he said, okay, I
14   have to cut back expenses, and that expense was only for the
15   purpose of doing his work at StoneX so he decommissioned the
16   server.  The account is free when there's no server connected
17   to it.  We've told him that.  He also said in his declaration,
18   there's no way to reactivate the server to bring up all the
19   information.  You can try to do the reconfiguration again, but
20   really the better approach is to go to Linode.  So we
21   encouraged them to go to Linode.  And they've also gone to the
22   mother company, which is Charter, and they've subpoenaed all of
23   the relevant information, so that's all been preserved,
24   presumably the moment that Linode got that subpoena, which we
25   did not oppose in any way and which is in fact returnable
```

N2D1STOC

```
1    today.  I would assume that everything that could have
2    potentially been destroyed by them, 'cause he can't, at this
3    juncture, reactivate that server, to be preserved by them.  So
4    in their application to you, they said, you know, they're not
5    revealing to us what computers — all the computers he used.
6    Yes, we have.  They just don't believe him.  And he's swearing
7    that those are all the computers that he's used in the last two
8    years.  They asked me does he have an iPad.  Yes, he does, and
9    we're willing to let you look at it.  They asked us what
10   accounts he has.  And he told them.  He told them he had a
11   Linode account but decommissioned the server.  He told them
12   that he had an email account, Yahoo.
13           So those are the relevant things that you — those are
14   the relevant questions, not like what devices do you have in
15   the house?  I mean, that's overbroad, and that's their — the
16   burden was on them for being precise to what they wanted him to
17   swear to.  What he said was, he revealed to them through me
18   that he does have a Yahoo account, that that's something that
19   we had mentioned to the Court before, that we wanted, you know,
20   some protocols regarding privilege to be addressed.  It has
21   revealed everything that they know.  Then they asked me, does
22   he have phones.  Okay.  He has landline phones.  That's
23   irrelevant.  And he asked me, does he have an iPhone?  Yes, he
24   does.  But the reason an iPhone is not relevant is you can't
25   download documents to it.  And with respect to emails, all of
```

N2D1STOC

the emails that would be on his home —— sorry —— all of the
emails that would be on his work laptop computer and the two
laptops that they're examining, I guess he might also have them
on his phone but it doesn't make a difference because it's
redundant, right?  And with respect to cameras that are on his
phone, it seems to me that since a phone cannot, you know ——
doesn't have a Word doc function or a pdf function where you
can actually download items to it and it's completely redundant
for what they have, asking him to reveal family photos of his,
you know, daughter before and after she became trans or of his
wife, I mean, it's just completely inappropriate and over the
top.  And they haven't articulated a justification for that.
And they also think —— and he said that or hinted at it in this
call —— that if his adult children that are, you know, in
college also have as their residence his home, that they should
be able to get access to their computers.  And that's
outrageous.  That's an outrageous infringement on their
privacy.  And it's also an impingement on the privacy to ask to
look at his children and his wife's computers.  They have
nothing to do with this case.  And if he's willing to swear
under oath that he's never used their computers at all in the
last two years, it seems to me that in balancing the interests
of third parties that have absolutely nothing to do with this
case and impinging on their privacy rights, that would be fair.
They also asked for access to anybody who has used the router.

1    Well, I know when I've been on, you know, the local legislature

2    — which we call in Connecticut RCM — had people working on

3    legislation with me and they all hooked up to the router and

4    they all did work at the same time.  He said he had friends

5    over one time for a work group, one of his children — sorry —

6    one of his children had friends over and there were 30 people

7    accessing the router.  This is overbroad.  This is — he's

8    given them what is completely consistent with the Court's

9    order.  I understand your Honor's point that -- they filed

10   their motion after business hours at about 7:30 or 8:00 at

11   night on the 7th.  So your Honor waited two days for me to

12   reply, but there was nothing before you which is your order and

13   I never got an opportunity to reply and indicate that the Court

14   — that they had failed to disclose the email correspondence

15   over the last three days that would put the lie to what they

16   were claiming to the Court.  And I didn't get an order from the

17   Court saying please respond by such and so date, and since only

18   two days had passed and usually under the rules, you have a

19   certain amount of time, you know, to respond to motions.  I

20   think it's ten days.  I didn't know that after two days without

21   a court order saying, you must respond by XYZ date, that the

