UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
STONEX GROUP INC. and STONEX          :
FINANCIAL INC.,                        :        Case No. 23-CV-613 (JGK)
                                       :
                    Plaintiffs,        :
                                       :
            v.                         :
                                       :
                                       :
HOWARD SHIPMAN,                        :
                                       :
                    Defendant.         :
-------------------------------------------------------------X


**REPLY IN OPPOSITION TO PLAINTIFF STONEX'S MOTION FOR SANCTIONS**


Howard Shipman
15 Tudor Ln.
Trumbull, CT 06611
(203)536-9534
jovejava@yahoo.com
Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... 2

INTRODUCTION ............................................................................................................ 4

PRELIMINARY STATEMENT ....................................................................................... 5

STATEMENT OF FACTS ............................................................................................... 6

I.      Shipman's Employment and STONEX Retaliation ............................................ 6

        A.      STONEX Supervisors and Employees Use Private Encrypted Texting Apps ........ 7

        B.      AMATO Discusses Buying GME Stock Using Private Encrypted Messaging ...... 8

        C.      AMATO Discusses Hiding Dead Bodies Using Private Encrypted Messaging ..... 9

        D.      STONEX Manipulates the Market to Make Money from its Retail Clients......... 10

        E.      STONEX Uses Stolen BTIG Code to Generate Substantial Revenue .................. 11

        F.      STONEX Cultivates a Toxic Culture .................................................................... 13

II.     STONEX Filed Complaint Under a False Premise ............................................. 14

        A.      Darwin Has No Economic Value .......................................................................... 14

        B.      STONEX Expressed No Interest in Resolution for the Relief They Seek ............ 14

        C.      ROBINSON Fails to Establish Chain of Custody ................................................ 15

        D.      CRA Fails to Preserve Evidence During Collection ............................................ 16

        E.      CRA Violates this Court's Order and Leaks Privileged Communications to
                Plaintiffs TWICE .................................................................................................. 18

        F.      CRA Provides 414,113 Files to Review for a Privilege Log ................................ 18

        G.      I do not Possess Darwin Source Code .................................................................. 19

        H.      Plaintiffs Make Numerous Inaccurate Statements and Propose Several False
                Conclusions ........................................................................................................... 20

ARGUMENT .................................................................................................................. 23

I.      Plaintiffs' Original Complaint Is Made with Unclean Hands and Bad Faith.................. 23

II.     Plaintiffs' Have Acted In Bad Faith In Discovery Based On False Premises.................. 24

        A.      Plaintiffs have Ulterior Motives for Filing Their Complaint and for Conducting
                Discovery ............................................................................................................... 24

CONCLUSION ............................................................................................................... 25

TABLE OF AUTHORITIES

*Republic of Turkey v. Christie's Inc.,*
    No. 17-cv-3086(AJN), 2021 WL 1089487, at *1 (S.D.N.Y. Mar. 22, 2021) .........................23

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20, 32-34 (1984) ........................................................................................................25

## **INTRODUCTION**

Defendant, Howard Shipman, respectfully submits this Memorandum of Law in opposition to plaintiffs' motion for sanctions. I do not have legal representation. On July 5, 2023, I declared bankruptcy in the Connecticut Bankruptcy Court. My bankruptcy petition was filed after I incurred large litigation costs for my defense. I have no legal training, and I am relying on the "Instructions for Litigant's Who Do Not Have Attorneys" mailed to me by this Court. This response is made *pro se*.

Plaintiffs have provided only portions of my deposition, in their exhibits. But I believe there are several omitted portions which support my arguments. I have not been provided with a complete transcript, and I cannot afford to purchase a transcript. Also, I have not received or reviewed any preliminary copies, and I could not provide a certification. Plaintiffs agreed to allow me to enter testimony at the end of the deposition, but they have kept the deposition open, and I cannot yet enter my testimony.

I believe my defense would be supported if I could hire a forensics expert to examine the digital images of my devices and computer. They would expose the false conclusions and misstatements in the CRA Report. But I cannot afford an expert.

I believe my defense would be supported if I could cross examine R. CUYLER ROBINSON regarding the several inconsistencies in his report and declarations. But I cannot afford to cross examine ROBINSON.

Since I am untrained in the law and unfamiliar with motion practice, I will use common sense arguments to state my opposition to Plaintiffs motion.

## PRELIMINARY STATEMENT

Plaintiffs' accusations and slanders are false. They employ conjecture, half-truths, and deceits to smear my name in anticipation of their defenses against Regulators for several violations of law.