22   Court was going to issue an order just based on what they said.

23   And that's — my apologies for that.  I didn't know your Honor

24   was going to rule.  I believe that your Honor has — that

25   order, I would respectfully request that it be reconsidered

N2D1STOC

1    because there might be aspects of it that once you have an

2    opportunity to review the correspondence between counsel on

3    February 3rd and February 6th, you'll come to a different

4    conclusion about the accuracy of what was represented by

5    opposing counsel.  And I also think that based on this

6    declaration and the opposition that's been filed, you will see

7    that it — the last part of the Court's order, where it says

8    the defendant should promptly reactivate his Linode server,

9    which would mean he would have to incur $125 a month again, and

10   the other accounts that he's canceled, but the Linode server,

11   he has the account because it's free when you don't have a

12   Linode server, he can't reactivate the old server, so I think

13   that should be — I think you should look at — I would

14   respectfully request that you look at his declaration, and he

15   says he doesn't believe that what was on his server before, he

16   has access to and that the better approach is for them to

17   subpoena Linode and its mother company Charter to get at the

18   hard drive regarding that.  He doesn't have access to that.  So

19   that request — or that order, rather, that he incur the cost

20   of reactivating his Linode server, I think in light of what he

21   said in his declaration is something that I would respectfully

22   request that the Court reconsider.  Again, I didn't know the

23   Court was going to issue an order without letting me know that

24   I have till X, Y, Z date to respond.  I assume that the regular

25   rules regarding response time for motions would be permissible,

N2D1STOC

1    and that was my error.  I apologize for that.  But I would hope

2    that the Court will review his declaration and the emails and

3    then reconsider the Court's order that it issued on

4    February 10th.

5            And then secondly, I believe that their request to

6    look at his children's computers and his wife's computers and

7    the router is really just a gross infringement on their privacy

8    rights.  I have not seen a court order, something like that.  I

9    haven't seen any precedence cited by them that that's an

10   appropriate thing to order the Court to do.  I did tell them

11   that I thought they could take his deposition and ask him those

12   questions and issue discovery requests consistent with the

13   actual deadlines that the Court has ordered in this case, which

14   is that discovery would go to April 1st, instead of asking him

15   to turn around a declaration without any kind of proper

16   discovery requests consistent with the Federal Rules of Civil

17   Procedure, and ask him to identify every device and every

18   account that there is, even though it's not reasonably

19   calculated to lead to admissible evidence for him to have to

20   identify every account and every device.  He has identified

21   that he has an iPhone, that he has an iPad, that he has two

22   computers that he used; he also said and has returned already

23   the laptop computer that he used when he was at StoneX.  He

24   also has identified that he had a Linode server and

25   decommissioned it on the 14th.

N2D1STOC

1           So I believe that he's met all of his obligations in

2     terms of paragraph 3, and I also believe that he's given them

3     all the information they need to do an examination, a prompt

4     examination.  We were available for them to do the examination

5     a week ago.  They got all the information they need regarding

6     the relevant devices that they can look at.  We simply do not

7     agree and strongly oppose them looking at his children's

8     devices, his wife's devices, asking for, you know, any devices

9     that ever attached to the router during the last two years.

10    He's willing to swear that he –– under oath, subject to the

11    penalty of perjury –– that he has never used any of other

12    people's, third party's devices to –– or computers to do StoneX

13    work, to access StoneX information, your Honor.  I think that

14    subject-to-perjury assertion should be enough.  And from the

15    cost/benefit perspective, in weighing impingement of privacy

16    rights versus what we actually have as proof in this case, the

17    Court should say –– issue an order saying that the children's

18    computers, the wife's computers, the –– any computers ever

19    connected to the router are outside the purview of this round

20    of discovery, unless they can meet some sort of a showing that

21    it's appropriate.  And they have not met that showing, provided

22    that showing to date.

23          Thank you, your Honor.

24          THE COURT:  Mr. Chin?

25          MR. CHIN:  Well, your Honor, first, I would just like

N2D1STOC

1    to note that we filed our letter with the Court on

2    February 7th, and, you know, we made it clear our understanding

3    of the defendant's position.  And I've referred you to, in the

4    correspondence that was submitted, the very place where she

5    waited —— where defense counsel made it clear that they were

6    not willing to turn everything over, and she has told you

7    today, although a bit varied in the midst of discussing other

8    things, that that's still their position.  And Exhibit A for

9    this is the iPhone, or an iPhone.  No iPhone has been disclosed

10   by Mr. Shipman as a device for our review.  We specifically

11   asked about an iPhone, and the response was essentially no, and

12   that's in the section of the email that I read to you earlier:

13   "You asked whether he has any phones in the house; I informed

14   you he does but that none of them have StoneX's proprietary,

15   confidential, and trade secret information on them."  That's

16   precisely the concern that we have.  Those kind of assessments

17   were being made by the defendant and his counsel.