Furthermore, Plaintiffs' complaint and discovery demands are based on a false premise. Namely, that Darwin is a valuable trade secret. But in fact, Darwin does not have economic value. It lost large sums of money for months.

Plaintiffs are aware of these losses; it's simple accounting. Yet, they have held up the pretense for finding Darwin. Plaintiffs certainly have copies of Darwin which were provided to the I.T. Department in keeping with broker/dealer regulations, and a copy was provided to EVAN PFEUFFER, who discussed his usage of Darwin almost daily.

To compound matters, Plaintiffs' complaint is before this Court with Unclean Hands. Plaintiffs are using Stolen Trade Secrets from BTIG to "generate substantial revenue." Indeed, 2,000 pages of that evidence was preserved and filed with this Court under seal to report or investigate a violation of law. The code contains several references to BTIG, and it even refers to a BTIG employee, Matthew Fitzpatrick, Managing Director of Technology.

Plaintiffs are well motivated for their defenses; penalties could surpass $100 million. So, they ignore our offers to give them relief which they claim to seek, instead choosing to incur more litigation costs. Although a more likely explanation, Plaintiffs are abusing discovery in this complaint, to use for another purpose. Namely, they are searching for information that implicates Plaintiffs of their violations.

On August 7, 2023, Mr LEON, joined my First Meeting of Creditors, for my Bankruptcy Petition, in the US Bankruptcy Court in CT. He asked for details of my SEC Whistleblower Complaint against Plaintiffs. He even asked if I had been contacted by the SEC.

Meanwhile, the Plaintiffs proffered expert, CHARLES RIVER ASSOCIATES ("CRA"), is no expert at all. CRA fails at performing basic tasks such as establishing Chain of Custody, Preserving Evidence, or complying with this Court's Order. Under great pressure from Plaintiffs, they have leaked hundreds of privileged communications, *twice.*

Accordingly, for the reasons stated above and set forth in further detail herein, plaintiffs' motion for sanctions should be denied in its entirety.

## STATEMENT OF FACTS

### I.   Shipman's Employment and STONEX Retaliation

Since December 9, 2022, Plaintiffs have not settled on a reason for my termination. First, JACOB RAPPORPORT, Global Head of Equities, offered me "an opportunity to resign" for reasons of "cultural differences." (Shipman Declaration, Jan 2023, ¶4). Then one month later, on my FINRA Form U5, the reason became "unprofessional interactions with leadership and team," and in the motion just filed by Plaintiffs, they have added "failure to meet deadlines."

For months, I had complained to supervisors regarding conduct and business practices which were in violation of laws and regulations. However, management took no action to address these violations. Then, RAPPAPORT fired me in retaliation. (Shipman Declaration, Jan 2023, ¶¶2-5)

STONEX abuses and violations are prolific across the firm. They conduct themselves with impunity, despite civil penalties such as the Commodity Futures Trading Commission's

6

("CFTC") recent $650,000 fine for Violations of Swap Business Conduct Standards by the CFTC on September 20, 2023.

I have also filed a complaint with the Office of the Whistleblower at the U.S. Securities and Exchange Commission ("SEC") with 64 pages of evidence. The SEC has recently contacted me.

I have also filed a Whistleblower Retaliation complaint under the Sarbanes-Oxley Act with the U.S. Department of Labor ("DOL"). The DOL has also contacted me.

A.       **STONEX Supervisors and Employees Use Private Encrypted Texting Apps**

STONEX Supervisors regularly communicated about business matters over their personal devices using the encrypted texting app, Signal. Signal has a feature which deletes messages after a timeout. This violates duties to maintain, preserve, or produce records to ensure the safety and integrity of the U.S. Markets by their Regulating Authorities. Moreover, this conduct is a violation of federal securities laws.

The pervasive usage of Signal by STONEX Supervisors is particularly treacherous because it is their duty to <u>enforce</u> these obligations among subordinates.

On February 2, 2021, CHRISTOPHER AMATO, Managing Director and Head of Principal Equities Development, and formerly Head of Trading at CITADEL SECURITIES, communicated with EVAN PFEUFFER, Managing Director, formerly Head of Market Making at CREDIT SUISSE and Head Trader of Market Making at UBS SECURITIES.

> PFEUFFER: "I think we are the heaviest signal users in the world, everytime I call someone it's busy"
> (see Exhibit A).

Signal also provides a feature for encrypted voice communication.