18            And as far as this speculation by counsel in this call

19   as to what an iPhone contains and doesn't contain and it's

20   irrelevant and would be redundant, I just need to go back to

21   the voluntary stipulation by Howard Shipman proposed to be

22   entered as a court order, that was entered as a court order on

23   January 26, 2023.  In paragraph 4, the key phrase is: "the

24   SanDisk drive, Sony drive, Linode cloud computer, or any other

25   computer, device, or account in my possession or control."  And

N2D1STOC

1   an iPhone is plainly a device.  A blender is not.  You know,

2   like, this is a little ridiculous.  But I think it's clear that

3   there are devices that are in play that are not blenders, but

4   they're iPhones, and there may be other things that the

5   defendant has — has been very cagey about whether he was

6   disclosing them to us, whether he was going to permit them to

7   be reviewed.  An iPhone may well take a completely different

8   device to copy than a computer.  I'm not an expert on this, but

9   that's what we were trying to accomplish, to know in advance

10  what our consultants were going to be coming to review.  And we

11  filed this letter on February 7th.  It wasn't until today, at

12  11:30, that you received this affidavit saying, I don't know

13  why they said this, you know, we're ready to give them

14  everything, although, again, she told you in this call, your

15  Honor, that she's not prepared to give us the iPhone or iPhones

16  or anything like that.  So, I mean, we're a little skeptical of

17  the timing here.  I mean, if we really had it all wrong and if

18  that's the issue here, that could have been cleared up pretty

19  easily before now.

20          As far as — I think the iPhone is clear enough.

21          With respect to the Linode cloud computing device,

22  again, this was a stipulation submitted by defendant to the

23  Court to try to put off any litigation of a TRO.  And the Court

24  so ordered it.  And that paragraph refers specifically to the

25  Linode cloud computer.  And the defendant's position now is,

N2D1STOC

```
1    well, you wrote those words —— you, the plaintiff, wrote those
2    words, we just copied them into this stipulation, you can't
3    hold us to them.  Well, I don't think that —— I mean, things
4    were deleted from the TRO that we had proposed.  This is not
5    exactly the TRO we had proposed.  They revised it.  But they
6    left in Linode cloud computer.  Now we're told, you can't come
7    on site and access the Linode cloud computer using my sign-on,
8    login ID and so forth, because I decommissioned it.  And we're
9    further told, that ID, I decommissioned it, but I didn't think
10   to take it out of this document I signed on January 26, 2023,
11   but I decommissioned it, and you can rely on the subpoena that
12   you've issued to Linode.  Well, we don't know that we would get
13   the same information from Linode that we would get through the
14   direct access to the account.  It may well be that Linode has
15   logs of information but doesn't have the actual underlying
16   information that he would have access to.  We don't know that.
17   And there's been nothing —— the defendant has not come forward
18   and said, you will lose nothing by ignoring the portion of the
19   January 26, 2023, order referring to a Linode cloud computer if
20   you simply go via subpoena to Linode and seek the information
21   they have.  There's been no showing of that, and that's what
22   the order required.  And we think that the judge —— there's no
23   reason for the Court to reconsider what is already stated on
24   that point.
25             MS. PETERS-HAMLIN:  Your Honor, I might help resolve
```

N2D1STOC

1    things here.  We have absolutely no problem —— and we've never

2    said what he's claiming now.  We have no problem giving them

3    the password to —— that he had to Linode and giving them access

4    to his account.  There has never been any issue of us revealing

5    right from the beginning that he had a Linode cloud computer.

6    He was asked.  It was approved by his manager.  Linode was

7    something that was also used by Evan Pfeuffer.  He disclosed

8    that.  They can have passwords to the account; they can look at

9    the account.  He decommissioned the server so we've identified

10   that the proper way to getting any information off that server

11   is from Linode.  We haven't in any way opposed them getting

12   that information from Linode.  Absolutely they can have the

13   password to the Linode account.  Nobody is denying them that.

14        MR. CHIN:  But your Honor has —— you've already

15   ordered —— we don't know what meaning that password will have

16   or what access they will gain to us without the reactivation

17   occurring, and as you ordered on February 10, the defendant is

18   to promptly reactivate his Linode server, and we ——

19        THE COURT:  Here.  I'll resolve it.  I'll resolve it.

20   The defendant has no objection to producing the Linode cloud

21   computer, giving the password to the Linode.  The plaintiff

22   doesn't want to reactivate the account because it costs $120,

23   and the reactivation of the account is not specifically

24   provided for in paragraph 4.  But if the defendant wants the

25   account reactivated, the defendant can pay $120 to reactivate

N2D1STOC

1    the account.