Both AMATO and PFEUFFER are licensed by the Financial Industry Regulatory Authority ("FINRA"), and they are both Series 24 General Securities Principals for STONEX. FINRA describes the job functions for General Securities Principals as:

1. Supervision of Registration of Broker-Dealer and Personnel Management Activities
2. Supervision of General Broker-Dealer Activities
3. Supervision of Retail and Institutional Customer-related Activities
4. Supervision of Trading and Market Making Activities
5. Supervision of Investment Banking and Research

On September 27, 2022, the Securities and Exchange Commission ("SEC") fined several trading firms $1.1 billion in total penalties, including 8 firms at $125 million each:

1. Barclays Capital Inc.
2. BofA Securities Inc. together with Merrill Lynch, Pierce, Fenner & Smith Inc.
3. Citigroup Global Markets Inc.
4. Credit Suisse Securities (USA) LLC
5. Deutsche Bank Securities Inc. together with DWS Distributors Inc. and DWS Investment Management Americas, Inc.
6. Goldman Sachs & Co. LLC
7. Morgan Stanley & Co. LLC together with Morgan Stanley Smith Barney LLC
8. UBS Securities LLC together with UBS Financial Services Inc.

**B.**      **AMATO Discusses Buying GME Stock Using Private Encrypted Messaging**

On February 2, 2021, AMATO privately communicated over Signal using encrypted text messaging. He discussed buying and selling stock in GameStop, and he discussed the pricing of stock in GameStop. The stock ticker for GameStop is GME. (see Exhibit B)

AMATO had privileged access to STONEX trading systems. He viewed trading activity and order details from Retail Clients, and he viewed activity and order details from Institutional Clients. This included clients' trading activity in GameStop.

AMATO's private discussions in Signal's off-channel communications were not retained by the firm-sponsored systems. His communications circumvented STONEX's obligations for record keeping. Moreover, AMATO was a supervisor with the obligation to enforce these very rules.

**C.      AMATO Discusses Hiding Dead Bodies Using Private Encrypted Messaging**

STONEX Supervisors maintain a culture of hiding illicit activities from regulators and other authorities. It is considered Business-as-Usual.

On February 9, 2021, a meeting was held by STONEX that included JACOB RAPPAPORT, Global Head of Equities; THOMAS MOORE, Head of Equity Trading; KIET HUYNH, Deputy Chief Operating Officer; AMATO; and PFEUFFER.

During the meeting, AMATO also privately communicated with PFEUFFER in real-time over encrypted text messaging using Signal.

> AMATO: "[Kiet's] abrasive ways are known and whatever you stupidly assigned on an internal doc as a designation has no bearing on our compensation."

and

> AMATO: "* we need him on our side, 'stupid auto fill'"
>
> PFEUFFER: "Well it's partly true, we need initially his help"
>
> AMATO: "Yes, he buried the bodies that are here already. We will give him a fisher price steering wheel for some things so he thinks he has input on them. He has no knowledge base of true market making."
> (see Exhibit C).

9

AMATO frequently used the analogy of "buried bodies" to mean hiding evidence that would implicate the business supervisors.

In the attached exhibits, MOORE is referred to as "TMO". This is because prior to joining STONEX, THOMAS MOORE made his living as a Professional Water Skier who was known by the nickname "TMO". Then, STONEX hired him, and he became Head of Equities Trading, and he officed in Winter Park, Florida.

On May 29, 2022, MOORE accepted an invitation to a private Signal room created by PFEUFFER. The room was named "wake jumpers" in reference to MOORE's experience as a Professional Water Skier. PFEUFFER set messages in the room "wake jumpers" to be deleted after 1 day. This was done so that all discussions about business matters, clients and stock trading would be destroyed beyond recovery. And indeed, discussions covered topics such as Asian ADR trading, the hiring of employees, and anticipated market conditions.

**D.      STONEX Manipulates the Market to Make Money from its Retail Clients**

STONEX Traders manipulate public markets through a practice they called "managing the spread." The spread is the difference in price between buyers and sellers. If the spread is wide, then STONEX Traders can buy stocks at cheap prices and sell them at expensive prices. This results in more profit. If the spread is thin, then there are less profits. STONEX Traders were frustrated when they saw their spreads shrink after smaller legitimate buyers and sellers placed more competitive orders than STONEX. They referred to these smaller buyers and sellers as "pikers," and they boasted about "taking out the pikers" to "manage the spread." This artificially widened the spread and increased STONEX's profits, but at the expense of STONEX's retail public customers, who were filled at inferior prices. STONEX's Traders referred to their retail customers as "dumb flow."

MOORE directed his subordinates to "shear the sheep, but don't kill the sheep." He explained that his traders should take everything they have, but leave just enough, so that they can keep taking from the same retail client, over and over again.