2              MS. PETERS-HAMLIN:  I think you mean the plaintiff,

3    your Honor.

4              THE COURT:  Yes.  I mean the plaintiff.  So the

5    plaintiff can pay $120 to reactivate the account.

6              Also, I am not sufficiently technologically adept to

7    know whether it really makes a difference whether the account

8    is reactivated, so it would appear to me that Linode should

9    have the information and should not be destroying information

10   from the time that it got the subpoena.  Now from my

11   nontechnologically sophisticated standpoint, it would be

12   remarkable if Linode did not freeze whatever information it had

13   at the time that it got the subpoena.

14             So the parties on both sides have developed a

15   relationship that normally gets worked out but in this case

16   hasn't.  The whole issue of devices could be easily worked out

17   by simply defining devices in such a way as devices which can

18   receive or communicate information of some sort.  But --

19             MR. CHIN:  Your Honor, we attempted to do that.  I'm

20   sorry.  I don't mean to interrupt.  But if you look at --

21             THE COURT:  Hold on.  Hold on.

22             MR. CHIN:  All right.

23             THE COURT:  Okay.  But then there could be a response

24   that, gee whiz, you know, if blenders can operate remotely,

25   that's getting or giving information to the blender.  Sure.

N2D1STOC

1    You both can engage in that sort of stuff.  Okay.  I mean,

2    plaintiff says, we tried to do that, the defendant says, no,

3    you didn't.  Okay.

4          The Linode issue, I've worked out for you; and could

5    have been worked out among yourselves.  So I modified the final

6    paragraph of my February 10 order to say that the plaintiff

7    will provide any necessary cost to reactivate the Linode

8    server.  That resolves the Linode issue.  With respect to

9    the —

10          MR. CHIN:  Your Honor, just —

11          THE COURT:  Go ahead.

12          MR. CHIN:  — to be clear, though, an iPhone is not a

13    blender, and I think — I'm not going to re —

14          THE COURT:  I was going to get to iPhones.

15          MR. CHIN:  Okay.  I apologize.

16          MS. PETERS-HAMLIN:  Also, they did say iPhone —

17          THE COURT:  Stop, stop.  Please stop.  You're both

18    talking over each other, and the reporter can only get down one

19    person talking, and as a matter of default, the reporter will

20    take down what I'm saying.

21          So with respect to iPhones, it's plain that iPhones

22    are covered as a device.  The defendant says, we've identified

23    all iPhones under his possession or control.  I don't know if

24    that's accurate, but that I think is the representation.

25          MS. PETERS-HAMLIN:  Just so I can answer your Honor

N2D1STOC

1    about that.  He has not identified his children's iPhones, his

2    wife's iPhone ——

3              THE COURT:  I was going to get to that.  I was going

4    to get to that.

5              MS. PETERS-HAMLIN:  Okay.  All right.  Or their

6    computers.

7              THE COURT:  So it's his iPhones.  With respect to

8    iPhones of the wife and children, I would not at this point

9    require discovery of the iPhones of the wife or children if the

10   defendant submits an affidavit that he never used the iPhones

11   of his wife or children to get or receive any information,

12   without trying to parse whether the "any information" is work

13   related or not.  If his children and wife's iPhones are solely

14   for their personal use and not his, and he swears he respects

15   that, he doesn't use them, over the last two years never has,

16   then I would not require their inspection.

17             MS. PETERS-HAMLIN:  Could I get a clarification from

18   the Court on one issue with respect to what your Honor just

19   said, so I understand?  So for instance, I have three children

20   with my husband.  Sometimes they text my husband and he shows

21   it to me.  So I'm getting —— I look at their funny texts that

22   they just sent to him.  Or Brittany makes, you know, an inquiry

23   about hedge fund, and I look at what he says that she said

24   because we're a family.  Sometimes we will show each other some

25   silly text that somebody in the family has just said.  That's

1    not to get information that is remotely related to this.  It's

2    an extraordinary, you know —— it's not reasonably calculated to

3    lead to admissible evidence to say --

4              THE COURT:  Thank you.  I know the scope of discovery.

5              MS. PETERS-HAMLIN:  I know you do, your Honor, and I

6    have the greatest respect for you, and you're much more IT

7    aware than I am.  But I do think that it would be relevant for

8    the order to say that he has not used the phone of his wife or

9    children for any purpose related to StoneX.  But to say that he

10   hasn't used it to access information, every time we look at a

11   text on our wife's --