STONEX handles orders from a wide range of clients, such as Fidelity, Trade Station, Santander Bank, U.S. Bank, Flagstar Bank, and RW Baird.[1]

### E.    STONEX Uses Stolen BTIG Code to Generate Substantial Revenue

I filed evidence under seal with this Court to report or investigate a violation of law by EVAN PFEUFFER; whereby he stole source code from BTIG for the economic benefit of its competitor, STONEX. That evidence under seal is approximately 2,000 pages of the source code which PFEUFFER stole. I was authorized to access this code as part of my duties at STONEX.

PFEUFFER joined the PASCAL team and renamed BTIG's source code, then he used it to generate substantial revenue in 2022 (Complaint, ¶17(iv) under FACTS).

PFEUFFER was not tidy when he stole BTIG's trade secrets. He kept numerous references to "BTIG" and their associated numerical values which are used in its algorithms and logic (see examples ECF 51, pp 2-3).

The stolen source code contains a reference and numerical value for "MATT FITZPATRICK" (see ECF 51, p.4). Matthew Fitzpatrick is the Managing Director of Technology at BTIG, and he is responsible for BTIG's software development. Mr. Fitzpatrick is also a member of the firm's Global Operating Committee.

On September 29, 2017, while PFEUFFER was employed at BTIG, he emailed several source code files from his personal gmail account. That source code contained trade secrets with

---

[1] Client routing information is publicly available per SEC Rule 606.

commercial value. Those files were used to generate revenue at STONEX (see examples ECF 51, pp. 9-19, 44-59).

On January 14, 2021, while PFEUFFER was employed at BTIG, and during work hours, he prepared code to steal from BTIG and import it to STONEX. On Google Chat, he explained, "I'm organizing code for our new venture."

On January 15, 2021, the next day, PFEUFFER signed his STONEX Employee Agreement and accepted the new job at STONEX. However, he gave his notice to BTIG weeks later.

On February 8, 2021, PFEUFFER used Signal chat messages to describe the sophisticated technique he used to steal BTIG source code, namely using a "hidden encrypted payload appended to pdf." He also announced his intent to "keep it secret, keep it safe like the ring."

On February 10, 2021, PFEUFFER used Signal chat messages to boast in real-time as he extracted BTIG source code onto his STONEX laptop. He celebrated with the comment, "The eagle has landed."

PFEUFFER kept files and logic in the stolen source code for connecting to other firms (see examples ECF 51, pp. 65-69), even though the team did not connect to those same firms.

PFEUFFER kept files and logic in the stolen source code containing several methods for pricing European Options (see examples ECF 51, pp. 53-54, 59), but the team did not trade options. Moreover, equity options are traded and priced as American Options, not European Options.

STONEX Management is aware of this evidence, and PFEUFFER is still employed at STONEX to generate more revenue for their economic benefit. There has been no Disgorgement.

STONEX managers have not rightfully returned the profits to BTIG, which they made from BTIG's trade secrets.

Previous to STONEX, PFEUFFER was investigated by the New York Attorney General ("NYAG") for market manipulation techniques such as "rip and print." The NYAG has already seen PFEUFFER's code. If they had access to the stolen source code filed with this Court, they would confirm identical features on a line-by-line basis with the code that they investigated before.

The Signal Chat messages and Google Chat messages which are referenced above, have been provided to the Securities and Exchange Commission ("SEC").

### F.   STONEX Cultivates a Toxic Culture

On two occasions, a PASCAL team member referred to Asians as "brownies." I asked him to stop, since I am half-Thai. He did not stop, and I reported this to my manager AMATO, who took no action. (ECF. 71, Defendant Answer and Counterclaims, ¶206).

In September 2021, at a company gathering in Florida, the STONEX Managing Director of Institutional Sales ("AM") asked about my four daughters. He elaborated that he was attracted to underage girls, and that he enjoyed watching the teenage friends of his own children in the swimming pool. I replied that I found this offensive in the presence of my manager. AMATO took no action. (ECF. 71, Defendant Answer and Counterclaims, ¶¶207-212).

In March 2022, during a STONEX corporate-sponsored dinner in Florida, attended by approximately two dozen STONEX employees, AM shouted to me across the room, "When did your daughters become c*nty?" He continued to shout this insult several times while sitting at the same table as my managers, JACOB RAPPAPORT, Global Head of Equities, and THOMAS

MOORE, Head of Equity Trading. My managers took no action. (ECF. 71, Defendant Answer and Counterclaims, ¶¶213-216).

In March 2022, while attending the STONEX Global Summit, I was invited to an afterparty. There, I observed multiple STONEX Traders using cocaine. The next day, I reported this to supervisor MOORE, who took no action. (ECF. 71, Defendant Answer and Counterclaims, ¶¶219-225).