12             THE COURT:  Okay, okay.  Mr. Chin?

13             MR. CHIN:  As to this issue, I mean, I'm not sure how

14   this would be worded, but if the exclusion being requested here

15   is not that there was any communication between Shipman and his

16   children or wife on their phones or any use by Shipman of those

17   phones to communicate but rather —— well, if the exclusion

18   would be that merely looking at someone else's phone would not

19   fall into the scope of the Court's order, I don't have any

20   problem with that.  That's the first time I'm hearing that

21   argument.  But looking at it ——

22             THE COURT:  Oh, stop.  Stop, stop.  It would be

23   sufficient at this point that he wouldn't have to produce any

24   phones from his wife or children if he submits an affidavit

25   that he has never gotten or received any information relating

1    to StoneX on those devices.  If he can submit that declaration
2    under oath, then those devices wouldn't be required to be
3    produced or examined, at this point, unless something occurs.
4            MR. SHIPMAN:  Your Honor, may I address the Court?
5    This is Howard Shipman.
6            THE COURT:  Well, actually, you're being represented
7    by a lawyer at this point.
8            MS. PETERS-HAMLIN:  You can email me, Howard, if you
9    want to have something said to the Court.
10           MR. SHIPMAN:  My apologies.
11           MR. CHIN:  Your Honor, you made a statement about the
12   iPhone situation that I just need to address.  And we've
13   provided these papers to the Court; they're attached to our
14   February 7th letter.  So the statement that he has disclosed
15   iPhones to us for our inspection, that's not accurate.  The
16   claim by defense counsel that that's what occurred is not
17   accurate at all.  And if you look at the attachments to our
18   February 7th letter, you'll see the first attachment was the
19   declaration that we proposed, where we offered context for the
20   word "device," which you will see —— if you look at it, you'll
21   see was including, without limitation, computers, mobile phones
22   —— there's no mention of a blender.  And then you will see as
23   the second attachment to our February 7th letter the
24   declaration of Mr. Shipman that was submitted —— I don't know
25   —— I think it was seven or eight minutes before our last

N2D1STOC

1    conference, and if you look at that declaration, there's no

2    iPhone listed in it.  So the idea that it --

3             MS. PETERS-HAMLIN:  Yes, but your Honor, Exhibit A and

4    B makes very clear that orally I did ——

5             MR. CHIN:  Please, your Honor, may I ——

6             THE COURT:  No, no.  Stop, stop, stop, stop, stop.  I

7    let some interruptions go, but plainly my ease in dealing with

8    counsel has been misplaced.  I usually don't allow

9    interruptions.  I wait for someone to be finished before

10   calling on someone else.

11            So I'm prepared to take the point that at one point an

12   iPhone or iPhones wasn't disclosed.  Okay.  Then an iPhone was

13   disclosed, at least one, and then there was a dispute about

14   other iPhones in the house.  I'm not prepared to referee an

15   internecine meet-and-confer between the parties to attempt to

16   resolve definitions of terms, and what was or wasn't produced

17   when.  I'm just not at this point.

18            So you were going finish something, Mr. Chin.

19            MR. CHIN:  Your Honor, the position with respect to

20   iPhones has been consistent on the defense part.  It's just not

21   correct that there's ever been a point where the defense has

22   said, there is an iPhone that we're willing to disclose and

23   make available for inspection and here's the model number or

24   whatever, whatever you would need to know to do that.  You'll

25   see when you look at the papers that I've already referred to

N2D1STOC

1    that are attached to our February 7th letter.

2              And then in the email exchange that defense counsel is

3    so anxious for you to review, that — it's a discussion of the

4    phones subject, where defense counsel injected this "none of

5    them have StoneX's proprietary, confidential, and trade secret

6    information."  And so I think the import of the order issued on

7    Friday is now clear that, I mean, any iPhones that are in the

8    possession, custody, or control of Mr. Shipman will have to be

9    disclosed.  But I'm just — I'm just saying that they haven't

10   been prior to this call.  They haven't been —

11             THE COURT:  Okay.

12             MR. CHIN:  — and that's just not an accurate

13   statement by defense counsel to you.

14             MS. PETERS-HAMLIN:  Your Honor, I'm sorry.  Please

15   read Exhibits A and B.  I clearly disclose that there's an

16   iPhone.  They pointedly did not provide to the Court that

17   correspondence where I very clearly did disclose that there is

18   an iPhone.  Because it is redundant of an iPad and there's

19   nothing that can be downloaded onto an iPhone and because it

20   has personal photographs of the family, etc., which would then

21   be in the control of somebody he doesn't even know, we said we

22   do not believe that it's appropriate for you to copy his

23   iPhone.  However, we absolutely disclosed, both orally, in the

24   meet-and-confer conference call, as well as in Exhibits A and

25   B, that he does have an iPhone.  So he's not — he just

1  finished saying to you I never disclosed it.  That's not true.