## II.   STONEX Filed Complaint Under a False Premise

### A.   Darwin Has No Economic Value

Since inception of the Complaint, Plaintiffs have emphasized that the computer source code called "Darwin" is the crux for this action before the Court.  It's heavily discussed in Plaintiffs' Preliminary Statement of their Motion.

Yet, as Plaintiffs are aware, Darwin has consistently lost large sums of money over multiple months. Every Darwin strategy was a failure, and every strategy that was deployed accumulated more and more losses. (see Exhibit E, ¶2).  This is not just my opinion, but a simple matter of accounting.

It has been demonstrated that the technique used by Darwin is fundamentally flawed, and it must be abandoned. Moreover, Darwin could not be useful to a competitor, as the competitor would also lose money.

### B.   STONEX Expressed No Interest in Resolution for the Relief They Seek

In March 2023, just weeks after Plaintiffs filed their complaint, we[2] proposed agreement to the terms of a Permanent Injunction, and we were open to hearing their terms if they

---

[2] I use first person plural to indicate through counsel.

disagreed. But Plaintiffs did not respond, they offered no counter, and they chose to incur more litigation fees. (see Exhibit E, ¶3).

On or around April 4, 2023, we offered an agreement that would render the Plaintiffs' Relief moot. But Plaintiffs did not respond, they offered no counter or revision, and they chose to incur more litigation fees. (see Exhibit E, ¶4).

On or around April 17, 2023, we offered to agree to the terms of a Permanent Injunction with *greater restrictions* than the Relief sought in the Complaint, *including stipulations*. But Plaintiffs did not respond, they offered no counter or revision, and they chose to incur more litigation fees. (Exhibit E, ¶5).

On April 26, 2023, in a conference with Magistrate Figueredo, we raised the issue of agreement to the terms of a Permanent Injunction and mootness. Magistrate Figueredo ruled that she could not force Plaintiff to settle. And Plaintiffs were elusive, proposing no context or scenario they would accept.  They offered no counter or revision, and they chose to incur more litigation fees.

### III.     CRA Violates Court Orders and Industry Best Practices to Collect Data

The opinions of Plaintiffs' proffered experts, R. CUYLER ROBINSON and CHARLES RIVER ASSOCIATES ("CRA") should be excluded. Their opinions are problematic for several reasons.

### C.     ROBINSON Fails to Establish Chain of Custody

ROBINSON's very first declarations in Plaintiffs' action begin with false statements. ROBINSON falsely attests that the laptop was shipped to CRA by counsel. In fact, as attached receipt shows, I personally shipped the laptop on December 28, 2022, via Fed Ex addressed to

"Cuyler Robinson" at CRA Offices in Chicago, IL. (see Exhibit D). (Robinson Declaration, Jan 2023, ¶12).

Moreover, ROBINSON seems to rely on hearsay to establish Chain of Custody, even though the FedEx package was addressed to him personally. This raises several questions, regarding who possessed the laptop before ROBINSON, and how much does ROBINSON rely on hearsay for his report.

Because Chain of Custody was not established, the StoneX laptop should be excluded, along with all determinations and analyses derived from it.

**D.     CRA Fails to Preserve Evidence During Collection**

Per the Court Ordered Forensic Protocol (ECF 45), it was agreed that I could observe CRA in my home when they performed their collection, and I did so.

MIKE SMITH and BROOKE GOTTLIEB arrived at my home at 8:05am and 8:14am, respectively. My desktop computer was off.

GOTTLIEB asked, "Should I inventory all of them before analysis?"

SMITH answered, "Not analysis. Collection."

GOTTLIEB seemed misinformed on her duties, or she misunderstand them.

GOTTLIEB began with my iPhone, and SMITH began formatting a collection drive. For 30 minutes, GOTTLIEB seemed confused and was fidgeting with her collection device.

SMITH asked, "Do you need any help?"

GOTTLIEB replied, "I can't figure out how to turn it on."

SMITH pointed to the On/Off switch on the side, and GOTTLIEB turned it on.

GOTTLIEB did not seem qualified to collect digital evidence. She did not understand how to perform simple operations with her collection equipment.

16

Later, SMITH began powering on and off my computer as he attempted to run a program I did not recognize. He cycled the power several times.