2            THE COURT:  Okay.  His iPhone, or one or more of his

3  iPhones, would be covered by the order.  And you can work out

4  the protocol for what's not covered on the iPhone, as I asked

5  you to do.  But that would be covered.  The other iPhones of

6  the children and the wife are not covered, providing he

7  provides an affidavit or declaration under oath that he didn't

8  use those iPhones to get or receive any information relating to

9  StoneX.  I think ──

10            MS. PETERS-HAMLIN:  That's perfectly fair.  And I

11  assume that the same applies to computers, that the children's

12  and wife's computers are not covered, as long as he gives you

13  an affidavit that says he's never used them to get or access

14  any ── to get or receive any information regarding StoneX.

15            THE COURT:  Yes.  Do you want to be heard on that,

16  Mr. Chin?

17            MR. CHIN:  Well, your Honor, look, we've been advised

18  that we have a number of children, adult children, I assume

19  minor children.  You know, it's our view that possession,

20  custody, and control would extend, you know, in terms of, in

21  physical terms, to the household.  The Court has, you know,

22  conceivably held otherwise, assuming certain conditions are

23  met.  As we presented in our original filing here ── and I

24  don't believe our original filing here has been resolved by the

25  single affidavit submitted by Mr. Shipman ── there are a lot of

N2D1STOC

1    open questions as to where our data is — our data are.  I

2    think the Court observed in our last conference that

3    Mr. Shipman's declaration did not answer a number of those

4    questions.  So we do have — we have real concerns about where

5    our data has traveled since these issues began to emerge in

6    early December.  But I understand the Court's ruling, and I'm

7    not aware of any basis on which to make an alternative or

8    different ruling with respect to the computers.  I guess our

9    view would be if they are in the household as opposed to an

10   adult children's possession outside the household, we think

11   they should be included.  I think the Court has ruled against

12   us, at least in part —

13            THE COURT:  Right.

14            MR. CHIN:  — assuming certain representations can be

15   made, and we accept that.

16            THE COURT:  Okay.  Fine.  You're right that I ruled

17   against you on that.  These discovery rulings are always

18   subject to revision if what's uncovered in discovery proves

19   that they should be revised.  So on its face, it's reasonable

20   not to inspect the children's and wife's computers or iPhones

21   if the defendant makes the necessary sworn declaration that

22   they were not used to get or receive any information relating

23   to StoneX.

24            I think I've resolved the two open issues with respect

25   to iPhones and the Linode server.  So with those amendments to

N2D1STOC

1   the February 10 order, I don't think that it's necessary to

2   make any other rulings.

3           Now at this point I remain open to any other

4   applications that are made before me, though I'm on the cusp of

5   referring it to the magistrate judge.  But I'll keep the role

6   of referee at the moment.

7           Anything else?

8           MR. CHIN:  Well, your Honor, we were just going to

9   address that.  I mean, we're open to —— I mean, I think

10  whatever the Court's preference is, that we are certainly open

11  to the designation of a magistrate judge for discovery disputes

12  if and when the Court thinks that's appropriate.  And --

13          THE COURT:  I prefer to keep discovery disputes so

14  that I get a sense of who's being reasonable and who's being

15  unreasonable.  These are disputes that should be resolved.

16  When I send it to the magistrate judge, it's all too easy to

17  just rely on the magistrate judge to try and resolve disputes

18  rather than for the parties to resolve them among themselves.

19  For some reason parties think it's easier if they appear

20  unreasonable to the magistrate judge rather than to the

21  district court judge.  So I'll keep it, at the moment.  I

22  eventually have to decide the substantive issues in the case on

23  the preliminary injunction motion so I'll keep the disputes

24  before me at the moment.  But there will come a time, if

25  necessary, that I'll refer it to the magistrate judge.

1          Anything else for me at the moment?

2          MS. PETERS-HAMLIN:  Yes, your Honor.  The thing that

3    my client was trying to say during the conference call and then

4    sent to me by email is, he says that he does believe at one

5    point in time he sent to his wife StoneX benefits and health

6    insurance information from his StoneX account so that she could

7    have it for medical purposes for their children.  I said that

8    he could just include that in his declaration, that that's

9    something that he has done, but other than that, he would have

10   to say that in his affidavit that he has never used their

11   phones or their computers to get or receive any StoneX

12   information.  Obviously sending something to his wife about

13   medical coverage was not within the contemplation of the Court,

14   but he could just address that in his affidavit, and I hope

15   that's correct from your Honor's viewpoint.