Yet, Plaintiffs agreed in the Court Ordered Forensic Review Protocol (ECF 45, ¶2) that:

> "In conducting the forensic review, CRA shall use digital forensic best practices and procedures regarding the collection and handling of digital forensic evidence. This includes the use of procedures that *prevents changes to any sources of digital evidence*, verification that any collected digital evidence is an accurate copy of its source, and preservation of the integrity of any digital evidence CRA collects." (emphasis mine)

According to Forensic Standards published by the National Institute of Standards and Technology ("NIST"), and Forensic Standards published by the International Organization for Standardization ("ISO"), powering on and off a computer changes the digital evidence. This is also common sense. SMITH did not log any of the occasions he powered my computer on or off.

SMITH gave up on that approach and then proceeded to dismantle my computer on the floor of my home office. For over an hour, he searched for the location of the solid-state drive, disassembling and reassembling my computer, over and over again.

It did not seem SMITH was qualified to collect digital evidence on a computer.

Several times, over the course of the day, SMITH would interrupt his collection of evidence, and then he would ask me to log-in to my computer to update passwords to my accounts for remote collection by another CRA office.

I used 1password.com to generate strong, safe passwords under SMITH's observation which he would report back to the other CRA office.

SMITH never updated his Chain of Custody log or any other log, when he asked me to log onto my computer.

17

The desktop should be excluded, since SMITH did not maintain proper Chain of Custody, and he ran an unidentified program on the computer hot, which violated the Court's Order to follow industry best practices and preserve evidence.

**E.      CRA Violates this Court's Order and Leaks Privileged Communications to Plaintiffs TWICE**

CRA have admitted to breaching the Court Ordered protocol on March 29, 2023, when they leaked 530 privileged documents to the Plaintiffs, namely communications with my attorneys. Plaintiffs also admitted they had access to my privileged communications for 1 week. Plaintiffs were asked to provide a full accounting of CRA's violations, so that we could assess the extent to which my defense has been disadvantaged. But CRA refused. We do not know how many CRA employees and managers breached the Court Order. CRA will not cooperate. It is still not clear which of my privileged communications have been viewed by Plaintiffs.

Then, on May 17, 2023, CRA violated the Court Order *for a second time,* and leaked more of my privileged communications to Plaintiffs. They provided no details. They did not answer our questions. They did not describe which files were available to which individuals.

CRA does not appear competent to manage the data in their own analysis.

**F.      CRA Provides 414,113 Files to Review for a Privilege Log**

CRA provided me with 414,113 files to review for privileged information. To protect my Attorney Client Privileged Information, the Court Order requires that I create a privilege log, and identify: (a) Type of document (e.g., letter, memoranda, etc.); (b) Name of author or preparer; (c) Name of recipient; (d) Data of recording or preparation; (e) Description of the subject matter and content of the document sufficient to identify it; and (f) The reason for the claim of privilege and/or exclusion.

Many of the files do not contain sufficient information to complete the privilege log.

The number of files provided by CRA is quite aggressive. I have not received, sent or participated in 414,113 digital communications over my lifetime. CRA would have to *invent* candidates for communication, to create such an extensive log for me to review.

### G.     I do not Possess Darwin Source Code

On June 16, 2023, I answered interrogatories for Plaintiffs. Interrogatory No. 4 stated, "Identify the Locations in your possession, custody or control that contained some, or all, of the Darwin source code at any time from June 1, 2022 through the present," and I answered *pro se,* "Defendant pleads the Fifth Amendment." (see Exhibit E, ¶¶6-8).

I withdraw my invocation of the Fifth Amendment, and I will answer the question plainly: There are no locations in my possession, custody or control that contained some, or all, of the Darwin source code at any time from June 1, 2022, through the present. (see Exhibit E, ¶9).

I recognize that this will appear like a convenient maneuver to obfuscate the truth, so I will elaborate on events surrounding my invocation of the Fifth Amendment. On May 23, 2023, I located several files used in the Darwin project. These are open-source files downloaded from the internet that were used to kick start source code that would become Darwin. I inadvertently collected the open-source files when I collected my personal files from the StoneX company laptop per the Corporate Policy. (see Exhibit E, ¶¶10-12).

On May 24, 2023, I brought the USB device holding these files to the deposition at Proskauer Offices, to deliver them to opposing counsel. I met my attorney at the doors of the Proskauer offices, and we conferred. Then, I remained downstairs while my attorney conferred with opposing counsel. I did not attend the deposition. (see Exhibit E, ¶¶13-15).

At the rescheduled deposition on June 14, 2023, I attended without representation, and I invoked the Fifth Amendment.

> Q: Let me ask you something. Do you understand the consequence of pleading the Fifth Amendment in a civil case?
>
> A: I probably don't, because I'm pro se, but I'm doing the best I can.
>
> (see Exhibit E, ¶16).