16         THE COURT:  Yes.  Yes.  I think that's very

17   forthcoming.  And I appreciate it.

18         MS. PETERS-HAMLIN:  Okay.

19         THE COURT:  Okay.

20         MS. PETERS-HAMLIN:  And I will work before I withdraw

21   from the case, your Honor, to include in the protocols that

22   we've already sent to opposing counsel protocols for the

23   iPhone.  Given that it's now clear from your Honor that he

24   would like the iPhone —— at least part of it, relevant parts,

25   assumably not photographs, but —— the iPhone is to be included

N2D1STOC

1    in the inspection.

2            And I just want your Honor to know ——

3            THE COURT:  I said iPhone or iPhones.

4            MS. PETERS-HAMLIN:  Pardon?

5            THE COURT:  I said iPhone or iPhones.  I mean, if he

6    has more than one.

7            MS. PETERS-HAMLIN:  Yes.  He just has one, your Honor.

8            THE COURT:  Okay.

9            MS. PETERS-HAMLIN:  So I want your Honor to know that

10   when I was talking about, broadly, what "accounts" means and

11   what "devices" means, it wasn't to be cute or adorable.  It was

12   because within a 24-hour turn-around period they wanted him to

13   sign a declaration saying that, and I was asking them to narrow

14   it to the reasonable scope that the Court has just narrowed it

15   to, and I absolutely disclosed to them that he does have an

16   iPhone, he does have an iPad, he does have a Yahoo account.  He

17   said they can examine the Yahoo, they can examine the iPad.  I

18   did say I thought that the iPhone was outside the scope because

19   the same cloud is available on iPad as on iPhone and there

20   really was no reason for it.

21           The other thing I'd like to just bring to the Court's

22   attention is, they also tried to say that they should have

23   access to all of the things remotely until such time as they

24   believe they no longer have a business need, so that would mean

25   that they could come in and out of his computer at any time;

1    CRA could.  I believe that the examination, the standard

2    examination and what the Court has ordered here is that they

3    come to his home, they do the examination of the iPhone, his

4    iPhone, USB, USBs identified, the computers, the accounts, they

5    do it in his home, and they leave.  And I personally would be

6    really spooked if somebody, for however long that they needed,

7    could just remotely access my equipment.  That's something else

8    that they've asked for.  And I believe that's completely

9    unreasonable.  I've never seen any kind of forensic terms like

10   that being ordered by anybody.  Hopefully they will back down

11   from that.  But our concerns were just the overbreadth that we

12   were seeing from them, including his children's iPhones,

13   including his children's computers.  We weren't being adorable,

14   your Honor; we were trying to make sure that this was not

15   beyond the pale and beyond the scope of what was reasonable.

16          So I thank you for taking the time to resolve these

17   matters, your Honor.

18          THE COURT:  I thought that the plaintiff was actually

19   proposing to inspect the devices at some location outside the

20   defendant's home so that they wouldn't be an unnecessary

21   presence at the defendant's home.

22          MS. PETERS-HAMLIN:  No.  He wants it to be done in his

23   home and —— because he doesn't, you know —— the longer that

24   they take his phone, his computer, you know —— he has a study,

25   a separate room where he does his work, where they can do this

N2D1STOC

1    examination.  The longer, you know ── if they travel to some

2    hotel and then come back again, it's just ── deprives him

3    longer.  He's happy to have them come to his home.  I think

4    that's what the stipulation says, very pointedly, that the

5    examination would be done in his home.  The issue is they were

6    then trying ── in coming up with a protocol and asking him to

7    sign a declaration ── and this protocol version that they sent

8    to us said that they would have ── that he had to, you know,

9    disclose the router and everybody that's ever accessed it, that

10   they would be able to have, as long as they had a ── CRA

11   determined they had a business need, they would be able to have

12   remote access.  I mean, it was really over the top.  And --

13           THE COURT:  Could I stop you, please.  I'm not going

14   to resolve the details of the protocols between the parties as

15   to the terms of the CRA examination.  If there is a dispute

16   between the parties, you'll have to bring it back to me or the

17   magistrate judge.