I have since conferred with counsel, and I withdraw my invocation of the Fifth Amendment. (see Exhibit E, ¶17).

I am not in possession of any Darwin source code.

## H.    Plaintiffs Make Numerous Inaccurate Statements and Propose Several False Conclusions

PFEUFFER was provided with a copy of Darwin. He tried to use a calculator he called "Dynamo" (Shipman Declaration, Jan 2023, ¶¶64-66).

The I.T. Department were provided with a copy of Darwin to satisfy the record-keeping requirements of the Broker/Dealer. A systems administrator assisted me in creating an archive, and I provided the archive to him. This was done so he could save it on a Write-Once Read-Many ("WORM") storage drive to satisfy the record-keeping requirements.

Darwin was also stored and backed up on servers in Azure.

I did not transfer 87 megabytes of data out of StoneX's systems. I did not use computer commands to transfer data (which is a theatrical leap from their own report.)  On December 9, 2023, I ran a training session for two new quantitative researchers and PFEUFFER (Shipman Declaration, Jan 2023, ¶67). Since the team was working remotely, the meeting was conducted using video streaming from a server named "corvo-004." Video streaming consumes heavier

20

bandwidth. The video streaming service was running when STONEX violently disconnected my

access, interrupting the performance of my End of Day duties and Server Migration. I do not

know the state of my End of Day duties, Server Migration or Video Streaming Service after I lost

access.

      I did not use "anti-forensic" efforts to obscure, alter, or destroy data.

      I did not alter the system clock of the StoneX Laptop for any purpose of obfuscation or

obstruction.

      As Plaintiffs know, files in the "StoneX Docs" folder cannot be destroyed. They are

updated in real-time to StoneX's file server. As a broker/dealer, StoneX is required to retain files

for 7 years. Plaintiffs may view all files in this folder, including all previous versions. Plaintiffs

already know there is no source code in those folders. There were only personal files which I was

allowed to collect per StoneX policy. This is another inflammatory accusation based on a lie.

      I do not recognize the command "sys.dat" and I did not run it to delete BTIG source code

as claimed. The source code evidence is preserved on my computer now. I filed this evidence

with this Court under seal solely for the purpose of reporting or investigating a suspected

violation of law.

      I have not used "sdelete" or any other "wiping" program for purposes of obfuscation or

obstruction.

      I did not create "an anti-forensic playbook", nor did I use one for any purpose of

obfuscation or obstruction.

      Early this year, I used TOR Browser to consider submitting a Whistleblower Complaint

to the Office of Letitia James, New York State Attorney General. The Whistleblower Portal

recommends using TOR Browser to make submissions. I reconsidered and did not submit my

complaint. However, I have since prepared a complaint which I am finalizing, and I will submit it to her office next week.

In Exhibit B, CHINN has omitted a large portion of my deposition, (pages 533 to 556) which answers allegations about Robocopy and Durango. I must use my memory, since I do not have the transcript from that deposition, nor can I afford to purchase the transcript, nor have I seen a preliminary copy of the transcript to certify.

In the omitted sections that CHINN has moved to strike, CHINN's questions were puzzling because he seemed to accuse me of using "Robocopy" to copy files from a USB device onto the StoneX laptop. Out of politeness, I asked if he was certain he had the direction correct, which he said he did. But that direction is nonsensical.

In Plaintiffs Motion, CHINN does not address or discuss the issues with direction of the copies. Regardless, I do not recognize "Robocopy," and I did not use "Robocopy" for any purpose of obfuscation or obstruction. CRA makes this allegation in the context of changing the date and time, but this is also nonsensical. In the report, they describe how "Robocopy" can be used "to preserve timestamp metadata of files and folders." (Report, ¶39, footnote 11). In CRA's proposed construct, that would obviate the need to change the system clock in the first place.

VirtualBox was used for quality assurance and testing. These reasons are listed on the VirtualBox website. As explained to CHINN, VirtualBoxes were created and rebuilt over and over again, to test new features in the performance of my duties.

The Linode Server was redeployed per the Court Order, and CRA was given a username and password to take a full image.

We agreed to provide devices, but they contain privileged communications. During discussions after the CRA's 2nd Breach of the Forensic Protocol, we committed to providing to

CRA if they remediated the issues of the 2nd Breach that leaked my privileged communications to Plaintiffs.

Plaintiffs incorrectly list devices or accounts that have already been provided. Plaintiffs are attempting the recollection of data that they have already collected.

I did not destroy forensic evidence before, during, or after I lost access on December 9, 2023. I was conducting a server migration while performing my regular duties.