18           MS. PETERS-HAMLIN:  Okay.  Thank you, your Honor.

19           MR. CHIN:  I mean, your Honor, I'm not really sure

20   what to do with all of that.  I think you indicated that you're

21   not going to take it up right now.  I mean, I'll merely say

22   that as the judge, as you pointed out, yes, there was a point

23   at which we suggested for everyone's convenience that we have

24   CRA remove the devices and make the forensic copies at some

25   remote ── someplace nearby so as to be less intrusive.  But I

N2D1STOC

1    think that suggestion was rejected.  We didn't move to compel

2    on that.  I mean, we recognized the stipulation and order says

3    in his home, and, you know, CRA is prepared to do their —— to

4    make their forensic copies, you know, in his home.  That was

5    not something that was agreed to.  So we haven't sought an

6    order from the Court in that regard, and we're prepared to go

7    forward on that point as the existing order provides.

8            THE COURT:  Okay.  There was an issue as to perpetual

9    access, if you will.  And that was an issue that hadn't been

10   raised before.  And I don't know what the positions of the

11   parties are with respect to that.  There was plainly a

12   contemplation of the January 26th order which contemplated the

13   forensic copying of information.  So I don't know what the

14   parties' discussions were with respect to subsequent remote

15   access to the same devices, as opposed to forensic copying of

16   any relevant information that's found.

17           MR. CHIN:  Well, your Honor, I think it's in two

18   pieces, and the piece that —— where we've been arguing about

19   before you today and was the subject of our letter last week is

20   really just the accessing and copying piece.  In paragraph 4 of

21   the January 26th order, after the forensic examination —— so

22   that's —— if you read through that paragraph to, "and to

23   forensically examine those computers, devices, or accounts," if

24   you stop there, I think that's what we've really been talking

25   about thus far.  Now following that, you have to accomplish the

N2D1STOC

1    permanent removal, deletion, and destruction of all copies of

2    StoneX's proprietary, confidential, and/or trade secret

3    information.  I mean, that will have to come after CRA has

4    reviewed their forensic copying, right?  They'll have to look

5    and see what they find.  And, you know, then they will identify

6    or advise that if they found StoneX proprietary information on

7    a certain device, reviewing their copy of it, then we will

8    reengage with the defendant to accomplish the second part of

9    paragraph 4, the deletion or destruction of that information.

10   But we're not there yet.  We can't do that until we've created

11   the forensic copy and CRA has run the searches through those

12   forensic copies to see whether that information is present or

13   not.  I think that's the only follow-on access that I have in

14   mind.  If I'm missing something that the Court is thinking

15   about, I'm happy to address it, but that's the circumstance

16   where there would have to be some further access to

17   Mr. Shipman's devices, accounts, and systems would be if CRA

18   concludes that StoneX's information is present on them.

19             THE COURT:  Okay.

20             MS. PETERS-HAMLIN:  Yeah, I think this question came

21   up because your Honor asked whether there was anything else.

22   What I raised with your Honor is I received a protocol from

23   Daryl Leon and it says that they would be asking for these

24   other things that I mentioned, you know, access to the router,

25   anybody — any computer ever attached to the router, and remote

N2D1STOC

access for as long as CRA determines there is a business need.
That's what they asked for.  And, you know, I assume that
Mr. Chin is indicating that he had no idea that his own team
sent such a request to my client and insisted on that as a
protocol, that they have —— for as long as they unilaterally
determine there was a business need to have remote access.
Obviously, however, in stark contrast, something that we're not
talking about at all is, the provision that I wasn't talking
about at all when I mentioned the protocols that were most
recently suggested, the provision that says after there's been
a determination and copying, if there's a determination that
some of it is confidential information, they will be able to
destroy that or ask for an order for destruction of that.
That's a separate issue.  What I'm talking about is the
protocol sent, copying Mr. Chin, in which they said that they
would have remote access for as long as CRA unilaterally
determines there was a business need.  We're opposed to that.
Your Honor says it's not ripe, that you'll ask us to go back to
the drawing board and try to resolve this.  If that issue
remains an issue, your Honor will address it at that time, and
I accept that.

       THE COURT:  Okay.  It's not before me.

       Anything else?

       MS. PETERS-HAMLIN:  No.  Thank you, your Honor.  I
appreciate the time you've taken.

N2D1STOC

1          THE COURT:  Okay.

2          MR. CHIN:  And nothing else for plaintiffs, your

3   Honor.  If need be, we'll address these protocol issues that

4   are — that have arisen between the parties separately.

5          THE COURT:  Okay.  All right.  Thank you, all.  Great.

6          MS. PETERS-HAMLIN:  Thank you.

7          THE COURT:  Bye.

8          MR. CHIN:  Bye-bye.

9                          o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25