Plaintiffs request for Privilege Log is insincere. In last conference with Magistrate Judge Figueredo, recognizing that 414,113 files is quite ridiculous, they stated in Court that they "are not looking for it at this time."

Plaintiffs make false and misleading statements regarding the retirement of a "corvo-004". Those statements are covered and addressed in my first declaration (see Shipman Declaration, Jan. 2023, ¶¶10-31).

## ARGUMENT

### I.      Plaintiffs' Original Complaint Is Made with Unclean Hands and Bad Faith

The equitable doctrine of unclean hands is an "ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." (*Republic of Turkey v. Christie's Inc.*, No. 17-cv-3086(AJN), 2021 WL 1089487, at *1 (S.D.N.Y. Mar. 22, 2021)

Plaintiffs used stolen BTIG Trade Secrets to generate substantial revenue.

Plaintiffs were aware their complaint was made with Unclean Hands.

Darwin has no economic value. Darwin has no commercial value.

Darwin does not derive independent economic value by not being generally known or readily ascertainable.

Darwin is not a Trade Secret.

Plaintiffs are aware that Darwin does not have economic value.

Plaintiffs are aware that Darwin is not a Trade Secret.

## II.    <u>Plaintiffs' Have Acted In Bad Faith In Discovery Based On False Premises</u>

Plaintiffs misled this Court with pretense when they came to this Court with their Complaint. Their discovery actions were not demanded under the auspices of good faith or true premises.

I would offer the Court an analogy (although, probably an inartful one.)

Consider a wealthy homeowner who discovers his house is infested with termites. Wouldn't we be surprised if he accused his gardener of stealing his termites? And if he filed a lawsuit against his gardener, and if he travelled to the gardener's home with thirty experts to thoroughly search the gardener's home at great expense, then wouldn't we also be surprised?

However, consider one further detail: if we learned that before the wealthy homeowner made his accusations, that our gardener discovered several dead bodies buried in the garden, and that he collected evidence to report to the local constable, perhaps now, we would understand the actions of the wealthy homeowner.

Moreover, the expense was the choice of the wealthy landowner, and it was not proportionate to the value of the termites.

### A.    **Plaintiffs have Ulterior Motives for Filing Their Complaint and for Conducting Discovery**

Plaintiffs are facing the potential for several penalties from their violations of regulations and law. The penalties are significant, possibly greater than $100 million.

In response, Plaintiffs have retained LLOYD CHINN, co-head of the Whistleblowing & Retaliation Group at PROSKAUER ROSE LLP. From the description found on their website, www.proskauer.com/practices/whistleblowing-retaliation:

> Proskauer's Whistleblowing & Retaliation Group is at the forefront of *defending* and investigating highly sensitive whistleblower claims. (emphasis mine).
>
> We regularly *defend* cases before federal and state courts and at all levels of the U.S. Department of Labor ... (emphasis mine).

Mr. CHINN makes regular posts to the website www.whistleblower-defense.com.

On June 12, 2023, at a conference with Magistrate Judge Figueredo, Mr. CHINN initially sat down at the defense table.

Plaintiffs are preparing their defenses for violations of regulations and law.

Indeed, if Plaintiffs' complaint is based on false premises, and they have repeatedly shown no interest in Relief, then what is the goal of Plaintiffs' discovery except for another purpose?

The United States Supreme Court has recognized that there is no right to use pretrial discovery from one case for another purpose. (*Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32-34 (1984).

## **<u>CONCLUSION</u>**

Plaintiffs' motion for discovery sanctions must be denied. Throughout this action, Plaintiffs have emphasized Darwin as the crux for their discovery, including this Motion. But Plaintiffs have manufactured a faux zeal for Darwin, since it has no economic value. Their effort to discover Darwin is disproportionate to the worth of Darwin. This effort was their choice after we made several attempts to offer them Relief they were seeking, but they did not respond, counter, revise or otherwise amend.

Plaintiffs are desperate to find evidence and materials in defense of their several violations of regulations and laws, and they are trying to stick me with the bill.

Secondly, Plaintiffs' proffered expert, CRA, is not credible. They could not conduct basic procedures like Chain of Custody or Data Collection. They flouted Court Orders that required them to follow best practices and protect privileged information. Their report contains many conjectures, inconsistencies and half-truths; their conclusions are not sound.

For the foregoing reasons, defendant, Howard Shipman, respectfully requests that plaintiffs' motion for sanctions be denied in its entirety, together with such other and further relief as this Court deems just and proper.


Dated: October 19, 2023
Trumbull, CT

/s/ Howard Shipman
15 Tudor Ln.
Trumbull, CT 06611
(203)536-9534
jovejava@yahoo.com